# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

SHANNON HUNT and LANETTE JOHNSON,

individually and on behalf of all others similarly

situated,

|                                    1:22-cv-04744

Plaintiff,

- against -

The Kroger Co.,

Defendant

# SUPPLEMENTAL DECLARATION OF ANDREA LYNN MATTHEWS, PH.D. IN

# RESPONSE TO THE DECLARATION OF DR. ROBERT PALMATIER

Pursuant to 28 U.S.C. § 1746, I declare:

1. I have been retained by counsel for the Plaintiffs in this matter. If called upon to testify, I would and could testify competently to all such subject matter in this expert report.

2. I previously wrote a declaration and export report dated April 5, 2024 (the "Matthews Report"), which documented and reported on the results of a consumer survey that I created and analyzed with William Ingersoll, Ph.D., of Phillips, Fractor, & Company, LLC ("Phillips Fractor"). I provided my qualifications, as well as the list of other cases in which I testified as an expert at trial or by deposition during the previous 4 years, in the April 5 Report. I provided my updated CV and list of cases separately.

3. In the April 5 Report, we concluded that 32.7% of consumers of over-the-counter lidocaine patches indicated that they believed that the Kroger brand Maximum Strength Lidocaine patches (the "Product") delivered more lidocaine than do other over-the-counter lidocaine patches and the same amount or more lidocaine as do prescription-strength lidocaine patches; 84.6% of consumers of over-the-counter lidocaine patches indicated that they believed the Product at least somewhat blocks and numbs nerve pain receptors and at least somewhat reduces responses to painful stimuli; and 88.5% of consumers of over-the-counter lidocaine patches indicated that they believed the Product would adhere to the wearer's skin for at least 5 hours after being applied. Further, we concluded that removing the statements "Maximum Strength," "Desensitize Aggravated Nerves," and "Up to 8 Hours of Relief" from the image of the front of the package, and "Use one patch for up to 12 hours" from the Drug Facts panel image from the label statistically decreases the likelihood that consumers of lidocaine patches believe each of the above statements about the Product. Finally, we concluded that that a vast majority of consumers overall and past purchasers of Kroger brand products 1) would prefer to purchase a lidocaine patch that delivered the maximum amount of lidocaine available in patch form compared to a patch that delivered less than the maximum available in patch form, 2) would prefer to purchase a lidocaine patch that completely blocks and numbs nerve pain receptors compared to a patch that does not completely

block or numb nerve pain receptors, and 3) would prefer to purchase a lidocaine patch that adheres for 5 to 7 hours or for at least 8 hours, compared to a patch that adheres for less than 5 hours.

4.      I understand that Defendant submitted the Expert Report of Dr. Robert Palmatier (the "Palmatier Declaration"). Plaintiffs' counsel asked me to review and address that portion of the Palmatier Declaration that relates to the April 5 Report regarding consumer perceptions and materiality.

5.      The Palmatier Declaration disputes the April 5 Report by lodging multiple criticisms regarding the methodologies used in our consumer surveys. In this reply, I address why the Palmatier Declaration is incorrect in its critique of the Matthews Report's methodology, does not indicate proper understanding of the questions relevant to the court, and needlessly contributes more confusion rather than clarity to the case.

## I.      EXECUTIVE SUMMARY

6.      The following are some of the more glaring flaws in Dr. Palmatier's criticisms of our survey methodology. We discuss these and other flaws more in-depth throughout this Reply Report.

7.      First, Dr. Palmatier Declaration repeatedly demonstrates a misunderstanding of the relevant task for the Matthews Report litigation survey. The Matthews survey was designed to assess whether there is consumer confusion that arises from particular wording on the Product's label, and whether a product that contains a particular attribute is more desirable than a similar product that does not contain that particular attribute. However, the Palmatier Declaration's critiques are built on the false assumption that the appropriate question is instead centered around whether or not the participant notices a particular aspect of the product label. Although the Palmatier Declaration critiques might be plausible in an academic or business setting, where questions about what captures consumers' attention in the marketplace are of interest, they are irrelevant in this litigation context and only serve to add confusion.

8.      To illustrate this common misunderstanding about the purpose of the Matthews

Report further, I will pull from an analogy used in the Palmatier Declaration. Paragraph 57 of the Palmatier Declaration discusses the common image of a needle in a haystack. What the Palmatier Declaration fails to acknowledge, however, is that the purpose of the Matthews Survey would be more analogous to asking if consumers believe the needle in the haystack is sharp; the Matthews survey is *not* seeking to identify if consumers can find the needle in the haystack. Therefore, in order to gather information about consumers' perceptions of the needle in the haystack, the needle needs to be pointed out to them.

9.     Second, Dr. Palmatier Declaration makes the often repeated but easily rejected criticism that the surveys discussed in the Matthews Report are "extremely biased, not scientifically valid, and do not provide reliable support." This criticism is inherently false, and also stems from Dr. Palmatier's misunderstanding of the types of research questions the Matthews Report was designed to address.

10.     Third, the Palmatier Declaration frequently demonstrates a misunderstanding of what constitutes "bias" in a survey. A survey is biased if the answers it obtains are either systematically too high or systematically too low than what is true in the population. Any actions that do not lead to consumers selecting a response option that is systematically different than what is true in the population are not biasing. None of the design decisions I made in my survey would lead to an underreporting or overreporting of the true answers in the population with regard to either consumers' understanding of the meaning of the allegedly deceptive phrases on the Product label, or whether or not consumers would prefer one product versus another.

11.     In the rest of this reply, I first address the fundamental error in the Palmatier Declaration's assumptions about the research question at hand. Specifically, I discuss how the research question I was asked to address is fundamentally different from the types of marketing research questions often addressed in the academic and business literature. Following the overview of fundamental differences in understanding, the rest of this reply follows the Palmatier Declaration structure and addresses each of the opinions presented, in order.

## II.     FUNDAMENTAL MISUNDERSTANDING

12.     The Palmatier Declaration repeatedly demonstrates a misunderstanding of the relevant task for the Matthews Report litigation survey. Dr. Palmatier's claims are largely based on misunderstandings regarding my research goals, as my study is aimed at gathering data to answer a legal research question that is very different from the types of marketing research questions often addressed in the academic literature.

