EXHIBIT A

Page 1

1          UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
    ----------------------------------------X
3   SHANNON HUNT and LANETTE JOHNSON, individually and
    on behalf of all others similarly situated,
4
                        PLAINTIFFS,
5
6        -against-   Case No.:
                        1:22-cv-04744
7
8   THE KROGER CO,
9                       DEFENDANT.
    ----------------------------------------X
10
11                DATE: May 13, 2024
12                TIME: 2:03 P.M.
13
14
15        DEPOSITION of the Plaintiff, LANETTE
16   JOHNSON, taken by the Defendant+, pursuant to a
17   Subpoena and to the Federal Rules of Civil
18   Procedure, held remotely, at all parties' location,
19   before Karyn Chiusano, a Notary Public of the State
20   of New York.
21
22
23
24
25

Page 2

1    A P P E A R A N C E S:

2

3    SPENCER SHEEHAN & ASSOCIATES
        Attorneys for the Plaintiff
4       SHANNON HUNT and LANETTE JOHNSON,
        individually and on behalf of all others
5    similarly situated
        60 Cutter Mill Road ~ Suite 409
6       Great Neck, New York 11021
        BY: SPENCER SHEEHAN, ESQ.
7       spencer@spencersheehan.com

8

     GORDON, REES, SCULLY, MANSUKHANI, LLP
9       Attorneys for the Defendant
        THE KROGER CO.
10      101 W. Broadway ~ Suite 2000
        San Diego, California 92101
11      BY:   KIRSTEN M. GOUGH, ESQ.
            DIANE WEBSTER, ESQ.
12      kgough@grsm.com
        dwebster@grsm.com

13

14

15

16
            *      *      *
17

18

19

20

21

22

23

24

25

Page 3

1    F E D E R A L   S T I P U L A T I O N S

2

3

4     IT IS HEREBY STIPULATED AND AGREED by and between

5    the counsel for the respective parties herein that

6    the sealing, filing and certification of the within

7    deposition be waived; that the original of the

8    deposition may be signed and sworn to by the witness

9    before anyone authorized to administer an oath, with

10   the same effect as if signed before a Judge of the

11   Court; that an unsigned copy of the deposition may

12   be used with the same force and effect as if signed

13   by the witness, 30 days after service of the

14   original & 1 copy of same upon counsel for the

15   witness.

16

17    IT IS FURTHER STIPULATED AND AGREED that all

18   objections except as to form, are reserved to the

19   time of trial.

20

21              *     *     *     *

22

23

24

25

Page 4

1   L A N E T T E        J O H N S O N, called as a

2   witness, having been first duly sworn by a Notary

3   Public of the State of New York, was examined and

4   testified as follows:

5   EXAMINATION BY

6   MS. GOUGH:

7         Q.      Please state your name for the record.

8         A.      Lanette Johnson.

9         Q.      What is your address?

10        A.      ████████████████████████████████

11  ████  ████████.

12        Q.      Good afternoon Ms. Johnson.

13              My name's Kirsten Gough.  I represent

14  Kroger in this case, and I'll be asking questions

15  this afternoon?

16              Can you state your name for the record,

17  please?

18        A.      Lanette Johnson.

19        Q.      I'll go over some ground rules before

20  we get started.  The Court Reporter is here taking

21  down everything we say so that we get a clear

22  record.  It's important that you let me finish my

23  question before you begin your answer, okay?

24        A.      Yes.

25        Q.      And it's also important that you give a

1    verbal answer because she can't take down nods or

2    shakes of the head, okay?

3         A.     Yes.

4         Q.     And you understand you're under oath

5    today?

6         A.     Yes.

7         Q.     Do you understand that means you must

8    tell the truth?

9         A.     Yes.

10        Q.     And you'll do that for us today?

11        A.     Yes.

12        Q.     Are you taking any medication that

13   would interfere with your ability to provide

14   accurate testimony today?

15        A.     No.

16        Q.     Is there anything else, medical or

17   otherwise, that would effect your ability to testify

18   today?

19        A.     No.

20        Q.     If that changes at any point today, you

21   have to tell me right away; is that okay?

22        A.     Yes.

23        Q.     And we'll plan to take a break about

24   once every hour so about 3:00 P.M. Eastern -- 2:00

25   P.M. Eastern or 1:00 P.M. Central, we'll plan to

```
 1   take a break.  If you need a break sooner, just let
 2   me know, okay?
 3        A.    Yes.
 4        Q.    If you need to take a break, I just ask
 5   that if I asked a question, you provide the answer
 6   before we go on a break; is that fair?
 7        A.    Yes.
 8        Q.    If you don't understand any of my
 9   questions, will you let me know?
10        A.    Yes.
11        Q.    And if you need me to clarify or
12   rephrase one of my questions, will you at the time
13   me know?
14        A.    Yes.
15        Q.    And if you need to clarify or update or
16   change any of the answers you give today, that's
17   okay.
18              Will you just let me know that you need
19   to do that?
20        A.    Yes.
21        Q.    That way we can get truthful, complete
22   and accurate testimony, okay?
23        A.    Yes.
24        Q.    And if you answer my question, I'm
25   going to assume that you understood what I'm asking
```

```
                                          Page 7
 1   you, okay?
 2        A.    Yes.
 3        Q.    Have you had your deposition taken
 4   before?
 5        A.    No.
 6        Q.    Have you ever testified in court?
 7        A.    No.
 8        Q.    I'm going to introduce our first
 9   exhibit today.
10              (Whereupon, Defendant's Notice of
11   Deposition of Plaintiff Johnson was marked as
12   Defendant's Exhibit 1 for identification as of this
13   date by the Reporter.)
14        Q.    Can you see that document?
15        A.    Yes.
16        Q.    It says Plaintiff -- I'm sorry.
17              It says, "Defendant's Notice of
18   Deposition of Plaintiff Johnson."
19              Do you see that?
20        A.    Yes.
21        Q.    Have you seen this document before?
22        A.    No.
23        Q.    I'm going to scroll to the second page.
24              Do you see where it says, "Requests For
25   Production of Documents"?
```

```
                                                     Page 8
 1           A.      Yes.

 2           Q.      Number 1, it says, "All DOCUMENTS read,

 3    reviewed, considered, and/or relied upon by YOU to

 4    prepare for this deposition."

 5                   Did you bring any sort of documents

 6    related to that first bullet point?

 7           A.      No.

 8           Q.      The second one says, "YOUR current

 9    resume or curriculum vitae."

10                   Did you bring a resume or CV with you

11    today?

12           A.      No.

13           Q.      Number 3 says, "To the extent not

14    already produced, all DOCUMENTS in YOUR files and/or

15    otherwise in your possession, custody, or control

16    that are responsive to Defendant's first set of

17    requests for production of documents."

18                   Did you bring any of those documents

19    with you today?

20           A.      No.

21           Q.      Fair to say that you did not bring any

22    documents to your deposition today?

23           A.      No.

24                   MS. GOUGH:  Let me rephrase that.

25           Q.      Did you bring any documents with you
```

```
                                                      Page 9

 1   today?

 2          A.      No.

 3          Q.      You said your address it --

 4                  MS. GOUGH:  Okay.  We can stop sharing

 5   this.

 6          Q.      You said your address is 411 Oneida

 7   Street in Joliet.

 8                  For how long have you been living

 9   there?

10          A.      For 11 years.

11          Q.      Who lives with you at that address?

12          A.      I have two sons.

13          Q.      What are their names?

14          A.      Eljin, E-L-J-I-N, Johnson and Marcus,

15   M-A-R-C-U-S, Johnson.

16          Q.      Are you currently employed?

17          A.      Yes.

18          Q.      What is your job?

19          A.      I am a housekeeping Supervisor.

20          Q.      For a company?

21          A.      Yes.

22          Q.      What company?

23          A.      Laureate Operations.

24          Q.      Can you spell that for me?

25          A.      L-A-U-R-A-T-E [sic].
```

1      Q.     How long have you worked for Laureate

2  Operations?

3      A.     Seven years.

4      Q.     Before Laureate Operations, what was

5  your job?

6      A.     I was a stay-at-home mom.

7      Q.     Have you had any other roles for

8  Laureate Operations, other than housekeeping

9  Supervisor?

10      A.     No.

11      Q.     So for the full seven years you've

12  worked for them, you've always been a housekeeping

13  Supervisor?

14      A.     Yes.

15      Q.     What do you do in your day-to-day job,

16  as a housekeeping Supervisor?

17      A.     I do scheduling, supply orders,

18  inventory, room checks.

19      Q.     Do you perform this job at a hotel?

20      A.     No, it's a Nursing Home.

21      Q.     Nursing Home?  Oh, okay.  Thank you.

22             Where is the Nursing Home?

23      A.     It's here, in Joliet.

24      Q.     Is it just one Nursing Home that you

25  work for?

1      A.     Yes.

2      Q.     Do you work full-time?

3      A.     Yes.

4      Q.     Besides this case, have you been

5  involved in any other civil lawsuits?

6      A.     No.

7      Q.     Have you been involved in any criminal

8  cases?

9      A.     No.

10     Q.     Do you have any criminal history?

11     A.     No.

12     Q.     Have you ever been arrested?

13     A.     No.

14     Q.     Have you ever been charged with any

15  crime?

16     A.     No.

17     Q.     For this case, what is your

18  understanding of what the claims are in this case?

19            MR. SHEEHAN:  Objection.  Legal

20  conclusion or legal --

21            You may proceed, Ms. Johnson.

22     Q.     You can answer.

23            MR. SHEEHAN:  To the best of your

24  knowledge.

25     A.     I'm sorry, can you please repeat that

Page 12

1  question?

2       Q.     Sure.

3              What is your understanding of the

4  claims in this case?

5       A.     My understanding's that there's a claim

6  against the -- the lidocaine patch, my -- maximum

7  strength.

8       Q.     What is your understanding of your role

9  as a named Plaintiff in this case?

10      A.     Well, to provide all -- all the

11 necessary information.

12      Q.     What is your understanding of your

13 responsibilities as a class representative in this

14 case?

15      A.     To be honest.

16      Q.     Anything else?

17      A.     No.

18      Q.     Do you know what the class definition

19 is in this case?