13.     Specifically, my task was to obtain correct, reliable, and precise estimates of consumer perceptions regarding how much lidocaine consumers believed to be present in the Product, how long they believed the Product adhered, and the extent to which they believed the Product blocked and numbed nerve receptors. The criticisms raised by the Palmatier Declaration indicate an entirely different research topic. Specifically, the criticisms of the product label experiments tend to focus on purchase choice, market conditions, and label salience. Although these criticisms might be valid if the research were trying to address the business question of "is this label component useful for purchase decisions," these criticisms are not relevant for questions about consumer perceptions of different label attributes or consumer choices between otherwise identical products that differ on one attribute of interest.

## III.   THE DISTRACTOR TASK DOES NOT BIAS THE SURVEYS

14.     In the first Palmatier Declaration opinion, Dr. Palmatier incorrectly conflates salience of a topic with bias in a survey, and incorrectly assumes that questions on a thematically similar topic will be inherently biasing. First, it is not biasing to raise the topic of topical anesthetic products. Raising a topic and asking questions about a subject matter of interest is not biasing; it is focused questionnaire design. This point is made at length by Jacob Jacoby in Chapter 12: "Are Closed-Ended Questions Leading Questions" in the seminal work, "Trademark and Deceptive Advertising Surveys" edited by Diamond and Swann (2012), which Dr. Palmatier has cited in his declaration. Per Dr. Jacoby:

a)   "All questions necessarily lead respondents to think in terms of the subject matter posed by the question – sometimes, regarding issues the respondent might not have considered

without being stimulated by the question. That is the primary and necessary function of survey questions – to focus the respondent's thoughts on the issue of interest. The alternative to asking questions that guide thought is for the questioner to stare at the respondent hoping that, somehow, someday, the respondent will spontaneously provide an answer to the question the researcher has in mind.

b) "What makes a question a leading question is that it does more than cause a respondent to think in terms of the subject matter posed by the question; it also guides or biases the respondent to answer one way rather than another. This can be accomplished in one of two general ways – either by making one or more responses (or response options) more likely to be selected than others, or by making one or more responses (or response options) less likely to be selected than others. All questions lead respondents to think; this does not make them leading questions. It is only when a question leads you to answer one way rather than another that it is considered leading. As the passages from authorities on legal evidence cited earlier indicate, when a (closed-ended or open-ended) question does not lead the respondent to select one response over others, it is not a leading question."

15.     Asking respondents about their likelihood of purchase of a fictional topical anesthetic product should not in any way impact consumers' perceptions of a different lidocaine patch product, specifically, how much lidocaine is present in said product, how long that product adheres to a wearer's skin, and the extent to which that product blocks and numbs nerve pain.

16.     Our research was specifically focused on the meaning that respondents took from the allegedly deceptive phrasing on the package (e.g. "Maximum Strength,"), and not on whether or not consumers noticed or paid attention to the wording in a purchase setting. Therefore, increasing the salience of a topical anesthetic in no way biases the study.

17.     Furthermore, the only attribute that is similar across products is that the hypothetical product is "for the temporary relief of pain." If this hypothetical product caused any bias, it would be to bias respondents in the materiality survey toward selecting a product that said that it temporarily relieved pain, as this language would be more salient than language regarding

a product that completely blocked and numbed pain receptors. Thus, if our distraction task caused any bias, it would be in the opposite direction of that alleged by Plaintiff. None of our other surveys involved language about the temporary relief of pain. Knowing that a sunscreen product temporarily relieves pain should not in any way bias respondents when they are answering a question regarding how much lidocaine is in a lidocaine patch, how long a lidocaine patch adheres to a wearer's skin, or the extent to which a lidocaine patch blocks and numbs nerves.

18. Finally, asking respondents about their likelihood of purchase of a fictional product is unrelated to asking their perceptions regarding the meaning of allegedly deceptive phrases, as none of these questions ask consumers about their likelihood of purchase, so there is no way that the distractor task could have biased the deception study. Further, asking consumers how likely they are to purchase a sunscreen product is unlikely to impact their decisions in a choice task involving two nearly identical lidocaine patch products. There is no reason to believe that asking about purchase intentions regarding a sunscreen would cause respondents to either be more likely or less likely to select a lidocaine patch that has the maximum amount of lidocaine, that adheres for a longer time period, or that blocks and numbs nerve receptors.

19. We are therefore confident that our distractor task did not bias respondents and that, instead, it served as a scientifically valid and reasonable way of lessening the likelihood that respondents would believe that the survey was conducted for litigation purposes without impacting the quality of responses to later questions.

20. Similarly, the Palmatier Declaration statement that, "the Distractor Task is highly relevant to the Surveys, almost as if the Distractor Task was purposefully designed to increase respondents' awareness of key aspects of the Surveys"[1] is utterly inaccurate. I did not design the distractor task to increase awareness of key aspects of the Surveys. In fact, I specifically designed the distractor task to *avoid* including any product aspects that would actually bias respondents. Specifically, *none* of the three product attributes in question in this matter (i.e., (1) the amount of

---

[1] Palmatier Declaration at ¶¶ 30

lidocaine present, (2) the length of adherence time, and (3) the extent to which it blocks and numbs nerve receptors) is a feature of the distractor task. Therefore, participants are not going to be primed to believe that a product should contain any of these aspects, and are not going to be primed to choose a product that contains any of these aspects over one that does not contain these aspects.

21. Likewise, the Palmatier Declaration statements that "the Distractor Tasks will lead to bias in the responses to subsequent questions by <u>increasing the salience of these issues and connections</u>,"[2] and "Priming...is especially problematic when a logical case can be made that, by making certain mental content more or less salient, the survey has tilted the results in favor of the side sponsoring the survey,"[3] incorrectly assumes that if a feature is made salient, that it is inherently biasing. However, it is impossible for a survey to collect data about a topic without making it salient.

22. Salience is only biasing if one is collecting data on *whether or not* consumers would *notice and pay attention to* a particular phrase without the researcher calling attention to it. However, that is not the research question our surveys were addressing. Thus, increasing the salience of lidocaine in the survey by discussing a lidocaine product in the distractor task does not bias the rest of the survey.