20             MR. SHEEHAN:  Objection.  Legal.

21             You can please continue.

22      Q.     You can answer.

23      A.     No.

24      Q.     What did you do to prepare for your

25 deposition today?

```
                                              Page 13

 1         A.      Did a load of research on the lidocaine

 2   patch.

 3         Q.      What sort of research is that?

 4         A.      Research as far as some side effects,

 5   similar to -- they -- side effects to -- some that I

 6   have heard but I have not experienced myself.

 7         Q.      What are those side effects that you

 8   researched?

 9         A.      It's just some complaints of -- of

10   soreness.

11         Q.      Is that soreness before or after the

12   patch is applied?

13         A.      Before.  Before and after, in some

14   cases.

15         Q.      So, when you say "side effects" and

16   "soreness," are you talking about somebody having,

17   like, some kind of adverse reaction to the patch?

18         A.      Yes.

19         Q.      Okay.  Other than soreness, did you

20   research any other side effects?

21         A.      No.

22         Q.      Other than researching the side

23   effects, did you do anything else to prepare for

24   your deposition today?

25         A.      No.
```

Page 14

1             MR. SHEEHAN:  Ms. Johnson, you're

2    permitted and should indicate to Ms. Gough, you

3    know, if you spoke with me at any time.

4             THE WITNESS:  Oh.

5        Q.    Ms. Johnson, to prepare for your

6    deposition today, did you speak to Mr. Sheehan?

7        A.    Yes, I did.

8        Q.    When did you speak with him?

9        A.    I spoke with him last Friday.

10       Q.    Was anyone else in the room when you

11   spoke with Mr. Sheehan?

12       A.    No.

13       Q.    I guess I should say, you probably

14   weren't in the same room.

15             Was anyone else present or could

16   overhear your conversation with Mr. Sheehan when you

17   spoke with him on Friday?

18       A.    No.

19       Q.    How long did you speak with Mr. Sheehan

20   on Friday?

21       A.    For about half an hour.

22       Q.    Other than speaking with Mr. Sheehan on

23   Friday, did you speak with him any other time to

24   prepare for your deposition today?

25       A.    Yes.

Page 15

1      Q.      When was that?
2      A.      I can't -- it's -- remember the
3  specific day, but maybe -- maybe earlier this month;
4  maybe the first week of this month.
5      Q.      Any other times you spoke with
6  Mr. Sheehan about this case?  And you don't have to
7  tell me what you talked about, but just any other
8  times you spoke with him.
9      A.      Yes, April of this year.
10     Q.      So, I've got Friday you spoke with him,
11  earlier this month, you were thinking maybe the
12  first week in May, and then, April, so that's three
13  occasions.
14             Have you spoken with Mr. Sheehan, other
15  than those three occasions?
16     A.      Not that I can remember.
17     Q.      Okay.  For your personal background,
18  I'd like to ask you some questions about any medical
19  conditions or diagnoses that would provide some
20  context about this case and your use of the
21  lidocaine patch.
22             Do you have any medical conditions?
23     A.      No.
24     Q.      Do you have any past or ongoing
25  injuries?

Page 16

```
 1        A.      No.
 2        Q.      Have you had any surgeries?
 3        A.      No.
 4        Q.      Have you taken any prescription
 5   medication?
 6        A.      No.
 7        Q.      Have you ever been prescribed a
 8   lidocaine patch?
 9        A.      No.
10        Q.      Have you ever been prescribed lidocaine
11   cream?
12        A.      No.
13        Q.      Do you know what lidocaine is?
14        A.      No.
15        Q.      Do you know what it does?
16        A.      It's supposed to relieve pain.
17        Q.      Anything else you know about lidocaine?
18        A.      No.
19        Q.      Do you shop at Mariano's stores?
20        A.      Yes.
21        Q.      What other grocery stores do you shop
22   at?
23        A.      Walmart, on occasion.
24        Q.      Anywhere else?
25        A.      No.
```

Page 17

1          Q.      Any other Kroger-brand grocery store
2     that you shop at?
3          A.      No.
4          Q.      Do you have a Mariano's or a Kroger
5     frequent shopper card?
6          A.      No.
7          Q.      Do you have a Kroger or Mariano's
8     frequent shopper account?
9          A.      No.
10         Q.      No other, like, loyalty account with
11    Mariano's or Kroger?
12         A.      No.
13         Q.      Do you use digital coupons at
14    Mariano's?
15         A.      No.
16         Q.      I'm going to start asking you some
17    questions about the lidocaine patch in this case.
18    You understand when I say "product," that I mean the
19    Kroger lidocaine patch that is the subject of this
20    litigation?
21         A.      Yes.
22         Q.      When you purchased the product, what
23    did the label look like?
24         A.      Blue and white with a figure on it.
25                 THE COURT REPORTER:  With a what on it?

Page 18

1                    THE WITNESS:  Like a figure, like a

2        male figure.

3              Q.    Was there anything about the packaging

4        or the label of the product that made you want to

5        buy it?

6              A.    Yes, because it said

7        "Maximum Strength."

8              Q.    Anything else?

9              A.    No.

10             Q.    Is there anything about the way the

11       label looked, like the colors or the graphics, that

12       made you want to buy it?

13             A.    Yes.

14                   It was the -- the graphics, also.

15             Q.    Can you describe the graphics?

16             A.    From what I can remember, it was what

17       looked to be a male figure with a red -- like, maybe

18       a red circle that was maybe around, like, the middle

19       of his back.  Something like a target pain area.

20             Q.    And what about that graphic was

21       appealing to you or made you want to buy it?

22             A.    I am going to say it wasn't mainly the

23       graphic, it was just mainly the -- the part where it

24       says "maximum strength."

25             Q.    Was there anything else about the

Page 19

```
 1    packaging or the label, including any other words or

 2    phrases, that made you want to buy the product,

 3    other than maximum strength?

 4            A.      No.

 5                    MS. GOUGH:   I will introduce our second

 6    exhibit.

 7                    (Whereupon, First Amended Class Action

 8    Complaint was marked as Plaintiff's Exhibit 2 for

 9    identification as of this date by the Reporter.)

10            Q.      Do you see this document, Ms. Johnson?

11            A.      Yes.

12            Q.      Does this look familiar to you?

13            A.      Yes.

14            Q.      What do you understand this document to

15    be, from what -- from what you can see?

16            A.      Are you talking about the document

17    itself or the picture that is connected to it?

18            Q.      The document itself.

19                    MR. SHEEHAN:  Can you scroll down,

20    Kirsten, or -- you know, just so that she can see

21    the whole thing?

22                    MS. GOUGH:   Let's see.  If I zoom in --

23

24                    MR. SHEEHAN:  Oh, zoom out maybe and

25    scroll down.  Yeah, zoom out, I think.  Okay.
```

Page 20

1      Q.      Does this look familiar to you?

2      A.      Yes.

3      Q.      And what do you understand this

4  document to be?

5      A.      Well, this is what -- it looks to be

6  what's -- what may be indicated on the back of the

7  package, maybe.

8      Q.      Have you seen this image before?

9      A.      Yes.

10     Q.      And what do you understand this image

11  to be?

12     A.      Only the -- the product that I

13  purchased.

14     Q.      And this -- do you understand that this

15  image is in the First Amended Complaint?

16     A.      Yes.

17     Q.      Have you seen this First Amended

18  Complaint before?

19     A.      No.

20     Q.      Going back to the product, did you --

21  did you, yourself, buy the product?

22     A.      Yes.

23     Q.      Did anyone ever buy the product for

24  you?

25     A.      No.

Page 21

```
 1          Q.     Why did you purchase the product?
 2          A.     I purchased the product because I was
 3     having pain in my lower calf area.  And the fact
 4     that it said "maximum strength" is -- was why I had
 5     chose it.
 6          Q.     Sorry, I was taking notes.
 7                 Did you say you were having pain in
 8     your lower half?
 9          A.     A little bit below my lower calf area.
10          Q.     Oh, calf, like, in your leg?
11          A.     Yes.
12          Q.     Okay.  I thought you said lower half of
13     your body.  Thank you for clarifying.
14          A.     Um-hum.
15          Q.     Which leg?
16          A.     Left.
17          Q.     When did you first purchase the
18     product?
19          A.     I first purchased it this year.  From
20     what I can recall, maybe in the first week of --
21     maybe around the first week of February.
22          Q.     Where did you purchase that first
23     product, around the first week of February?
24          A.     At Mariano's.
25          Q.     What location?
```

Page 22

1          A.      In Bolling Brook.

2                  THE COURT REPORTER:  Can you spell

3    that?

4                  THE WITNESS:  Bolling Brook is

5    B-O-L-L-I-N-G, B-R-O-O-K.

6                  THE COURT REPORTER:  Thank you.

7          Q.      Do you know what street that Mariano's

8    is on?

9          A.      No.

10         Q.      Okay.  The first time you purchased the

11   product was around the first week of February this

12   year; correct?

13         A.      Yes.

14         Q.      How many times did you purchase the

15   product?

16         A.      Once.

17         Q.      Did anyone tell you to purchase the

18   product?

19         A.      No.

20         Q.      Did anyone advise you, like a Doctor,

21   to purchase the product?

22         A.      No.

23         Q.      Did anyone tell you or advise you to

24   stop using the product?

25         A.      No.

1     Q.    Are you still using the product?

2     A.    No.

3     Q.    How many individual patches were in the

4 box when you purchased the product?

5     A.    From what I can recall, like, there may

6 have been seven to nine patches.

7     Q.    Did you ever use a coupon to purchase

8 the product?

9     A.    No.

10     Q.    Was it ever -- was it on sale when you

11 bought it?

12     A.    No.

13     Q.    Was it discounted in any way when you

14 bought it?

15     A.    No.

16     Q.    Did you see an advertisement for the

17 product?

18     A.    No.

19     Q.    What other products were near the

20 Kroger lidocaine patch when you bought it?

21     A.    I can't really recall.  If I had to

22 guess, there may have been maybe Aspercreme®.

23     Q.    Anything else that you remember?

24     A.    No.

25     Q.    When you say "Aspercreme®," is that --

Page 24

1    is that a lidocaine patch product?

2           A.      No.

3           Q.      What kind of a product is that?

4           A.      I am -- I'm not sure.

5           Q.      Did you read the front of the box when

6    you bought the product?

7           A.      Yes.

8           Q.      What do you remember about the front of

9    the box when you bought the product?

10          A.      I just remember the -- the figure, I

11   think it was maybe a male figure, with the red --

12   with the red circle indicating pain, is what I

13   figure.  And the fact that it said "maximum

14   strength."

15          Q.      Did you read the back of the box when

16   you purchased the product?

17          A.      I did.  I skimmed over it.

18          Q.      What do you remember about the back of

19   the box that the product came in?

20          A.      Just the color.  Just the blue and

21   white cover.

22          Q.      Do you remember any instructions on the

23   box?

24          A.      Yes.

25          Q.      Did you read those instructions?

Page 25

1       A.     Yes.

2       Q.     Was there -- for the -- the patches

3  inside the box, were they individually wrapped?

4       A.     Yes.

5       Q.     Were there instructions on each

6  individual patch?

7       A.     Not that I can remember.

8       Q.     Did the product work the way that you

9  expected it to?