23. Further, the Palmatier Declaration is incorrect in the assessment that, "The Distractor Task makes the Surveys unreliable since it provides very relevant cues to the characteristics of the study, where to get information, and what features to use to make purchase decisions. In addition, the Distractor Task provides 'demand characteristics.'"[4]

24. Instead, the Distractor Task makes the surveys more reliable since it effectively distracts respondents from believing that the survey is being conducted for litigative purposes. Any cues that it provides are related to the product context of the survey, which does not in any way lead to bias regarding consumers' answers about what they believe the allegedly deceptive text on

---

[2] Palmatier Declaration at ¶¶ 31, see also VI.A.
[3] *Ibid*
[4] Palmatier Declaration at ¶¶ 32

the Product label is communicating about the Product, or whether they would be more likely to purchase a lidocaine patch Product that contains certain attributes versus a product that does not. If any bias existed, it would only be in the question regarding consumers' preferences toward a lidocaine patch that completely blocked and numbed nerve pain receptors versus one that provided temporary pain relief – and in this case, the bias would be in the opposite direction to that alleged by Plaintiff. Thus, the Distractor Task is scientifically valid and not biasing.

25.     Additionally, while it may not be common practice in survey design to use a distractor task, most surveys are not conducted for litigation purposes and therefore do not need to distract respondents from who the sponsor of the study is. Further, this sort of distractor task is scientific best practices in experimental research that needs to disguise the research objectives from participants. We therefore apply scientific best practices from experimental research to our study. It is important to ensure that any potential bias due to respondents guessing the nature of the survey (i.e. for litigation purposes) be prevented. Therefore, we chose to use a distractor task of the sort commonly employed in experimental research (Allen 2017) to make respondents think that the study was for a different purpose.

26.     The above reference specifically refers to the entry, "Deception in Research" written by David Dryden Henningsen (https://methods.sagepub.com/Reference/the-sage-encyclopedia-of-communication-research-methods/i4142.xml) in our discussion on this point. Our distractor task is designed to make consumers believe that the purpose of the survey is to conduct traditional market research on behalf of a company that is engaging in new product development, rather than litigation. This is a form of ethical misdirection in research based "on the need to avoid biased responses by participants."

27.     For instance, the entry states, "Researchers can create false impressions in participants using a variety of different methodological techniques" such as "deceptive task instructions" and "manipulating the events that occur during the participant's research experience." By first asking respondents questions about a fictional new product, we mislead consumers into believing that the entire survey is a standard, traditional marketing research survey.

It is ethical to mislead participants when 1) there is not an alternative, nondeceptive means of attaining the results, and 2) when the benefits that accrue from the research outweigh the reasonably foreseeable potential costs that may result from the use of the deceptive technique. Both of these points hold in this context, as there is no nondeceptive way of making consumers believe that the survey is not for litigation purposes, and there are very few costs that would be incurred by misleading consumers regarding the existence of a fictional potential new product.

28.     In contrast, it is essential that respondents NOT believe that the survey is for litigation purposes. Per Diamond (2011), survey instruments should not provide either explicit cues or implicit cues about the survey's sponsorship or the expected responses (p. 266). If respondents believe that a survey is conducted for purposes of litigation, it will likely create demand effects. This distractor task is thus an important method to combat bias by making it less likely that respondents would think that the questions presented after the distractor task are for litigation purposes.

29.     Furthermore, it is inaccurate to say that the distractor task "is 'in the direction' of the Plaintiff's underlying research question.'"[5] If any bias were introduced, it would be in the *opposite* direction of the Plaintiff's underlying research question. The statements "topical anesthetic" and "the back of the package states" would only cause respondents to focus on the topics at hand, not to be any more or less likely to give a specific answer to any different question.

30.     The fact that we ask how likely individuals would be to purchase a given product in no way biases people toward being more, or less, likely to purchase a different product. The only attribute that is similar across products is that the hypothetical product is "for the temporary relief of pain." If this hypothetical product caused any bias, it would be to bias respondents toward selecting a product that said that it temporarily relieved pain, as this language would be more salient than language regarding a product that completely blocked and numbed pain receptors. Thus, if our distraction task caused any bias, it would be in the opposite direction of that alleged

---

[5] Palmatier Declaration at ¶¶ 32

by Plaintiff.

## IV. FOCUSING RESPONDENTS' ATTENTION ON THE SPECIFIC ISSUE BEING MEASURED IS GOOD QUESTIONNAIRE DESIGN, NOT BIASING

31.     As discussed previously, salience and bias are not the same. Instead, it is good questionnaire design to ensure that the researcher is collecting data on the research question of interest. Our questions would be biased if we had instead focused respondents' attention on a particular answer category in a question, which we carefully avoid doing through balanced design of our answer categories.

32.     Thus, when the Palmatier Declaration discusses my intentional survey design, it is correct to indicate that the instructions "focuses respondents' attention to the feature being measured"[6] to "increase the feature's salience."[7] However, this is evidence of strong survey design.

33.     It is indeed true that the purpose of repeating the text in the instruction was to increase its salience to respondents and, in fact, to specifically ensure that respondents were answering the question about what the claim in question communicated to them. This is because the purpose of our study was to test what consumers believed the claim in question was communicating, and one cannot test what consumers believe a claim is communicating if they have not seen or paid attention to the claim. Our study follows correct scientific procedures to collect this data.

34.     The Palmatier Declaration's argument incorrectly conflates two issues: whether or not consumers notice the claim in question on the package, and what consumers believe that the claim in question is communicating. The goal of this study was not to identify whether or not consumers see, read, or pay attention to the phrases in question when purchasing the product. The goal of this study was to identify what consumers believe that the text in question is communicating about the product. In order to measure what consumers believe about a given message, consumers

---

[6] Palmatier Declaration at ¶¶ 37
[7] *Ibid* ¶¶ 42

clearly first must read the message in question.

35.     One cannot test what consumers believe a claim means if they have not read it or seen it. Thus, it is important in our experimental study design to ensure that ALL consumers in the control condition paid attention to the claim in question. We did this by calling attention to the allegedly deceptive claim. We can then statistically compare the proportion of individuals with incorrect perceptions about the product across the two conditions and know that any difference between the two is ONLY due to interpretations of the claim, and NOT conflated with whether or not they saw the allegedly deceptive claim. Thus, we separate out the individual effect in question (was the claim deceptive) from the effect of whether or not consumers saw the claim to begin with.