10      A.     No.

11      Q.     Why not?

12      A.     I purchased it because it said it would

13  provide maximum strength, and I didn't notice any

14  type of relief.

15      Q.     What is your understanding of the

16  phrase "maximum strength?"

17            What does that mean to you?

18      A.     Maximum strength, meaning, the highest

19  level.  The highest level of relief.

20      Q.     How much did it cost when you purchased

21  the product?

22      A.     I can't recall the purchase -- the

23  purchase price.

24      Q.     Do you still have the box or the

25  individual patches that you purchased?

Page 26

```
 1        A.      No.
 2        Q.      Do you have any other packaging from
 3  the product?
 4        A.      No.
 5        Q.      Do you have any receipts from your
 6  purchase of the product?
 7        A.      No.
 8        Q.      Have you ever used similar lidocaine
 9  patches?
10        A.      No.
11        Q.      You have never used Salonpas® patches?
12        A.      No.
13        Q.      You have never used Icy Hot® patches?
14        A.      No.
15        Q.      You have never used Aspercreme®
16  patches?
17        A.      No.
18        Q.      Have you ever purchased lidocaine
19  patches from any store other than Mariano's?
20        A.      No.
21        Q.      You said earlier that you had pain in
22  your lower left calf.
23                When did you first have that pain?
24        A.      The first week of February.  Probably
25  two days before I purchased.
```

Page 27

1          Q.      What happened -- what happened or what
2      caused that pain?
3          A.      I'm not sure.
4          Q.      Can you describe that pain or that
5      injury that lead you to purchase the product?
6          A.      An ache, like, I may have pulled a
7      muscle.
8          Q.      How long did the pain last?
9          A.      I can't really recall how long it last.
10     I do remember two days before I made the purchase
11     was when I first noticed the pain.
12                 After I purchased the lidocaine patch,
13     I want to say maybe -- maybe three days after that,
14     the pain continued.
15         Q.      Is it still bothering you?
16         A.      No.
17         Q.      And are you saying that the pain lasted
18     for about five days or longer than five days?
19         A.      I want to say maybe a little bit longer
20     than five days.
21         Q.      About a week or longer than a week?
22         A.      About a week.
23         Q.      And you don't know what you did to
24     cause the pain or what -- what caused the pain?
25         A.      No.

Page 28

```
 1        Q.      Did you take any time off of work for
 2   the pain in your lower left calf?
 3        A.      No.
 4        Q.      Did you have any imaging done of your
 5   lower left -- left calf because of the pain?
 6        A.      No.
 7        Q.      Did you see a Doctor?
 8        A.      No.
 9        Q.      Did you get any other treatment for
10   that pain in your lower left calf?
11        A.      No.
12        Q.      Did you take any medication for it?
13        A.      No.
14        Q.      Other than purchasing the lidocaine
15   patch from Kroger, did you do anything else for the
16   pain?
17        A.      No.
18        Q.      Did you do any sort of at home
19   remedies, like icing or anything like that, for the
20   pain?
21        A.      No.
22        Q.      And no -- you said no over-the-counter
23   drugs for the pain?
24        A.      No.
25        Q.      And I take it you did not get a
```

Page 29

1    prescription lidocaine patch for the pain in your
2    lower left calf?
3          A.    No.
4          Q.    Okay.  Describe to me how you applied
5    the product to the area where you had pain.
6          A.    I removed the -- the -- I removed the
7    patch from the box.  There was -- there was -- there
8    was, like, a white coating on the back, which
9    separated down the middle.  I took both of them and
10   split them apart, and then it was the patch, itself.
11               I took it and placed it firmly on the
12   part of my lower calf that hurt it, and I just
13   pressed on firmly around all of the sides to make it
14   stick.
15         Q.    Did you read the instructions before
16   you did that?
17         A.    Yes.
18         Q.    Did you follow what the instructions
19   said to do?
20         A.    Yes.
21         Q.    How long did the instructions say to
22   leave the patch on your skin?
23         A.    I don't recall.
24         Q.    How long did you expect that the
25   product would stay on your skin?

1        A.     Maybe over night, possibly.

2        Q.     If -- if you could put it into hours,

3 how many hours did you expect the patch would stay

4 on your skin?

5        A.     Maybe seven.

6        Q.     Why did you think the patch would stay

7 on overnight?

8        A.     From what I recall, it said that once

9 applied, that it was -- that it would stay firmly on

10 the affected area.

11       Q.     Were you sleeping with the patch on?

12       A.     Yes.

13       Q.     Did you do anything to your skin before

14 you applied the patch?

15       A.     I made sure that the area which I

16 applied the patch was clean.

17       Q.     And how did you do that?

18       A.     I just took a cloth, wiped it -- a wet

19 cloth, I wiped it, I made sure it was dry and then I

20 applied the patch.

21       Q.     What kind of a cloths did you use?

22       A.     A wet cloth and then a dry one.

23       Q.     What -- what are these -- what type of

24 cloths did you use?

25             Was this, like, a -- like, paper towel,

Page 31

1   was it, like, a regular bath towel, or what were you

2   using?

3            A.      Actually, it was a bath towel, right

4   after -- right after the got out of the shower.

5            Q.      Okay.  So, you showered first, and then

6   dried your skin?

7            A.      Yes.

8            Q.      Before -- before you applied the patch,

9   did you put on any sort of location or anything else

10  on your skin before you applied it?

11           A.      No.

12           Q.      How long after you got out of the

13  shower did you wait to apply the product?

14           A.      Maybe half an hour after.

15           Q.      After you got out of the shower, was

16  there anything else that you did to your skin

17  between the time you got out of the shower and the

18  roughly half an hour later when you put the patch on

19  your skin?

20           A.      No.

21           Q.      After you put the patch on your skin,

22  what did you do?

23           A.      I can't recall.  I'm -- I can't recall

24  what I did next.

25           Q.      You said that there are, I think, seven

Page 32

1   to nine patches in the box, to the best of your

2   recollection; is that right?

3       A.      Yes.

4       Q.      Did you use all seven to nine patches?

5       A.      No.

6       Q.      How many did you use?

7       A.      One.

8       Q.      What time of day did you use that one

9   patch?

10      A.      It was after work.  I want to say

11  around maybe 9:00.

12      Q.      Is that P.M.?

13      A.      Yes.

14      Q.      So, after you put it on, did you just

15  go about your day as you always did?

16              Did you do anything different after you

17  put it on?

18      A.      I may have maybe watched something on

19  TV, or something to that effect, before I went to

20  bed.

21      Q.      And the patch was on your bare skin;

22  correct?

23      A.      Yes.

24      Q.      Did you put anything over the patch?

25      A.      No.

Page 33

1      Q.      No socks, no pajama pants, nothing like

2   that?

3      A.      No.

4      Q.      About how long after you put the patch

5   on did you go to bed?

6      A.      I can't recall.

7      Q.      What time do you typically go to bed?

8      A.      It varies.  Maybe -- it may not be

9   until 10:00, maybe a little after 11:00.

10     Q.      What was your experience with the --

11  the one patch that you put on your lower left calf

12  area?

13     A.      My experience was it wasn't as

14  described.  It didn't stay on.  I didn't see -- I

15  didn't feel any type of results from -- from wearing

16  it.

17     Q.      What results were you expecting?

18     A.      I was ex- -- expecting pain relief, for

19  one.  And then, two, would -- would have been for

20  the patch to still be on once I had awakened.

21     Q.      What time do you typically wake up in

22  the morning?

23     A.      5:00 A.M.

24     Q.      Oh, an early riser?

25     A.      Yes.

1      Q.     Okay.  So, you typically go to bed

2   around 10:00 or 11:00 P.M. and sleep until roughly

3   5:00 A.M.; is that fair?

4      A.     Yes.

5      Q.     And you said that the patch didn't stay

6   on.  What do you mean by that?

7      A.     When I had awakened the next morning,

8   the patch -- I could not find the patch at first.  I

9   did notice that immediately it wasn't on my lower

10  left leg.

11             Upon me searching, it had gotten mixed

12  up in my blankets.

13     Q.     Did you notice during the night that

14  the patch was not on your leg where you put it?

15     A.     No.

16     Q.     Was it your plan to put the patch on

17  your leg and go to sleep?

18     A.     Yes.

19     Q.     How did you sleep that night?

20     A.     Okay.  Pretty good.

21     Q.     Before that night, were you having

22  trouble sleeping because of the pain in your leg?

23     A.     A little, yes.

24     Q.     How long did that trouble sleeping go

25  on?

Page 35

1        A.     I can't really recall.

2        Q.     But you said that night that you put

3   the patch on, you slept pretty good?

4        A.     Yes.

5        Q.     And you don't recall waking up during

6   the night?

7        A.     No, not that I can recall, no.

8               THE WITNESS:  I'm going to have to

9   interrupt for one second because I was outside, and

10  it was raining really bad --

11              MS. GOUGH:  Okay.  Let's go off the

12  record.

13              (Whereupon, a short recess was taken.)

14       Q.     Are you all set to proceed,

15  Ms. Johnson?

16       A.     Yes.

17       Q.     Okay.  Let's see.  We were talking

18  about when you applied the product to your lower

19  left calf, you said that you put it on shortly

20  before you went to bed and woke up in the morning

21  and it was no longer on your skin; is that correct?

22       A.     Yes.

23       Q.     When you took the patch out of the

24  packaging, was it sticky?

25       A.     Not -- I -- I can't recall.  I'm not

Page 36

1    sure.

2         Q.    To review where we were, you put the

3    patch on shortly before you went to bed and you woke

4    up in the morning, and it was no longer on your

5    skin; correct?

6         A.    Yes.

7         Q.    When you took it out of the packaging,

8    was the adhesive sticky?

9         A.    Not that I can recall.

10        Q.    How did you apply it to your leg?  Can

11   you describe that to me?

12        A.    There was a plastic coating that

13   separated in the middle to separate -- I'm guessing

14   to keep the patch from sticking to anything else

15   before you apply it.  So I took my fingers and

16   applied -- separated the two parts that were in

17   half, and then I put it on this part, this area

18   where I wanted it to stick to.  And, I pressed

19   firmly around the edges to make sure that it was

20   stuck and it would stay in place.

21        Q.    And did it appear to be stuck and in

22   place after you applied it?

23        A.    Yes.

24        Q.    And you said that you didn't recall

25   waking up in the night; is that right?

Page 37

1          A.      Correct.

2          Q.      And that you slept pretty good the

3     night that you applied it?

4          A.      From what I can recall.

5          Q.      Is it fair to say that you wouldn't

6     know while you're sleeping that the patch had come

7     off?

8          A.      Not that I know of.

9          Q.      Do you know -- so if you're sleeping

10    and the patch came off, you don't know how long it

11    was on your body, do you?