36.     Similarly, although the Palmatier declaration criticizes the Matthews survey for showing a single respondent three consecutive images, followed by different instructions,[8] the allegation of bias due to demand effects is utterly baseless. The three questions asked were about three different aspects of the product: the length of time it adhered, the amount of lidocaine present, and whether or not it desensitized aggravated nerves. There is no reason to believe that answering any of these questions would impact the response that consumers gave to any of the other questions. Further, the order of these questions was randomized across respondents, so there is no possibility of bias due to order effects.

37.     In addition, even if the questions were biased, the amount of bias would be similar across the experimental conditions and so would be held constant in our statistical analysis. Thus, our statistical analysis that found a difference in respondents' perceptions regarding the product across conditions would hold.

38.     The Palmatier Declaration's conclusion about repeating information in the instruction text[9] and the importance of showing an entire product label[10] being "improper methodology" is also inaccurate and comes from a quote taken out of context. In particular, the

---

[8] Palmatier Declaration at ¶¶ 43
[9] Palmatier Declaration at ¶¶ 44
[10] *Ibid.* at ¶¶ 45

conclusion that the survey design is "improper" misuses a quote from a highly regarded source on survey design. Specifically, the quote is taken from a section of Diamond (2012) that refers to incorrect structuring of open-ended question. It is completely irrelevant for closed-ended question design.

39.     The larger context of this quote reads, "Finally, earlier questions in a survey can provide a context for a question that influences the pattern of answers that respondents are likely to give to the questions that follow…The court pointed out that the plaintiff's survey questions asking respondents, "What does the ultrasound do?" and "What is the benefit of ultrasound?" focused the attention of the respondents on ultrasound. The court concluded that these questions may have stimulated ultrasound responses that did not reflect the message respondents took from the commercial." This passage is talking about whether or not respondents gave an answer about ultrasound to these questions ("stimulated ultrasound responses") which is a relevant point for an open-ended question but not for a closed-ended question where ALL of the responses relate to the topic that is raised in the question wording.

40.     Recall also that our research question pertained to what a reasonable consumer would believe about the particular phrases that appeared on the Product's packaging, rather than about what messages the packaging conveyed in the context of the marketplace. That is, our question was highly specific, and only about certain aspects of the Product's packaging. Furthermore, our research question had to do with whether a reasonable consumer believed that particular phrases held a particular meaning. This type of research question is best operationalized with a closed-ended question. Thus, open-ended question design, which the Diamond quote in the Palmatier Declaration discussed, is irrelevant for the topic of our assignment.

41.     Note also that it is impossible to accurately measure a concept without asking about it, as previously explained at length above (Diamond and Swann 2012). We were specifically testing whether respondents' understanding of the product's attributes differed when the claims in question were included versus when they were excluded from the packaging. Such questions accurately and precisely focus respondents on the phrasing about which the research questions

revolved. However, this focusing did not lead respondents to be more or less likely to indicate that the product contained a certain amount of lidocaine, adhered for a certain length of time, or blocked and numbed nerve pain receptors to a given extent. Our survey questions were properly designed, based on scientific best practices for the relevant research question.

## V.    THE SURVEY CONTROL WAS APPROPRIATE

42.    The Palmatier Declaration makes a puzzling assertion that the Matthews control condition(s) varied in two ways, rather than a single way.[11] Contrary to the Palmatier Declaration assertions, it would also have been methodologically inappropriate if the text in the instructions had not been updated appropriately to reflect the conditions of the experiment.

43.    The Palmatier Declaration's false "distinction" between the product text and instructions text again reflects the Palmatier Declaration's conflation of the two research questions of 1) whether or not respondents saw and paid attention to the claim on the product label, and 2) what they believe that the claim communicates, if anything. Again, only the second was the focus of our perception study. There are many cases in experimental research where a scenario has multiple distinct aspects that are manipulated from the test condition to the control condition if those aspects are all manipulating one construct. For instance, in my own published academic work in the Journal of Business Research and the Journal of Public Policy and Marketing (see the Matthews CV for full references), my peer-reviewed experiments involved changing multiple sentences and descriptions in a single scenario that collectively manipulated a single construct (e.g. "authenticity.")

44.    In this lidocaine experiment, it was important to call consumers' attention to the phrasing in question in the control condition to ensure that all respondents were able to accurately state their perceptions of what, if anything, the phrase in question communicated about the product. As such, the manipulation consisted of using the phrases "Maximum Strength," "Up to 8 Hours of Relief," and "Desensitize Aggravated Nerves" in both the product label and the instruction

---

[11] Palmatier Declaration at ¶¶ 46-54

wording in the control condition, and removing the relevant phrases in the experimental condition from both the product label and the instructions. This was a correct and appropriate manipulation design that tested the single construct of what consumers believed that the phrasing in question communicated about the product.

45.     Similarly, despite the Palmatier Declaration's assertion to the contrary, it is accurate to say that consumers' perceptions about the product were caused by the labeling change. The fact that respondents' attention was purposefully drawn to the relevant component of the label does not introduce any other external factors that could have caused the change in respondent perceptions. Repeating the exact same wording from the label in the instructions does not add a new variable that is being measured; it merely ensures that all respondents are answering the focused question of, "what does this particular language mean in the context of this product label?"

46.     As mentioned previously, the Palmatier Declaration frequently demonstrates a mistaken assumption about the purpose and task of the Matthews report and survey. When the Palmatier Declaration discusses what "no academic or business research" would do,[12] the assertion clearly demonstrates confusion regarding the difference between "academic or business" research questions and legal research questions done for the purposes of assessing consumer deception and materiality, following standards set out by the FTC and other governing bodies. This study is designed to answer a distinct legal question: "what do consumers believe that an allegedly deceptive claim communicates about the product?" Assessment of the "true" effects of features "in the marketplace," which would be typical research topics for academic and business research, is irrelevant for the specific task for use in a legal setting. We correctly designed an experimental study that would collect data to answer this specific legal question, not to answer more common marketing questions studied by most academic and business researchers.

47.     Similarly, the Palmatier Declaration's discussion of an experiment for joint pain medicine[13] is incorrectly used and inapplicable. The discussion from the Palmatier Declaration

---

[12] Palmatier Declaration at ¶¶ 53
[13] Palmatier Declaration at ¶ 53

conflates giving of a drug and beliefs about efficacy based on statements made about the drug.