12         A.      Not that I can recall, no.

13         Q.      So it could've been on your leg all

14    night and come off shortly before you woke up; it

15    could've have been on shorter than that.

16              You don't know because you were asleep;

17    is that correct?

18         A.      It -- it's possible.

19         Q.      And it could've provided pain relief.

20              You don't know because you were

21    sleeping; is that right?

22         A.      Well, can I say that:  If it would've

23    provided pain relief, I'm guessing I would've felt

24    some type of relief once I had awoken.

25         Q.      So if you put it on around 9:00 and you

Page 38

1  woke up around 5:00, that's roughly eight hours;

2  correct?

3          A.      Yes.

4                  MS. GOUGH:  Let's go off the record for

5  a moment.

6                  (Whereupon, a short recess was taken.)

7                  MS. GOUGH:  Karyn, would you mind

8  reading back my last question to see where we were?

9                  (Whereupon, the referred to question

10  and testimony was read back by the Reporter:

11                 "QUESTION:  So if you put it on around

12  9:00 and you woke up around 5:00, that's roughly

13  eight hours; correct?

14                 "ANSWER:  Yes.")

15                 MS. GOUGH:  Thank you.

16      Q.      Did you have an expectation that the

17  pain relief would go beyond eight hours?

18          A.      I'm not sure.

19      Q.      How did your leg feel when you woke up

20  in the morning?

21          A.      It was still hurting.

22      Q.      Why didn't you apply another patch?

23          A.      I didn't apply another patch because I

24  wasn't sure that it would -- I wasn't sure that a

25  second one would work.

Page 39

1          Q.      You just didn't want to try to see?

2          A.      No.

3          Q.      Just because you weren't sure that it

4   was going to work?

5          A.      Yeah.

6                  I just -- I just decided not to

7   continue to use the product.

8          Q.      Why did you decide not to continue use?

9          A.      Because I went by what the package

10  said, by it saying "Maximum Strength."  And when it

11  said that, to just apply it to the affected area, so

12  I just assumed that it would stay in the area for

13  which I had chosen it to be and it would apply the

14  -- the maximum relief.

15         Q.      Did you try anything else in the

16  morning, when you woke up with your leg still having

17  that pain?

18         A.      No.

19         Q.      How did you sleep the next night?

20         A.      I can't recall.

21         Q.      But you said you did remember having

22  some difficulty sleeping because of the pain in your

23  leg?

24         A.      Yes.

25         Q.      Just not the night that you applied the

Case: 1:22-cv-04744 Document #: 70-1 Filed: 09/20/24 Page 41 of 74 PageID #:1305

1  patch?

2      A.     Correct.

3      Q.     Have you ever had issues with other

4  products not sticking to your skin?

5      A.     Not that I can recall.

6      Q.     Have you ever used any other patch-type

7  products?

8      A.     No.

9      Q.     Do you know anyone who's used lidocaine

10 patches?

11     A.     No.

12     Q.     What did you do with the other patches

13 that you didn't use?

14     A.     I held on to them for awhile that I

15 recall, and then tossed -- I wound up tossing them

16 out.

17     Q.     Do you know when it was that you tossed

18 them out?

19     A.     I can't recall.

20     Q.     And I may have asked you this before:

21 Correct that you did not see a doctor for the pain

22 in your lower left calf?

23     A.     Correct.

24     Q.     So it's fair to say that no doctor has

25 ever told you that you can't work because of that

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 41

```
1    pain?
2          A.      No.
3          Q.      I think it was my question:  Has a
4    doctor ever told you that can't work because of the
5    pain in your lower left calf?
6          A.      No.
7          Q.      And correct, that you did not miss any
8    days because of that pain?
9          A.      Correct.
10         Q.      Did you ever speak to anyone, other
11   than your attorney, about your experience with the
12   product?
13         A.      No.
14         Q.      Did you ever express any
15   dissatisfaction with the product?
16         A.      No.
17         Q.      You never complained to anyone about
18   it?
19         A.      No.
20         Q.      Did you ever try to return the product?
21         A.      No.
22         Q.      Did you ever seek a refund on your
23   purchase of the product?
24         A.      No.
25         Q.      Did you ever contact the Mariano's
```

Page 42

1  store where you purchased the product to tell them

2  that you were unhappy with it?

3        A.    No.

4        Q.    Did you ever contact Kroger Customer

5  Service about your experience with the product?

6        A.    No.

7        Q.    After you used the Kroger lidocaine

8  patch, did you consider trying a different brand of

9  lidocaine patch?

10       A.    No.

11       Q.    Why not?

12       A.    Probably -- I mean, because I didn't

13  have a good experience with the lidocaine patch, so

14  I just felt like that -- maybe that type of product

15  would not be good for me after that experience.

16       Q.    Did you ever consider using the product

17  during the day so that you could tell how long it

18  stayed on your skin?

19       A.    No.

20       Q.    Why not?

21       A.    I just figured that it would work well

22  at night because I'm -- I'm -- I'm less active, so I

23  just figured that I would have a better experience

24  at night, when I'm pretty much in a more relaxing

25  state.

Page 43

```
 1        Q.     In this case, you're represented by

 2   Mr. Sheehan; is that correct?

 3        A.     Yes.

 4        Q.     Do you have any other lawyers in this

 5   case?

 6        A.     No.

 7        Q.     Have you ever heard of a law firm

 8   called the Greene Consumer Law?

 9        A.     No.

10        Q.     Have you ever met someone named Francis

11   Greene, an attorney?

12        A.     No.

13        Q.     Did you ever sign an Engagement Letter

14   with Francis Greene?

15        A.     No.

16        Q.     Without telling me what you talked

17   about, when did you first speak with Mr. Sheehan?

18        A.     I can't remember, offhand, the first

19   conversation, but I would say maybe May of this

20   year.

21        Q.     How did you come to know Mr. Sheehan?

22   How did you learn about him?

23        A.     I believe on Google, there was a -- an

24   advertisement for the lidocaine patch.  There was a

25   -- from what I can recall, there was a -- a lawsuit,
```

Page 44

1    and the advertisement was -- was the picture of the

2    lidocaine patches that I had purchased.

3         Q.     When did you see that Google ad?

4         A.     I can't recall.

5         Q.     Was it in the year 2024?

6         A.     I can't recall.  Maybe.  Maybe earlier

7    this year.

8         Q.     When you say, "earlier this year," you

9    mean, earlier in 2024?

10        A.     Yes.

11        Q.     How did you find the Google ad?

12        A.     From what I can recall, I -- it was

13   nothing that I had searched for; it was just in my

14   Google feed.

15        Q.     I'm trying to picture this:  When I log

16   in to Google, I just see a search bar.

17               What do you see when you go to, like,

18   google.com?  What does your feed look like?

19        A.     My feed can look like -- it -- it can

20   be something that I was talking about -- it could be

21   something that I was talking about and I would --

22               MR. SHEEHAN:  I can jump in here

23   because I know these social media things, and the

24   internet can be confusing.

25               Are we sure we're talking about Google

Page 45

1  and not Facebook or anything?  Or not?  You tell me.

2       Q.     Ms. Johnson, go ahead.

3              MR. SHEEHAN:  Yeah.

4       A.     I, honestly, can't recall what -- what

5  type of platform or network I had saw it on.

6       Q.     So it's possible you saw it on

7  Facebook; you just don't remember?

8       A.     Yeah, I can't -- I can't recall which

9  one.

10             MR. SHEEHAN:  Okay.

11      Q.     So you said that Google --

12             MS. GOUGH:  Or I'm sorry.

13      Q.     You said the ad talked about the

14 lawsuit and had a picture of the patch.

15             Do you remember anything else from the

16 ad?

17      A.     No.

18      Q.     And what did you do when you saw the

19 ad?

20      A.     I clicked on it for more information.

21      Q.     Then what happened?

22      A.     I can't recall what happened next.

23      Q.     Did someone from Mr. Sheehan's office

24 reach out to you after that?

25      A.     I'm not sure what time frame that --

Page 46

1    that -- that it was.

2          Q.    But someone reached out to you at some

3    point?

4          A.    Yes.

5          Q.    Do you know anyone else who is a client

6    of Mr. Sheehan's?

7          A.    No.

8          Q.    Do you know someone named Tiffany Agee?

9          A.    No.

10         Q.    Do you know named Shannon Hunt?

11         A.    No.

12         Q.    Before I forget, I think I forgot to

13    ask this at the beginning:  What is your date of

14    birth?

15         A.    October 16th, 1973.

16         Q.    Thank you.

17               And you understand that your name was

18    on the First Amended Complaint in this case;

19    correct?

20         A.    Yes.

21         Q.    When did you first see that document?

22         A.    I can't recall.

23         Q.    Do you know if you reviewed the

24    document before it was filed with the court?

25         A.    I can't recall.

```
                                            Page 47

 1                   MR. SHEEHAN:  Objection.
 2        Q.     And you have looked at the First
 3   Amended Complaint in this case; correct?
 4        A.     Yes.
 5        Q.     Your attorney gave you a copy of it?
 6        A.     Yes.
 7        Q.     You looked it over to make sure it was
 8   correct and accurate?
 9        A.     Yes.
10                   MR. SHEEHAN:  Objection.  Legal
11   conclusion.
12                   Continue.
13        Q.     To the best of your knowledge, when you
14   reviewed the complaint, it was correct and accurate?
15        A.     Yes.
16                   MS. GOUGH:  Okay.  I'd like to go off
17   the record for maybe five, ten minutes and I'll
18   check my notes, but I think I've gone through most,
19   if not all, of my questions at this point.
20                   MR. SHEEHAN:  Okay.
21                   (Whereupon, a short recess was taken.)
22        Q.     Are you ready to proceed, Ms. Johnson?
23        A.     Yes.
24        Q.     I can't remember if we talked about
25   this earlier.
```

Page 48

1          Do you have any other cases with

2    Mr. Sheehan?

3          A.    No.

4          Q.    And you have never sued any other

5    companies about a product, correct?

6          A.    Correct.

7          Q.    And is it correct that you have never

8    purchased any other lidocaine patches, other than

9    the Kroger lidocaine patch?

10          A.    Correct.

11          Q.    And we said that the pain in your lower

12    calf lasted about a week; is that right?

13          A.    Yes.

14          Q.    When you said that you purchased the

15    product because of the phrase

16    "Maximum Strength," you said your understanding was

17    that that was the highest level of relief; correct?

18          A.    Correct.

19          Q.    Do you understand that you can -- well,

20    me ask you this:  Is that your understanding

21    over-the-counter products, or does that also include

22    prescription products?

23          A.    Well, for the lidocaine patch, it would

24    be over-the-counter.