48.     Instead, our study would be like showing two different patients two drug labels. One patient would see a label have it pointed out to them the fact that the drug states that it is for joint pain AND the drug's name. The other patient would see an edited label that removes the joint pain claim and having pointed out to them only the drug's name. The only thing that is different across these conditions is the claim about the drug being for joint pain.

49.     In the hypothetical instance of pointing out the drug name or the purpose of the drug, the only difference in perceptions about the ability of the drug to stop joint pain is, in fact, the claim made about the product being for joint pain. This is a correct design for measuring whether or not consumers' perceptions of the product's ability to stop joint pain is impacted by their perceptions of the meaning of the statement that the product is for joint pain and not conflating this feature with whether or not consumers were given the drug as well. In a similar way, our study does not conflate whether or not consumers notice the wording on the package with what they believe the relevant claims on the package are communicating, if anything.

50.     The Palmatier Declaration is also incorrect in saying, "There is no scientifically valid reason for using different language in the instructions before the test and control conditions…this inexplicable design choice, by itself, invalidates Survey 1."[14] Our design is scientifically valid and follows best practices for measuring consumer perceptions of the meaning of a particular phrase, which necessitates that consumers indeed see and interpret that phrase in the test condition.[15]

## VI. THE MARKETPLACE CONDITIONS THE PALMATIER DECLARATION DESCRIBES ARE IRRELEVANT FOR THE TASK

51.     As mentioned previously, the Palmatier Declaration frequently demonstrates a mistaken assumption about the purpose and task of the Matthews report and survey. This mistaken

---

[14] *Ibid.* at ¶ 54
[15] Additionally, including the text in the instructions facilitates the use of screen-readers and therefore contributes to ADA compliance and standards.

interpretation about the purpose is further reflected in the discussion of whether Survey 1 met marketplace conditions. Our research question for the perception survey was what, if anything, consumers believed that a given phrase on the Product label (e.g. Maximum Strength) was communicating about the Product's attributes (e.g. amount of lidocaine in the product). As such, we included the full front label to ensure that the phrase in question was shown in context, as well as the full Drug Facts panel, as many consumers tend to check the Drug Facts panel to give them relevant information about the attributes of medication products. We therefore sufficiently replicate marketplace conditions to ensure that our results are meaningful.

52.     Additionally, no survey can precisely replicate marketplace conditions. Although it is important for methodology to mirror marketplace conditions as closely as possible, it is also good experimental design to present a focused experimental stimulus to respondents so as to avoid cognitive overload. As a survey methodologist and academic marketing researcher, I therefore seek to present consumers with questions and experimental stimuli that are *most representative of their experience*, while still ensuring that the experiment is scientifically valid.

53.     Furthermore, it is not good experimental design to include elements in the stimulus that would not impact consumers' perceptions of the label statements, even if these elements would increase marketplace realism. For instance, it would add nothing (and would rather detract from) the experiment to play music in the background while respondents are taking the survey, even though most retail stores play background music. Similarly, showing the product situated on a display shelf would increase the marketplace realism, but would only lead to random noise and distraction by the respondent as the presence of a shelf should have no impact on the meaning communicated by a particular phrase on the Product label.

54.     In a similar manner, the parts of the label not displayed to respondents should have no impact on the meaning communicated by specific phrasing on the front label and Drug Facts panel of the Product. Therefore, the Palmatier Declaration's assertion that the Matthews Survey

not using the entire package leads to bias[16] is inaccurate.

55.     As previously discussed, focusing respondents on "relevant issues" in the case is not biasing unless it makes it more likely or less likely that respondents will give a particular answer to the question. We chose to show the entire front of the package, as well as the drug facts panel, as these are the two components of the package where the allegedly deceptive claims are made.

56.     We were not measuring how a consumer would evaluate the entire Product in an actual shopping experience; we are measuring consumer interpretations of specific claims made on the Product label. We do not believe that being able to see the top and sides of the product, or the non-Drug Facts portions of the back label (which do not make any allegedly deceptive claims) would fundamentally change the way in which respondents interpret the allegedly deceptive claims. For instance, there is no reason to believe that picking up a box in a store and looking at its top and sides would somehow change how respondents interpret the phrase "Maximum Strength," compared to how they would interpret the phrase based on looking at only the front and drug facts panel of the same product.

57.     Furthermore, the appellate court quote that the Palmatier Report uses to discuss which product aspects should be included in a survey[17] should be taken in full context. In its complete context, the quote discussed reads,

a)  "Respondents were shown an empty bag of the defendant's product, folded into quarters so that only the illustration of the crabgrass was visible, and concealing that part of the package that emphasized the product's focus on stopping crabgrass before it started. As the court of appeal stated, '[t]he survey thus elicited information about the consumer's reaction to an isolated part of the packaging, when the relevant issue in a false advertising case is the consumer's reaction to the advertisement as a whole and in context.'"

58.     This quote is therefore speaking to the need to show the entire front of the package,

---

[16] Palmatier Declaration at ¶¶ 55-56
[17] Palmatier Declaration at ¶ 58

and not to withhold important information from respondents that is present in the same visual image (e.g. a package's front label). We followed these guidelines by showing the entire front of the package and the entire Drug Facts panel, which were the relevant parts of the label that communicated the allegedly deceptive claims. In other words, my survey followed survey design best practices.

59.    The Palmatier Declaration's additional discussion of ways that my survey does not precisely duplicate market conditions continues to demonstrate that Dr. Palmatier misunderstands my assignment and the research question that my perception study successfully addressed. Our research question was what consumers believed was being communicated by a specific allegedly deceptive phrase on the front of the Product label and/or Drug Facts panel. The question of "how consumers would behave with the full Product package in the marketplace" is irrelevant to my assignment.

60.    My research question was successfully answered by presenting the front of the Product label and Drug Facts panel to consumers, as these aspects of the label were the parts of the product packaging that presented the allegedly deceptive phrasing, and asking them what they believed to be true about the product. We then compared respondents' answers statistically by randomly assigning a different set of consumers to view an identical set of images that were edited to remove the allegedly deceptive phrasing. To ensure that respondents were specifically answering what the phrase in question was communicating, their attention was drawn to that specific phrase (e.g. "maximum strength") in the original label condition as well as to control text ("Lidocaine Patch") while consumers' attention was only drawn to the control text ("Lidocaine Patch") in the control condition. In this way, we successfully assessed the impact that the allegedly deceptive text had on consumers' perceptions about the Product's attributes. This method is scientifically valid as it showed the entire front of the Product label and the entire Drug Facts panel, which are the only portions of the product that contained information that should systematically impact consumers' perceptions of the product's attributes.