25          Q.    So, maximum strength, that you can buy

Page 49

1    over-the-counter?

2         A.    Yes.

3         Q.    What is your understanding of how much

4    lidocaine was in the product?

5         A.    I'm not sure.

6         Q.    And correct that you no longer have the

7    calf pain that led you to use the product?

8         A.    Correct.

9         Q.    Did the pain in your calf affect your

10   life in any other way?  I know you said it didn't

11   affect your ability to work.

12              Did it affect your life any other way?

13        A.    No.

14        Q.    Okay?

15              MS. GOUGH:  I think that's all I have.

16              MR. SHEEHAN:  Mr. Sheehan for the

17   Plaintiff, I just wanted to put on the record, I

18   don't have any questions for Ms. Johnson.

19              Thank you, Ms. Johnson.

20              Court Reporter, you'll let us know when

21   we can go off the record, and Ms. Johnson can get

22   going.

23              THE COURT REPORTER:  We're ready to go

24   off.  I'm done.

25              MR. SHEEHAN:  Okay.

Page 50

1          MS. GOUGH:  Thank you, Ms. Johnson.  I
2   appreciate your time.
3          MR. SHEEHAN:  Thank you, Ms. Johnson.
4          THE WITNESS:  Thank you.
5          MR. SHEEHAN:  You have a great day.
6          THE WITNESS:  You all, as well.
7          Thank you.
8          (Whereupon, at 3:22 P.M., the
9   Examination of this witness was concluded.)
10
11          o      o      o      o
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 51

1                E X H I B I T S

2

3    DEFENDANT'S EXHIBITS

4

5    EXHIBIT EXHIBIT                    PAGE

6    NUMBER  DESCRIPTION

7    1       Defendant's Notice of

8            Deposition of Plaintiff

9            Johnson              7

10   2       First Amended Class

11           Action Complaint    19

12

13

14

15

16           (Exhibits retained by Counsel.)

17

18

19

20

21

22

23

24

25

Page 52

```
 1              I N D E X

 2   EXAMINATION BY                PAGE

 3   MS.  GOUGH                    4

 4

 5

 6

 7   INFORMATION AND/OR DOCUMENTS REQUESTED

 8   INFORMATION AND/OR DOCUMENTS  PAGE

 9   (None)

10

11

12        QUESTIONS MARKED FOR RULINGS

13   PAGE LINE  QUESTION

14   (None)

15

16

17

18

19

20

21

22

23

24

25
```

Page 53

1               C E R T I F I C A T E

2

3    STATE OF NEW YORK        )

                      :  SS.:

4    COUNTY OF NEW YORK       )

5

6        I, KARYN CHIUSANO, a Notary Public for and

7    within the State of New York, do hereby certify:

8        That the witness whose examination is

9    hereinbefore set forth was duly sworn and that such

10   examination is a true record of the testimony given

11   by that witness.

12       I further certify that I am not related to any

13   of the parties to this action by blood or by

14   marriage and that I am in no way interested in the

15   outcome of this matter.

16       IN WITNESS WHEREOF, I have hereunto set my hand

17   this 18th day of May, 2024.

18

19

20   _____

                    KARYN CHIUSANO

21

22

23

24

25

```
                                                    Page 54
1                       Veritext Legal Solutions
                           1100 Superior Ave
2                              Suite 1820
                         Cleveland, Ohio 44114
3                        Phone: 216-523-1313
4
    May 29, 2024
5
    To: Spencer Sheehan, Esq.
6
    Case Name: Hunt, Shannon, Et Al. v. The Kroger Co.
7
    Veritext Reference Number: 6693230
8
    Witness:  Lanette Johnson Deposition Date:  5/13/2024
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 6693230
3       CASE NAME: Hunt, Shannon, Et Al. v. The Kroger Co.
        DATE OF DEPOSITION: 5/13/2024
4       WITNESS' NAME: Lanette Johnson
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____        _____
9  Date                    Lanette Johnson
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
   this _____ day of_____, 20_____.
17
                  _____
18                Notary Public
19                _____
                  Commission Expiration Date
20
21
22
23
24
25
```