## VII.  OUR MATERIALITY PREFERENCE SURVEYS APPROPRIATELY FOCUSED

**CONSUMERS ON THE LABEL COMPONENTS AND ARE NOT BIASED**

61.     The Palmatier Declaration's claims that my preferences studies are biased[18] continue to demonstrate the misunderstanding of bias and focus. This is not a leading design. The fact that both of the lidocaine patches feature that they are "Maximum Strength" means that this aspect is being held constant across both patches. Therefore, any benefit accrued due to being "Maximum Strength" is being assigned to both product alternatives. We did focus respondents on the specific feature that was being tested, as the purpose of the preferences survey was to assess whether or not respondents valued the attribute in question. It is impossible to assess whether or not an attribute is valuable to respondents if they are not asked about it specifically. As such, we called respondents' attention to the attribute that they were asked about in a particular question. This is focused survey design, not bias.

62.     Similarly, the Palmatier Declaration confuses loaded language in the survey instructions with whether or not the attribute in question is, in fact, material and important to the target population.[19] Our research question in this preference study was to assess whether or not consumers care whether or not a lidocaine patch possesses one particular attribute or a different attribute. These attributes were drawn from the language of the complaint. The question we were assigned to answer in the maximum strength condition was, "does delivering the maximum amount of lidocaine matter to consumers, and do consumers care whether the lidocaine patch is, in fact, equivalent or superior in efficacy and results to all other patches?" Since this is the question that we were tasked with answering, we designed the question to present the option in a non-leading and non-biased way by randomly presenting the order in which the options were shown, and by using similar language to describe the two products except for the attribute that was different across the two options.

63.     The fact that our question wording itself is not loaded or biasing can be seen more clearly by looking at the question wording of the two materiality contexts that Dr. Palmatier does

---

[18] Palmatier Declaration at ¶ 61
[19] Palmatier Declaration at ¶¶ 65-68

not cover in depth: the length of time that the patch adheres to the wearer's body, and the extent to which the patch blocks and numbs nerve pain receptors versus temporarily relieves minor pain. The first of these uses no positively or negatively valenced language at all, but rather presents three lengths of time that a product could adhere to a body. The Palmatier Report's conclusion that this language is "loaded" stems entirely from his agreement that a product that adheres for longer lengths of time is more desirable than one that adheres for a shorter length of time.

64.　　　The second uses the words "completely blocks and numbs" and "does not completely block or numb" as positive and negative language. The Palmatier Report's conclusion that this language is "loaded" is based on the interpretation that positive actions (completely blocking and numbing) are better than negative actions (not completely blocking or numbing). However, the opposite might be the case, depending on the attribute in question.

65.　　　 As an illustration, one can consider an equivalently worded question with identical instructions for a different attribute. If we had asked respondents to consider two identical products that only differ in one way, that it typically caused feelings of nausea for "less than 5 hours," for "between 5 to 7 hours," and for "at least 8 hours," the "obviously correct" answer (less than 5 hours) would be the opposite response of that assumed in this case.

66.　　　Similarly, if we asked respondents to consider a product that "completely blocks taste receptors in the tongue," versus a product that "does not completely block taste receptors in the tongue, but instead temporarily reduces minor pain due to spicy food," it is not "obvious" that consumers would choose the "positively valenced terminology" option (completely blocks taste receptors) as Palmatier Report alleges. This example indicates that the Palmatier Report's problem is not with the question wording itself, but rather is identifying that the characteristic we are testing is indeed material to respondents since it is so important that Dr. Palmatier recognizes that it would "obviously" impact consumer buying behavior.

67.　　　Therefore, as we find in our reliable, valid survey, consumers do tend to have preferences for lidocaine patches that have more rather than less lidocaine, adhere for longer rather than shorter time periods, and block and numb nerve pain receptors rather than temporarily relieve

minor pain.

68.     In addition to the above points, while we disagree that the words "superior" and "is not equivalent or superior" are inherently loaded but rather are the product attributes that we were tasked with testing, the Palmatier Declaration fails to identify specific language that qualifies as "loaded" when assessing the "Desensitized Aggravated Nerves" and "Length of Adhesion" scenarios. Therefore, even if there were bias in the "Maximum Strength" scenario, the conclusion that the entire preference survey is unreliable and unusable is overstated; there is no specific loaded language that is found to be present in the "Desensitized Aggravated Nerves" or "Length of Adhesion" scenario.

69.     The Palmatier Declaration's discussion of the alleged "trivialization" of the buying process and "duplication of the marketplace" [20] again completely misses the point of the preference questions. These preference questions were designed to establish baseline preferences for lidocaine patch products in general that contain a particular attribute (e.g. adheres for at least 5 hours) compared to those that do not contain that attribute (e.g. adheres for less than 5 hours). Our survey succeeded in its goal. Packaging and brand context for this part of the study are irrelevant to the question at hand. Much high-quality research is to some extent unrealistic in order to focus on the variables of interest to the study. This does not render these studies unable to speak to the attitudes, perceptions, and behaviors of people in real-world contexts.

70.     Our study was properly focused and narrow, as its goal was to identify, holding all other variables constant, whether or not consumers had a preference for lidocaine patch products that 1) contains the maximum amount of lidocaine that is available in patch form versus patches that do not; 2) adhere for at least 5 hours versus patches that do not; and 3) completely blocks and numbers nerve pain receptors versus patches that do not. We were not attempting to measure consumers' purchase intentions in the marketplace while accounting for all possible factors that might impact purchase intentions. We were attempting to identify whether or not a given attribute

---

[20] Palmatier Declaration at ¶¶ 70-72

is important to consumer purchase decisions in isolation, and we succeeded in our objectives. This valid foundation would be built upon by a properly conducted price premium conjoint analysis in the future, which we could do if requested.