Page 56

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 6693230
 3      CASE NAME: Hunt, Shannon, Et Al. v. The Kroger Co.
        DATE OF DEPOSITION: 5/13/2024
 4      WITNESS' NAME: Lanette Johnson
 5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9      I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Lanette Johnson
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23          _____
            Notary Public
24
            _____
25          Commission Expiration Date
```

Page 57

1                        ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                   ASSIGNMENT NO: 6693230
3    PAGE/LINE(S) /          CHANGE          /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                  Lanette Johnson
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date

| & | | | |
| --- | --- | --- | --- |

**&**
**&** 2:3 3:14

**0**
**04744** 1:6

**1**
**1** 3:14 7:12 8:2
  51:7
**101** 2:10
**10:00** 33:9 34:2
**11** 9:10
**1100** 54:1
**11021** 2:6
**11:00** 33:9 34:2
**13** 1:11
**16th** 46:15
**18034** 53:19
**1820** 54:2
**18th** 53:17
**19** 51:11
**1973** 46:15
**1:00** 5:25
**1:22** 1:6

**2**
**2** 19:8 51:10
**20** 55:16 56:22
  57:22
**2000** 2:10
**2024** 1:11 44:5
  44:9 53:17
  54:4
**216-523-1313**
  54:3
**29** 54:4

**2:03** 1:12

**3**
**3** 8:13
**30** 3:13
**3:00** 5:24
**3:22** 50:8

**4**
**4** 52:3
**409** 2:5
**411** 4:10 9:6
**44114** 54:2

**5**
**5/13/2024** 54:8
  55:3 56:3
**5:00** 33:23 34:3
  38:1,12

**6**
**60** 2:5
**60435** 4:11
**6693230** 54:7
  55:2 56:2 57:2

**7**
**7** 51:9

**9**
**92101** 2:10
**9:00** 32:11
  37:25 38:12

**a**
**a.m.** 33:23 34:3
**ability** 5:13,17
  49:11

**above** 54:17
**accordance**
  55:5 56:5
**account** 17:8
  17:10
**accurate** 5:14
  6:22 47:8,14
**ache** 27:6
**acknowledge**
  55:11 56:16
**act** 55:14 56:20
**action** 19:7
  51:11 53:13
**active** 42:22
**actually** 31:3
**ad** 44:3,11
  45:13,16,19
**address** 4:9 9:3
  9:6,11 54:15
**adhesive** 36:8
**administer** 3:9
**adverse** 13:17
**advertisement**
  23:16 43:24
  44:1
**advise** 22:20,23
**affect** 49:9,11
  49:12
**affected** 30:10
  39:11
**affixed** 55:15
  56:21
**afternoon** 4:12
  4:15

**agee** 46:8
**agreed** 3:4,17
**ahead** 45:2
**al** 54:6 55:3
  56:3
**amended** 19:7
  20:15,17 46:18
  47:3 51:10
**answer** 4:23
  5:1 6:5,24
  11:22 12:22
  38:14
**answers** 6:16
**apart** 29:10
**appealing**
  18:21
**appear** 36:21
  55:11 56:15
**appended**
  56:11,18
**applied** 13:12
  29:4 30:9,14
  30:16,20 31:8
  31:10 35:18
  36:16,22 37:3
  39:25
**apply** 31:13
  36:10,15 38:22
  38:23 39:11,13
**appreciate** 50:2
**april** 15:9,12
**area** 18:19 21:3
  21:9 29:5
  30:10,15 33:12
  36:17 39:11,12

**arrested** 11:12
**asked** 6:5 40:20
**asking** 4:14
  6:25 17:16
**asleep** 37:16
**aspercreme**
  23:22,25 26:15
**assignment**
  55:2 56:2 57:2
**associates** 2:3
**assume** 6:25
**assumed** 39:12
**attached** 56:7
**attorney** 41:11
  43:11 47:5
**attorneys** 2:3,9
**authorize**
  56:11
**authorized** 3:9
**ave** 54:1
**awakened**
  33:20 34:7
**awhile** 40:14
**awoken** 37:24

**b**

**b** 22:5,5 51:1
**back** 18:19
  20:6,20 24:15
  24:18 29:8
  38:8,10 54:15
**background**
  15:17
**bad** 35:10
**bar** 44:16

**bare** 32:21
**bath** 31:1,3
**bed** 32:20 33:5
  33:7 34:1
  35:20 36:3
**beginning**
  46:13
**behalf** 1:3 2:4
**believe** 43:23
**best** 11:23 32:1
  47:13
**better** 42:23
**beyond** 38:17
**birth** 46:14
**bit** 21:9 27:19
**blankets** 34:12
**blood** 53:13
**blue** 17:24
  24:20
**body** 21:13
  37:11
**bolling** 22:1,4
**bothering**
  27:15
**bought** 23:11
  23:14,20 24:6
  24:9
**box** 23:4 24:5,9
  24:15,19,23
  25:3,24 29:7
  32:1
**brand** 17:1
  42:8
**break** 5:23 6:1
  6:1,4,6

**bring** 8:5,10,18
  8:21,25
**broadway** 2:10
**brook** 22:1,4
**bullet** 8:6
**buy** 18:5,12,21
  19:2 20:21,23
  48:25

**c**

**c** 2:1 9:15 53:1
  53:1
**ca** 54:25
**calf** 21:3,9,10
  26:22 28:2,5
  28:10 29:2,12
  33:11 35:19
  40:22 41:5
  48:12 49:7,9
**california** 2:10
**called** 4:1 43:8
**card** 17:5
**case** 1:6 4:14
  11:4,17,18
  12:4,9,14,19
  15:6,20 17:17
  43:1,5 46:18
  47:3 54:6 55:3
  56:3
**cases** 11:8
  13:14 48:1
**cause** 27:24
**caused** 27:2,24
**central** 5:25
**certificate**
  56:11

**certification**
  3:6 55:1 56:1
**certify** 53:7,12
**change** 6:16
  54:13,14 56:8
  57:3
**changes** 5:20
  54:12 55:7
  56:7,9
**charged** 11:14
**check** 47:18
**checks** 10:18
**chiusano** 1:19
  53:6,20
**chose** 21:5
**chosen** 39:13
**circle** 18:18
  24:12
**civil** 1:17 11:5
  55:5 56:5
**claim** 12:5
**claims** 11:18
  12:4
**clarify** 6:11,15
**clarifying**
  21:13
**class** 12:13,18
  19:7 51:10
**clean** 30:16
**clear** 4:21
**cleveland** 54:2
**clicked** 45:20
**client** 46:5
**cloth** 30:18,19
  30:22

**cloths** 30:21,24
**coating** 29:8
  36:12
**color** 24:20
**colors** 18:11
**come** 37:6,14
  43:21
**commission**
  55:19 56:25
  57:25
**companies** 48:5
**company** 9:20
  9:22
**complained**
  41:17
**complaint** 19:8
  20:15,18 46:18
  47:3,14 51:11
**complaints**
  13:9
**complete** 6:21
**completed**
  54:15
**concluded** 50:9
**conclusion**
  11:20 47:11
**conditions**
  15:19,22
**confusing**
  44:24
**connected**
  19:17
**consider** 42:8
  42:16

**considered** 8:3
**consumer** 43:8
**contact** 41:25
  42:4
**context** 15:20
**continue** 12:21
  39:7,8 47:12
**continued**
  27:14
**control** 8:15
**conversation**
  14:16 43:19
**copy** 3:11,14
  47:5
**correct** 22:12
  32:22 35:21
  36:5 37:1,17
  38:2,13 40:2
  40:21,23 41:7
  41:9 43:2
  46:19 47:3,8
  47:14 48:5,6,7
  48:10,17,18
  49:6,8
**corrections**
  54:12 56:17
**cost** 25:20
**could've** 37:13
  37:15,19
**counsel** 3:5,14
  51:16
**counter** 28:22
  48:21,24 49:1
**county** 53:4
  55:10 56:15

**coupon** 23:7
**coupons** 17:13
**court** 1:1 3:11
  4:20 7:6 17:25
  22:2,6 46:24
  49:20,23 55:7
**cover** 24:21
**cream** 16:11
**crime** 11:15
**criminal** 11:7
  11:10
**current** 8:8
**currently** 9:16
**curriculum** 8:9
**custody** 8:15
**customer** 42:4
**cutter** 2:5
**cv** 1:6 8:10

**d**

**d** 3:1 52:1
**date** 1:11 7:13
  19:9 46:13
  54:8 55:3,9,19
  56:3,13,25
  57:20,25
**day** 10:15,15
  15:3 32:8,15
  42:17 50:5
  53:17 55:16
  56:22 57:22
**days** 3:13 26:25
  27:10,13,18,18
  27:20 41:8
  54:18

**dear** 54:10
**decide** 39:8
**decided** 39:6
**deed** 55:14
  56:20
**deemed** 54:19
**defendant** 1:9
  1:16 2:9
**defendant's**
  7:10,12,17
  8:16 51:3,7
**definition**
  12:18
**department**
  54:22
**deposition** 1:15
  3:7,8,11 7:3,11
  7:18 8:4,22
  12:25 13:24
  14:6,24 51:8
  54:8,11 55:1,3
  56:1,3
**describe** 18:15
  27:4 29:4
  36:11
**described**
  33:14
**description**
  51:6
**diagnoses**
  15:19
**diane** 2:11
**diego** 2:10
**different** 32:16
  42:8

**difficulty** 39:22
**digital** 17:13
**discounted**
  23:13
**dissatisfaction**
  41:15
**district** 1:1,1
**division** 1:2
**doctor** 22:20
  28:7 40:21,24
  41:4
**document** 7:14
  7:21 19:10,14
  19:16,18 20:4
  46:21,24
**documents**
  7:25 8:2,5,14
  8:17,18,22,25
  52:7,8
**dried** 31:6
**drugs** 28:23
**dry** 30:19,22
**duly** 4:2 53:9
**dwebster** 2:12

**e**

**e** 2:1,1 3:1,1 4:1
  4:1 9:14,25
  51:1 52:1 53:1
  53:1
**earlier** 15:3,11
  26:21 44:6,8,9
  47:25
**early** 33:24
**eastern** 1:2
  5:24,25

**edges** 36:19
**effect** 3:10,12
  5:17 32:19
**effects** 13:4,5,7
  13:15,20,23
**eight** 38:1,13
  38:17
**eljin** 9:14
**email** 54:17
**employed** 9:16
**enclosed** 54:11
**engagement**
  43:13
**entered** 56:9
**entire** 55:5 56:5
**errata** 54:13,18
  56:7,10,18
  57:1
**esq** 2:6,11,11
  54:5
**et** 54:6 55:3
  56:3
**ex** 33:18
**examination**
  4:5 50:9 52:2
  53:8,10
**examined** 4:3
**except** 3:18
**executed** 56:10
**execution**
  55:14 56:19
**exhibit** 7:9,12
  19:6,8 51:5,5
**exhibits** 51:3
  51:16

**expect** 29:24
  30:3
**expectation**
  38:16
**expected** 25:9
**expecting**
  33:17,18
**experience**
  33:10,13 41:11
  42:5,13,15,23
**experienced**
  13:6
**expiration**
  55:19 56:25
  57:25
**express** 41:14
**extent** 8:13

**f**

**f** 3:1 53:1
**facebook** 45:1
  45:7
**fact** 21:3 24:13
**fair** 6:6 8:21
  34:3 37:5
  40:24
**familiar** 19:12
  20:1
**far** 13:4
**february** 21:21
  21:23 22:11
  26:24
**federal** 1:17
**feed** 44:14,18
  44:19

**feel** 33:15 38:19
**felt** 37:23 42:14
**figure** 17:24
  18:1,2,17
  24:10,11,13
**figured** 42:21
  42:23
**filed** 46:24
**files** 8:14
**filing** 3:6
**find** 34:8 44:11
  54:11
**fingers** 36:15
**finish** 4:22
**firm** 43:7
**firmly** 29:11,13
  30:9 36:19
**first** 4:2 7:8 8:6
  8:16 15:4,12
  19:7 20:15,17
  21:17,19,20,21
  21:22,23 22:10
  22:11 26:23,24
  27:11 31:5