71.     Additionally, the Palmatier Declaration mistakenly applies standards for surveys measuring *deception* to surveys measuring *materiality* in his discussion of whether the preference survey is useful for drawing conclusions about the Product.[21] These two different research topics require different approaches. The text referenced by the Palmatier Declaration is titled "Trademark and Deceptive Advertising Surveys: Law, Science, and Design," and its introduction specifically states the research questions that are covered by its survey design guidelines: "Are consumers likely to be confused as to the source of a trademark or likely to be deceived by a commercial message? How can we know unless we examine consumer reaction?" (p. 3).

72.     The guidelines of this text are applicable to surveys where the goal of the survey was to identify what consumers believe to be true about a product based on a particular allegedly deceptive message, such as the perception survey we conducted. Its guidelines are not applicable to the question of whether or not a particular product attribute impacts consumer decisions regarding product choice. As a survey methodologist and academic marketing researcher, I always seek to present respondents with questions and experimental stimuli that will help me to collect accurate, valid data that address the specific research question at hand. The goal of my preference study was to identify whether consumers prefer one of two identical products that only differ in one feature. As such, my decisions are scientifically defensible – and in fact, reflect best practices.

**VIII. AN APPROPRIATE CONSUMER UNIVERSE AND SAMPLE WAS USED**

73.     Despite the Palmatier Declaration's claims otherwise,[22] my study's population was properly chosen and defined. We defined our population as adult US individuals 1) who were at least 18 years of age, 2) who were residing in the United States, and 3) who had purchased lidocaine patches at least once in the past 12 months for their personal use. Our goal was to assess

---

[21] Palmatier Declaration at ¶ 73
[22] *Ibid* at ¶¶ 74-75

what "reasonable consumers" perceived about the product, and their preferences for products with different attributes, holding all other factors constant. We controlled for region of the country and found no significant differences in either consumers' perceptions of or preferences for lidocaine patches based on region.

74.     Dr. Palmatier's assertion that we "failed to represent the relevant consumer universe" by using a national sample instead of a sample drawn from just Illinois residents is not valid. Unless Illinois consumers are fundamentally different from other national consumers in their perceptions of and preferences for lidocaine patches, of which there is no statistical evidence in our study, a national sample is reasonable for assessing what "reasonable consumers" believe. We did use a national sample rather than a sample of only Illinois consumers, as we did not (and do not) believe that consumers who live in a particular region of the country are significantly different in how they interpret labels or in their product preferences compared to individuals who live elsewhere in the country.

75.     At the same time, we empirically tested these hypotheses of similarity by including a demographic "region" variable in our logistic regression analysis, and found no statistically significant differences in either consumer perceptions or preferences based on region of the country. Therefore, our survey accurately represents the perceptions and preferences of "reasonable consumers" in Illinois, as well as other areas of the United States and we can reasonably conclude that Illinois consumers are similar in their perceptions of and preferences for lidocaine patches with different amounts of lidocaine, length of time of adherence, and ability to block and numb nerve receptors.

76.     The Palmatier Declaration's assertion that my study found differences between Kroger shoppers and non-Kroger shoppers merits a more nuanced discussion. As stated in my report, the results pertaining to Kroger-brand purchasers and non-Kroger-brand purchasers shoppers reflect very small absolute sample numbers: 12 out of 26 individuals who saw the original Product label were confused on the Maximum Strength claim, while 11 out of 19 individuals were confused on the edited claim. It is methodologically inappropriate to compare these two numbers

to make statistical arguments about whether or not groups are different from each other. Thus, we focus on the results of our logistic regression, in which we control for whether or not individuals are previous Kroger shoppers while testing the impact of the label statements on consumer perceptions regarding the product. These regression analyses show that, controlling for whether or not someone is a Kroger shopper, the "maximum strength" statement has a statistically significant impact on consumers' perceptions regarding how much lidocaine is present in the product.

77.     Similarly, the Palmatier Declaration's assertion about the Matthews Declaration's reliability[23] ignores methodological and statistical best practices. This survey is reliable for drawing conclusions about the perceptions of reasonable consumers, including Kroger shoppers. Regressions controlling for whether or not an individual is a Kroger shopper consistently found a significant impact of the allegedly deceptive claims on consumer perceptions.

78.     Further, for two out of the three perception claims, as well as all three tests regarding the importance of different attributes to purchasers of lidocaine patches, the results are NOT different for Kroger Shoppers compared to the overall sample. Specifically, there is no significant impact of having previously purchased Kroger brand lidocaine patches on perceptions regarding length of product adherence or the extent to which the product blocks and numbs nerve pain receptors. Further, there is no difference in preference for lidocaine patch products across any of the three attributes for Kroger shoppers versus the overall sample. As such, even if there is a difference between Kroger shoppers and the overall sample on perceptions of the "Maximum Strength" claim, the survey is reliable for drawing conclusions about consumer perceptions regarding the claims "Desensitize Aggravated Nerves" and "Up to 8 Hours of Relief," as well for consumer preferences regarding lidocaine patches.

79.     The Palmatier Declaration is also incorrect when it claims that we do not discuss results for individuals who had purchased from Kroger.[24] My report discusses all of the results of the analysis. For instance, these numbers are presented in the conclusion (paragraphs 210-214) as

---

[23] Palmatier Declaration at ¶ 83
[24] Palmatier Declaration at ¶ 84

well as in the survey results section (paragraphs 33-34). In addition, we state in paragraph 61 that "individuals who had previously purchased the Kroger brand were more likely to believe that the Product delivered more lidocaine than do other over-the-counter lidocaine patches and the same amount or more lidocaine as do prescription-strength lidocaine patches (log-odds B=0.940, p=.002)."

80.    We focus on the results of our regression analysis rather than univariate statistics, however, as this is the set of statistical tests that leads to our conclusions that, controlling for a respondent's status as a Kroger shopper, seeing the statement "Maximum Strength" statistically significantly impacts respondents' perceptions regarding how much lidocaine is present in the product. We present the full regression output in the April 5 Report Appendix D for transparency.

81.    Additionally, the other methodological questions that the Palmatier Declaration claims to raise are addressed extensively in the report. For example, to address the concern about individuals who take a long or short amount of time,[25] as stated in my report, we specifically controlled for "speeders" and individuals who took a long time to answer the survey (individuals at the 10th and 90th percentile of length) in our regression results. Our findings regarding consumers' perceptions about the product and preferences for the product thus control for the length of time the respondent spent on the survey. Further, a full data quality review was conducted by Qualtrics prior to the data being provided to us, in which 109 individuals were identified as low quality respondents or bots and removed by Qualtrics' quality assurance team, while those which are left were considered to be of high quality by the Qualtrics team.