  34:8 43:17,18
  46:18,21 47:2
  51:10
**five** 27:18,18
  27:20 47:17
**follow** 29:18
**follows** 4:4
**force** 3:12
**foregoing**
  55:13 56:18

**[forget - instructions]**

**forget**  46:12
**forgot**  46:12
**form**  3:18
**forth**  53:9
**forward**  54:15
**frame**  45:25
**francis**  43:10
  43:14
**free**  55:14
  56:20
**frequent**  17:5,8
**friday**  14:9,17
  14:20,23 15:10
**front**  24:5,8
**full**  10:11 11:2
**further**  3:17
  53:12

**g**

**g**  22:5
**give**  4:25 6:16
**given**  53:10
**go**  4:19 6:6
  32:15 33:5,7
  34:1,17,24
  35:11 38:4,17
  44:17 45:2
  47:16 49:21,23
**going**  6:25 7:8
  7:23 17:16
  18:22 20:20
  35:8 39:4
  49:22
**good**  4:12
  34:20 35:3
  37:2 42:13,15

**google**  43:23
  44:3,11,14,16
  44:25 45:11
**google.com**
  44:18
**gordon**  2:8
**gotten**  34:11
**gough**  2:11 4:6
  4:13 8:24 9:4
  14:2 19:5,22
  35:11 38:4,7
  38:15 45:12
  47:16 49:15
  50:1 52:3
**graphic**  18:20
  18:23
**graphics**  18:11
  18:14,15
**great**  2:6 50:5
**greene**  43:8,11
  43:14
**grocery**  16:21
  17:1
**ground**  4:19
**grsm.com**  2:12
  2:12
**guess**  14:13
  23:22
**guessing**  36:13
  37:23

**h**

**h**  4:1 51:1
**half**  14:21 21:8
  21:12 31:14,18
  36:17

**hand**  53:16
**happened**  27:1
  27:1 45:21,22
**head**  5:2
**heard**  13:6 43:7
**held**  1:18 40:14
**hereinbefore**
  53:9
**hereunto**  53:16
**highest**  25:18
  25:19 48:17
**history**  11:10
**home**  10:6,20
  10:21,22,24
  28:18
**honest**  12:15
**honestly**  45:4
**hot**  26:13
**hotel**  10:19
**hour**  5:24
  14:21 31:14,18
**hours**  30:2,3
  38:1,13,17
**housekeeping**
  9:19 10:8,12
  10:16
**hum**  21:14
**hunt**  1:3 2:4
  46:10 54:6
  55:3 56:3
**hurt**  29:12
**hurting**  38:21

**i**

**icing**  28:19
**icy**  26:13
**identification**
  7:12 19:9
**illinois**  1:1 4:10
**image**  20:8,10
  20:15
**imaging**  28:4
**immediately**
  34:9
**important**  4:22
  4:25
**include**  48:21
**included**  54:13
**including**  19:1
**incorporated**
  56:12
**indicate**  14:2
**indicated**  20:6
**indicating**
  24:12 54:13
**individual**  23:3
  25:6,25
**individually**
  1:3 2:4 25:3
**information**
  12:11 45:20
  52:7,8
**injuries**  15:25
**injury**  27:5
**inside**  25:3
**instructions**
  24:22,25 25:5
  29:15,18,21

**[interested - lower]** Page 6

**interested**
 53:14
**interfere**  5:13
**internet**  44:24
**interrupt**  35:9
**introduce**  7:8
 19:5
**inventory**
 10:18
**involved**  11:5,7
**issues**  40:3

**j**

**j**  4:1 9:14
**job**  9:18 10:5
 10:15,19
**johnson**  1:3,16
 2:4 4:8,12,18
 7:11,18 9:14
 9:15 11:21
 14:1,5 19:10
 35:15 45:2
 47:22 49:18,19
 49:21 50:1,3
 51:9 54:8 55:4
 55:9 56:4,13
 57:20
**joliet**  4:10 9:7
 10:23
**judge**  3:10
**jump**  44:22

**k**

**k**  22:5
**karyn**  1:19
 38:7 53:6,20

**keep**  36:14
**kgough**  2:12
**kind**  13:17 24:3
 30:21
**kirsten**  2:11
 4:13 19:20
**know**  6:2,9,13
 6:18 12:18
 14:3 16:13,15
 16:17 19:20
 22:7 27:23
 37:6,8,9,10,16
 37:20 40:9,17
 43:21 44:23
 46:5,8,10,23
 49:10,20
**knowledge**
 11:24 47:13
**kroger**  1:8 2:9
 4:14 17:1,4,7
 17:11,19 23:20
 28:15 42:4,7
 48:9 54:6 55:3
 56:3

**l**

**l**  3:1,1 4:1 9:14
 9:25 22:5,5
**label**  17:23
 18:4,11 19:1
**lanette**  1:3,15
 2:4 4:8,18 54:8
 55:4,9 56:4,13
 57:20
**lasted**  27:17
 48:12

**laureate**  9:23
 10:1,4,8
**law**  43:7,8
**lawsuit**  43:25
 45:14
**lawsuits**  11:5
**lawyers**  43:4
**lead**  27:5
**learn**  43:22
**leave**  29:22
**led**  49:7
**left**  21:16 26:22
 28:2,5,5,10
 29:2 33:11
 34:10 35:19
 40:22 41:5
**leg**  21:10,15
 34:10,14,17,22
 36:10 37:13
 38:19 39:16,23
**legal**  11:19,20
 12:20 47:10
 54:1 57:1
**letter**  43:13
 54:19
**level**  25:19,19
 48:17
**lidocaine**  12:6
 13:1 15:21
 16:8,10,13,17
 17:17,19 23:20
 24:1 26:8,18
 27:12 28:14
 29:1 40:9 42:7
 42:9,13 43:24

 44:2 48:8,9,23
 49:4
**life**  49:10,12
**line**  52:13
 54:13 56:7
 57:3
**listed**  56:7,17
**listing**  56:7
**litigation**  17:20
**little**  21:9 27:19
 33:9 34:23
**lives**  9:11
**living**  9:8
**llp**  2:8
**load**  13:1
**location**  1:18
 21:25 31:9
**log**  44:15
**long**  9:8 10:1
 14:19 27:8,9
 29:21,24 31:12
 33:4 34:24
 37:10 42:17
**longer**  27:18,19
 27:21 35:21
 36:4 49:6
**look**  17:23
 19:12 20:1
 44:18,19
**looked**  18:11
 18:17 47:2,7
**looks**  20:5
**lower**  21:3,8,9
 21:12 26:22
 28:2,5,10 29:2

**[lower - okay]**

29:12 33:11
34:9 35:18
40:22 41:5
48:11
**loyalty** 17:10

**m**

**m** 2:11 9:15
**madam** 54:10
**made** 18:4,12
18:21 19:2
27:10 30:15,19
55:7
**make** 29:13
36:19 47:7
**male** 18:2,17
24:11
**mansukhani**
2:8
**marcus** 9:14
**mariano's**
16:19 17:4,7
17:11,14 21:24
22:7 26:19
41:25
**marked** 7:11
19:8 52:12
**marriage** 53:14
**matter** 53:15
**maximum** 12:6
18:7,24 19:3
21:4 24:13
25:13,16,18
39:10,14 48:16
48:25

**mean** 17:18
25:17 34:6
42:12 44:9
**meaning** 25:18
**means** 5:7
**media** 44:23
**medical** 5:16
15:18,22
**medication**
5:12 16:5
28:12
**met** 43:10
**middle** 18:18
29:9 36:13
**midwest** 54:17
57:1
**mill** 2:5
**mind** 38:7
**minutes** 47:17
**mixed** 34:11
**mom** 10:6
**moment** 38:5
**month** 15:3,4
15:11
**morning** 33:22
34:7 35:20
36:4 38:20
39:16
**muscle** 27:7

**n**

**n** 2:1 3:1 4:1,1
4:1 9:14 22:5
52:1
**name** 4:7,16
46:17 54:6

55:3,4,15 56:3
56:4,21
**name's** 4:13
**named** 12:9
43:10 46:8,10
**names** 9:13
**near** 23:19
**necessary**
12:11
**neck** 2:6
**need** 6:1,4,11
6:15,18
**network** 45:5
**never** 26:11,13
26:15 41:17
48:4,7
**new** 1:20 2:6
4:3 53:3,4,7
**night** 30:1
34:13,19,21
35:2,6 36:25
37:3,14 39:19
39:25 42:22,24
**nine** 23:6 32:1
32:4
**nods** 5:1
**northern** 1:1
**notarized**
54:14
**notary** 1:19 4:2
53:6 54:25
55:10,18 56:15
56:23 57:23
**note** 54:12

**notes** 21:6
47:18
**notice** 7:10,17
25:13 34:9,13
51:7
**noticed** 27:11
**number** 8:2,13
51:6 54:7,13
**numbers** 56:7
**nursing** 10:20
10:21,22,24

**o**

**o** 3:1 4:1,1 22:5
22:5,5
**oath** 3:9 5:4
**objection** 11:19
12:20 47:1,10
**objections** 3:18
**occasion** 16:23
**occasions** 15:13
15:15
**october** 46:15
**offhand** 43:18
**office** 45:23
**official** 55:15
56:21
**oh** 10:21 14:4
19:24 21:10
33:24
**ohio** 54:2
**okay** 4:23 5:2
5:21 6:2,17,22
7:1 9:4 10:21
13:19 15:17
19:25 21:12

**[okay - product]**

22:10 29:4
31:5 34:1,20
35:11,17 45:10
47:16,20 49:14
49:25

**once** 5:24 22:16
30:8 33:20
37:24

**oneida** 4:10 9:6

**ongoing** 15:24

**operations** 9:23
10:2,4,8

**orders** 10:17

**original** 3:7,14

**outcome** 53:15

**outside** 35:9

**overhear** 14:16

**overnight** 30:7

**p**

**p** 2:1,1 3:1

**p.m.** 1:12 5:24
5:25,25 32:12
34:2 50:8

**package** 20:7
39:9

**packaging** 18:3
19:1 26:2
35:24 36:7

**page** 7:23 51:5
52:2,8,13
54:13,15 56:7
57:3

**pain** 16:16
18:19 21:3,7
24:12 26:21,23

27:2,4,8,11,14
27:17,24,24
28:2,5,10,16,20
28:23 29:1,5
33:18 34:22
37:19,23 38:17
39:17,22 40:21
41:1,5,8 48:11
49:7,9

**pajama** 33:1

**pants** 33:1

**paper** 30:25

**part** 18:23
29:12 36:17
56:9

**parties** 1:18 3:5
53:13

**parts** 36:16

**past** 15:24

**patch** 12:6 13:2
13:12,17 15:21
16:8 17:17,19
23:20 24:1
25:6 27:12
28:15 29:1,7
29:10,22 30:3
30:6,11,14,16
30:20 31:8,18
31:21 32:9,21
32:24 33:4,11
33:20 34:5,8,8
34:14,16 35:3
35:23 36:3,14
37:6,10 38:22
38:23 40:1,6

42:8,9,13
43:24 45:14
48:9,23

**patches** 23:3,6
25:2,25 26:9
26:11,13,16,19
32:1,4 40:10
40:12 44:2
48:8

**perform** 10:19

**permitted** 14:2

**personal** 15:17

**personally**
55:11 56:15

**phone** 54:3

**phrase** 25:16
48:15

**phrases** 19:2

**picture** 19:17
44:1,15 45:14

**place** 36:20,22

**placed** 29:11

**plaintiff** 1:15
2:3 7:11,16,18
12:9 49:17
51:8

**plaintiff's** 19:8

**plaintiffs** 1:4

**plan** 5:23,25
34:16

**plastic** 36:12

**platform** 45:5

**please** 4:7,17
11:25 12:21
54:11,11

**point** 5:20 8:6
46:3 47:19

**possession** 8:15

**possible** 37:18
45:6

**possibly** 30:1

**prepare** 8:4
12:24 13:23
14:5,24

**prescribed**
16:7,10

**prescription**
16:4 29:1
48:22

**present** 14:15

**pressed** 29:13
36:18

**pretty** 34:20
35:3 37:2
42:24

**price** 25:23

**probably** 14:13
26:24 42:12

**procedure** 1:18
55:5 56:5

**proceed** 11:21
35:14 47:22

**produced** 8:14

**product** 17:18
17:22 18:4
19:2 20:12,20
20:21,23 21:1
21:2,18,23
22:11,15,18,21
22:24 23:1,4,8

**[product - representative]**

23:17 24:1,3,6
24:9,16,19
25:8,21 26:3,6
27:5 29:5,25
31:13 35:18
39:7 41:12,15
41:20,23 42:1
42:5,14,16
48:5,15 49:4,7
**production**
7:25 8:17
54:15,17,22
**products** 23:19
40:4,7 48:21
48:22
**provide** 5:13
6:5 12:10
15:19 25:13
**provided** 37:19
37:23
**public** 1:19 4:3
53:6 55:10,18
56:15,23 57:23
**pulled** 27:6
**purchase** 21:1
21:17,22 22:14
22:17,21 23:7
25:22,23 26:6
27:5,10 41:23