## IX. THE SURVEY QUESTIONS WERE BALANCED AND UNBIASED

82.    The Palmatier Report is incorrect in its assessment[26] of how I constructed the answer categories that include how long a consumer might expect a patch to adhere to the wearer's skin after being applied. I did not hold an a priori view regarding which categories of answers were going to be classified as "deceptive" in our analysis.

---

[25] Palmatier Declaration at ¶ 86
[26] Palmatier Declaration at ¶¶ 87-89

83.     Instead, I constructed a set of balanced response options around the claims on the box: "Up to 8 Hours of Relief" on the front label, and the claim "Use one patch for up to 12 hours" from the Drug Facts panel image. Thus, I had two numbers from the label that served as anchors for the creation of a balanced answer category set. I therefore created five substantive answer categories that placed the answer of "8-11 hours" (which is the average between the two anchors presented on the box that was represented to us as being the correct product label) in the middle of the scale. I then created answer categories that were both greater and smaller than these numbers in roughly equal intervals, ending with a 5-point balanced scale that correctly reflected possible answers that were higher than and lower than the statements given on the label.

84.     The final answer options thus 1) started at a minimum value (less than five hours), 2) proceeded upward in roughly equal intervals, and 3) ended at a maximum value (16 or more hours). Thus, the scale is balanced, correctly designed, and not biased.

85.     The specific set of response options that were designated as deceptive for our analysis is an independent assumption we were given apart from our survey design. We could have, using the same balanced answer scale, accurately reported the percentage of consumers who believed that the product adhered for at least 12 hours, for less than 8 hours, or the percentage of consumers who stated that the product label was not communicating anything. Our analysis approach does not in any way make our survey design biased.

86.     Furthermore, the Palmatier Declaration's argument that a small number of responses in final selection indicates "bias"[27] incorrectly conflates the design of a question prior to data collection with the results of that data collection afterward. The fact that the answer distribution is not balanced says nothing about whether the scale itself was designed in an accurate way. As an example, one can consider an actual scale from published peer-reviewed academic literature on customer-directed deviance (Darrat et al. 2010, 2017; Schwepker and Good 2022), which includes exemplar items such as "I have used deception to make a sale," and "I have

---

[27] Palmatier Declaration at ¶ 91

knowingly sold a defective product/service" with scale options from "Never" to "Daily" on a 7-point scale. This scale is balanced, as the range of options from "Never" to "Daily" is roughly equal and goes from a minimum to a maximum possible – as do our answer options in this question. However, the mean value of answers on this scale in Schwepker and Good (2022) was 2.05 on a 7-point scale, indicating an (unsurprising) extreme imbalance towards ethical behavior. This clearly does not reflect a biased scale, but rather an actual distribution in the data. In the same way, our data do not reflect a biased scale, but rather the fact that a large majority of respondents believed that the claims on the box indicated that the product would adhere for at least 5 hours.

## X.    THE PRICE PREMIUM STUDY, IF CONDUCTED, WOULD BE RELIABLE

87.    We have not yet been requested to perform a price premium study. If we were to do so, the methods laid out in our proposal would result in reliable, valid, precise measurements of the amount that consumers would be willing to pay for a given attribute present in the product. The methods proposed in our report (conjoint analysis and hedonic regression analysis) are often applied and accepted in litigation and academic work to estimate the value of specific attributes.

88.    We have been asked to assume that the product in fact adheres for less than five hours. As such, the correct difference in value to measure is between a product that adheres for less than five hours and a product that adheres for at least five hours. Dr. Palmatier's statement that "there is nothing on Defendant's Product related to 'at least 5 hours'" is thus irrelevant.

89.    However, if there is another legally relevant measurement to use, or if new evidence arises, the instrument could be adjusted to capture that effect. For instance, it could measure how much consumers would pay for a product that adhered for eight hours, and/or how much consumers would pay for a product that adhered for twelve hours, compared to a product that lasted for five hours or a different amount of time. This measurement would offer specific insight into the actual economic impact on consumers of their perceptions that they were purchasing a product that adhered for a given length of time.

90.    Since Dr. Palmatier fails to identify any problems with any other proposed

attributes to be tested in the price premium study, it is clear that the proposed methodology is adequate for identifying insight into the Product's actual economic impact on consumers across all proposed dimensions. We therefore stand by our proposed methods.

## XI.   CONCLUSIONS

91.     Our surveys followed academic and scientific best practices, which yielded high quality results that present accurate, precise estimates of what is true in the larger consumer population. We stand by our conclusions as presented in our original report and in this Reply that the amount of lidocaine delivered by the Product, the ability of the Product to completely block and numb nerve pain receptors, and the length of time the Product adheres to the skin matters to a sizable proportion of the target market for the Product, and that there was significant confusion with regard to the amount of lidocaine found in the Product, the ability of the Product to block and numb pain nerve receptors and reduce responses to painful stimuli, and how long users can expect the Product to adhere to the wearer's skin for its target market, including past purchasers of Kroger brand products.

Respectfully submitted on September 19, 2024 in Wichita, Kansas.

A. Lynn Matthews, Ph.D.

**References**

Allen, Mike (2017), *Sage Encyclopedia of Communication Research Methods*: SAGE.

Darrat, Mahmoud, Douglas Amyx, and Rebecca Bennett (2010). "An investigation into the effects of work–family conflict and job satisfaction on salesperson deviance." *Journal of Personal Selling & Sales Management* 30.3: 239-251.

Darrat, Mahmoud A., Douglas A. Amyx, and Rebecca J. Bennett (2017). "Examining the impact of job embeddedness on salesperson deviance: The moderating role of job satisfaction." *Industrial Marketing Management* 63: 158-166.

Diamond, Shari (2011), Reference Guide on Survey Research. In *Reference Manual on Scientific Evidence*: Third Edition: Federal Judicial Center/National Academy of Sciences.

Diamond, Shari and Jerre B. Swann (2012). *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*: American Bar Association.

Schwepker Jr, Charles H., and Megan C. Good (2022). "Salesperson grit: Reducing unethical behavior and job stress." *Journal of Business & Industrial Marketing* 37.9: 1887-1902.