**purchased**
17:22 20:13
21:2,19 22:10
23:4 24:16
25:12,20,25
26:18,25 27:12

42:1 44:2 48:8
48:14
**purchasing**
28:14
**pursuant** 1:16
**put** 30:2 31:9
31:18,21 32:14
32:17,24 33:4
33:11 34:14,16
35:2,19 36:2
36:17 37:25
38:11 49:17

---

**q**

**question** 4:23
6:5,24 12:1
38:8,9,11 41:3
52:13
**questions** 4:14
6:9,12 15:18
17:17 47:19
49:18 52:12

---

**r**

**r** 2:1 3:1 9:15
9:25 22:5 53:1
**raining** 35:10
**reach** 45:24
**reached** 46:2
**reaction** 13:17
**read** 8:2 24:5
24:15,25 29:15
38:10 55:5,6
55:12 56:5,6
56:17

**reading** 38:8
54:19
**ready** 47:22
49:23
**really** 23:21
27:9 35:1,10
**reason** 54:14
56:8 57:3
**recall** 21:20
23:5,21 25:22
27:9 29:23
30:8 31:23,23
33:6 35:1,5,7
35:25 36:9,24
37:4,12 39:20
40:5,15,19
43:25 44:4,6
44:12 45:4,8
45:22 46:22,25
**receipt** 54:18
**receipts** 26:5
**recess** 35:13
38:6 47:21
**recollection**
32:2
**record** 4:7,16
4:22 35:12
38:4 47:17
49:17,21 53:10
56:9
**red** 18:17,18
24:11,12
**rees** 2:8
**reference** 54:7
55:2 56:2

**referenced**
55:11 56:15
**referred** 38:9
**refund** 41:22
**regular** 31:1
**related** 8:6
53:12
**relaxing** 42:24
**relied** 8:3
**relief** 25:14,19
33:18 37:19,23
37:24 38:17
39:14 48:17
**relieve** 16:16
**remedies** 28:19
**remember** 15:2
15:16 18:16
23:23 24:8,10
24:18,22 25:7
27:10 39:21
43:18 45:7,15
47:24
**remotely** 1:18
**removed** 29:6,6
**repeat** 11:25
**rephrase** 6:12
8:24
**reporter** 4:20
7:13 17:25
19:9 22:2,6
38:10 49:20,23
55:7
**represent** 4:13
**representative**
12:13

| | | | |
|---|---|---|---|
| **represented** 43:1 | **road** 2:5 | **second** 7:23 8:8 | 47:10,20 48:2 |
| **request** 56:9,11 | **role** 12:8 | 19:5 35:9 | 49:16,16,25 |
| **requested** 52:7 | **roles** 10:7 | 38:25 | 50:3,5 54:5 |
| **requests** 7:24 | **room** 10:18 | **see** 7:14,19,24 | **sheehan's** |
| 8:17 | 14:10,14 | 19:10,15,20,22 | 45:23 46:6 |
| **required** 54:25 | **roughly** 31:18 | 23:16 28:7 | **sheet** 54:13 |
| **research** 13:1,3 | 34:2 38:1,12 | 33:14 35:17 | 56:7,10,18 |
| 13:4,20 | **rules** 1:17 4:19 | 38:8 39:1 | 57:1 |
| **researched** | 55:5 56:5 | 40:21 44:3,16 | **shop** 16:19,21 |
| 13:8 | **rulings** 52:12 | 44:17 46:21 | 17:2 |
| **researching** | **s** | **seek** 41:22 | **shopper** 17:5,8 |
| 13:22 | | **seen** 7:21 20:8 | **short** 35:13 |
| **reserved** 3:18 | **s** 2:1 3:1,1 4:1 | 20:17 | 38:6 47:21 |
| **respective** 3:5 | 9:15 51:1 | **separate** 36:13 | **shorter** 37:15 |
| **responsibilities** | 54:15 56:8,8 | **separated** 29:9 | **shortly** 35:19 |
| 12:13 | 57:3 | 36:13,16 | 36:3 37:14 |
| **responsive** 8:16 | **sale** 23:10 | **service** 3:13 | **shower** 31:4,13 |
| **results** 33:15 | **salonpas** 26:11 | 42:5 | 31:15,17 |
| 33:17 | **san** 2:10 | **set** 8:16 35:14 | **showered** 31:5 |
| **resume** 8:9,10 | **saw** 45:5,6,18 | 53:9,16 | **shown** 54:16 |
| **retained** 51:16 | **saying** 27:17 | **seven** 10:3,11 | **sic** 9:25 |
| **return** 41:20 | 39:10 | 23:6 30:5 | **side** 13:4,5,7,15 |
| **returned** 54:18 | **says** 7:16,17,24 | 31:25 32:4 | 13:20,22 |
| **review** 36:2 | 8:2,8,13 18:24 | **shakes** 5:2 | **sides** 29:13 |
| 54:12 55:1 | **scheduling** | **shannon** 1:3 | **sign** 43:13 |
| 56:1 | 10:17 | 2:4 46:10 54:6 | **signature** 53:19 |
| **reviewed** 8:3 | **scroll** 7:23 | 55:3 56:3 | 54:14 |
| 46:23 47:14 | 19:19,25 | **sharing** 9:4 | **signed** 3:8,10 |
| **right** 5:21 31:3 | **scully** 2:8 | **sheehan** 2:3,6 | 3:12 55:13 |
| 31:4 32:2 | **seal** 55:15 | 11:19,23 12:20 | 56:18 |
| 36:25 37:21 | 56:21 | 14:1,6,11,16,19 | **signing** 54:19 |
| 48:12 | **sealing** 3:6 | 14:22 15:6,14 | **similar** 13:5 |
| **riser** 33:24 | **search** 44:16 | 19:19,24 43:2 | 26:8 |
| | **searched** 44:13 | 43:17,21 44:22 | **similarly** 1:3 |
| | **searching** | 45:3,10 47:1 | 2:5 |
| | 34:11 | | |

**[sincerely - thank]**

| | | | |
|---|---|---|---|
| **sincerely** 54:21 | **speaking** 14:22 | **stipulated** 3:4 | **sworn** 3:8 4:2 |
| **sir** 54:10 | **specific** 15:3 | 3:17 | 53:9 55:10,13 |
| **situated** 1:3 2:5 | **spell** 9:24 22:2 | **stop** 9:4 22:24 | 56:14,18 57:21 |
| **skimmed** 24:17 | **spencer** 2:3,6,7 | **store** 17:1 | **t** |
| **skin** 29:22,25 | 54:5 | 26:19 42:1 | **t** 3:1,1 4:1,1 |
| 30:4,13 31:6 | **spencersheeh...** | **stores** 16:19,21 | 9:25 51:1 53:1 |
| 31:10,16,19,21 | 2:7 | **street** 4:10 9:7 | 53:1 |
| 32:21 35:21 | **split** 29:10 | 22:7 | **take** 5:1,23 6:1 |
| 36:5 40:4 | **spoke** 14:3,9,11 | **strength** 12:7 | 6:4 28:1,12,25 |
| 42:18 | 14:17 15:5,8 | 18:7,24 19:3 | **taken** 1:16 7:3 |
| **sleep** 34:2,17 | 15:10 | 21:4 24:14 | 16:4 35:13 |
| 34:19 39:19 | **spoken** 15:14 | 25:13,16,18 | 38:6 47:21 |
| **sleeping** 30:11 | **ss** 53:3 | 39:10 48:16,25 | **talked** 15:7 |
| 34:22,24 37:6 | **start** 17:16 | **stuck** 36:20,21 | 43:16 45:13 |
| 37:9,21 39:22 | **started** 4:20 | **subject** 17:19 | 47:24 |
| **slept** 35:3 37:2 | **state** 1:19 4:3,7 | **subpoena** 1:17 | **talking** 13:16 |
| **social** 44:23 | 4:16 42:25 | **subscribed** | 19:16 35:17 |
| **socks** 33:1 | 53:3,7 55:10 | 55:10 56:14 | 44:20,21,25 |
| **solutions** 54:1 | 56:15 | 57:21 | **target** 18:19 |
| 57:1 | **statement** | **sued** 48:4 | **tell** 5:8,21 15:7 |
| **somebody** | 55:13,14 56:19 | **suite** 2:5,10 | 22:17,23 42:1 |
| 13:16 | 56:19 | 54:2 | 42:17 45:1 |
| **sons** 9:12 | **states** 1:1 | **superior** 54:1 | **telling** 43:16 |
| **sooner** 6:1 | **stay** 10:6 29:25 | **supervisor** 9:19 | **ten** 47:17 |
| **soreness** 13:10 | 30:3,6,9 33:14 | 10:9,13,16 | **testified** 4:4 7:6 |
| 13:11,16,19 | 34:5 36:20 | **supply** 10:17 | **testify** 5:17 |
| **sorry** 7:16 | 39:12 | **supposed** 16:16 | **testimony** 5:14 |
| 11:25 21:6 | **stayed** 42:18 | **sure** 12:2 24:4 | 6:22 38:10 |
| 45:12 | **stick** 29:14 | 27:3 30:15,19 | 53:10 55:6,7 |
| **sort** 8:5 13:3 | 36:18 | 36:1,19 38:18 | 56:6,9,12 |
| 28:18 31:9 | **sticking** 36:14 | 38:24,24 39:3 | **thank** 10:21 |
| **speak** 14:6,8,19 | 40:4 | 44:25 45:25 | 21:13 22:6 |
| 14:23 41:10 | **sticky** 35:24 | 47:7 49:5 | 38:15 46:16 |
| 43:17 | 36:8 | **surgeries** 16:2 | 49:19 50:1,3,4 |
| | | | 50:7 |

**thing** 19:21
**things** 44:23
**think** 19:25
24:11 30:6
31:25 41:3
46:12 47:18
49:15
**thinking** 15:11
**thirty** 54:18
**thought** 21:12
**three** 15:12,15
27:13
**tiffany** 46:8
**time** 1:12 3:19
6:12 11:2 14:3
14:23 22:10
28:1 31:17
32:8 33:7,21
45:25 50:2
**times** 15:5,8
22:14
**today** 5:5,10,14
5:18,20 6:16
7:9 8:11,19,22
9:1 12:25
13:24 14:6,24
**told** 40:25 41:4
**took** 29:9,11
30:18 35:23
36:7,15
**tossed** 40:15,17
**tossing** 40:15
**towel** 30:25
31:1,3

**transcribed**
55:7
**transcript**
54:11,12 55:5
55:12 56:5,11
56:17
**treatment** 28:9
**trial** 3:19
**trouble** 34:22
34:24
**true** 53:10
**truth** 5:8
**truthful** 6:21
**try** 39:1,15
41:20
**trying** 42:8
44:15
**tv** 32:19
**two** 9:12 26:25
27:10 33:19
36:16
**type** 25:14
30:23 33:15
37:24 40:6
42:14 45:5
**typically** 33:7
33:21 34:1

**u**

**u** 3:1 9:15,25
**um** 21:14
**under** 5:4
**understand** 5:4
5:7 6:8 17:18
19:14 20:3,10
20:14 46:17

48:19
**understanding**
11:18 12:3,8
12:12 25:15
48:16,20 49:3
**understandin...**
12:5
**understood**
6:25
**unhappy** 42:2
**united** 1:1
**unsigned** 3:11
**update** 6:15
**use** 15:20 17:13
23:7 30:21,24
32:4,6,8 39:7,8
40:13 49:7
**used** 3:12 26:8
26:11,13,15
40:6,9 42:7
**using** 22:24
23:1 31:2
42:16

**v**

**v** 54:6 55:3
56:3
**varies** 33:8
**verbal** 5:1
**veritext** 54:1,7
57:1
**veritext.com.**
54:17
**vitae** 8:9

**w**

**w** 2:10
**wait** 31:13
**waived** 3:7
54:19
**wake** 33:21
**waking** 35:5
36:25
**walmart** 16:23
**want** 18:4,12
18:21 19:2
27:13,19 32:10
39:1
**wanted** 36:18
49:17
**watched** 32:18
**way** 6:21 18:10
23:13 25:8
49:10,12 53:14
**wearing** 33:15
**webster** 2:11
**week** 15:4,12
21:20,21,23
22:11 26:24
27:21,21,22
48:12
**went** 32:19
35:20 36:3
39:9
**wet** 30:18,22
**whereof** 53:16
**white** 17:24
24:21 29:8
**wiped** 30:18,19

**[witness - zoom]**                    Page 13

**witness**   3:8,13
   3:15 4:2 14:4
   18:1 22:4 35:8
   50:4,6,9 53:8
   53:11,16 54:8
   54:11 55:1,4
   55:11 56:1,4
   56:15
**witness'**   54:14
**woke**   35:20
   36:3 37:14
   38:1,12,19
   39:16
**words**   19:1
**work**   10:25
   11:2 25:8 28:1
   32:10 38:25
   39:4 40:25
   41:4 42:21
   49:11
**worked**   10:1,12
**would've**   37:22
   37:23
**wound**   40:15
**wrapped**   25:3

**x**

**x**   1:2,9 51:1
   52:1

**y**

**yeah**   19:25
   39:5 45:3,8
**year**   15:9 21:19
   22:12 43:20
   44:5,7,8

**years**   9:10 10:3
   10:11
**york**   1:20 2:6
   4:3 53:3,4,7

**z**

**zoom**   19:22,24
   19:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.