# EXHIBIT B

Page 1

1        UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS

2         EASTERN DIVISION
  ----------------------------------------X

3  SHANNON HUNT and LANETTE JOHNSON, individually and
  on behalf of all others similarly situated,

4

               PLAINTIFFS,

5

6      -against-Case No.:
             1:22-cv-04744

7

8  THE KROGER CO,

9            DEFENDANT.
  ----------------------------------------X

10

11           DATE:  May 13, 2024

12           TIME:  11:38 A.M.

13

14

15      DEPOSITION of the Plaintiff, SHANNON HUNT,

16  taken by the Defendant, pursuant to a Subpoena and

17  to the Federal Rules of Civil Procedure, held

18  remotely, at all parties' location, before Karyn

19  Chiusano, a Notary Public of the State of New York.

20

21

22

23

24

25

```
                                              Page 2

 1   A P P E A R A N C E S:

 2

 3   SPENCER SHEEHAN & ASSOCIATES
        Attorneys for the Plaintiff
 4      SHANNON HUNT and LANETTE JOHNSON,
        individually and on behalf of all others
 5   similarly situated
        60 Cutter Mill Road ~ Suite 409
 6      Great Neck, New York 11021
        BY: SPENCER SHEEHAN, ESQ.
 7      spencer@spencersheehan.com

 8

     GORDON, REES, SCULLY, MANSUKHANI, LLP
 9      Attorneys for the Defendant
        THE KROGER CO.
10      101 W. Broadway ~ Suite 2000
        San Diego, California 92101
11      BY:   KIRSTEN M. GOUGH, ESQ.
           DIANE WEBSTER, ESQ.
12      kgough@grsm.com
        dwebster@grsm.com

13

14
              *      *      *
15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1    F E D E R A L   S T I P U L A T I O N S

2

3

4    IT IS HEREBY STIPULATED AND AGREED by and between

5    the counsel for the respective parties herein that

6    the sealing, filing and certification of the within

7    deposition be waived; that the original of the

8    deposition may be signed and sworn to by the witness

9    before anyone authorized to administer an oath, with

10   the same effect as if signed before a Judge of the

11   Court; that an unsigned copy of the deposition may

12   be used with the same force and effect as if signed

13   by the witness, 30 days after service of the

14   original & 1 copy of same upon counsel for the

15   witness.

16

17   IT IS FURTHER STIPULATED AND AGREED that all

18   objections except as to form, are reserved to the

19   time of trial.

20

21                   *    *    *    *

22

23

24

25

```
                                                Page 4
```

1    S H A N N O N    H U N T, called as a witness,

2    having been first duly sworn by a Notary Public of

3    the State of New York, was examined and testified as

4    follows:

5    EXAMINATION BY

6    MS. GOUGH:

7          Q.      Please state your name for the record.

8          A.      Shannon Hunt.

9          Q.      What is your address?

10         A.      2628 South Millard Avenue, Chicago,

11   Illinois 60623.

12                 MR. SHEEHAN:  Spencer Sheehan for the

13   Plaintiff, would like to jump in here first.

14                 Can you hear me?

15                 MS. GOUGH:  Yes.

16                 MR. SHEEHAN:  Can you hear me?

17                 Okay.  I understand, and I appreciate

18   that this video deposition is taking place by Zoom.

19                 Is this video being recorded by video

20   in addition to occurring over Zoom?

21                 MS. GOUGH:  No.

22                 MR. SHEEHAN:  Okay.  Thank you.

23                 That is all, just a forum.  I

24   appreciate it.

25                 MS. GOUGH:  Okay.  I think we can go on

```
                                          Page 5
 1   the record.
 2                THE COURT REPORTER:  I'm ready for you.
 3        Q.    Okay.  Good morning, Mr. Hunt.
 4                My name is Kirsten Gough.  I represent
 5   the Defendant in this case, The Kroger Co.
 6                Could can you please state your name
 7   for the record?
 8        A.    Shannon Hunt.
 9        Q.    I'll be asking you questions today.
10   Before we get into it, I'd like to go over a few
11   ground rules.
12                Karyn is our Court Reporter this
13   morning --
14                THE COURT REPORTER:  Hold on a second.
15                Mr. Shannon, you have to -- like,
16   you're making a lot of noise and it's difficult to
17   hear.
18                MR. SHEEHAN:  That's me.
19                I'll go on mute.
20                I'm sorry.
21                THE COURT REPORTER:  Yeah.
22                That would be great.
23                Okay.  So, I'll be asking you
24   questions.  Before we get into it I want to go over
25   some ground rules.
```

Page 6

1                    MS. GOUGH:  Thank you, Karyn.

2          Q.      Okay.  The first thing is:  Karyn is

3      our Court Reporter this morning.  She'll be taking

4      down everything we say.

5                    It's important that we have a clear

6      record.  So, can you let me finish my question

7      before you start any answers?

8          A.      Okay.

9          Q.      And your answers must also be verbal on

10     the record so that -- she can't take down nodding of

11     the head or shakes of the head; okay?

12         A.      All right.

13         Q.      You understand you're under oath this

14     morning?

15         A.      Yes, I do.

16         Q.      You understand that means you must tell

17     the truth?

18         A.      Yes, I do.

19         Q.      And you'll do that today?

20         A.      Yes.

21         Q.      Are you taking any medication this

22     morning that would interfere with your ability to

23     provide testimony this morning?

24         A.      No, I'm not.

25         Q.      Is there anything else, medical or

1   otherwise, that would effect your ability to testify

2   this morning?

3        A.    No.

4        Q.    If that changes at any point today,

5   will you let me know?

6        A.    Yes.

7        Q.    We'll plan to take a break about once

8   an hour.  If you need a break sooner, will you let

9   me know?

10       A.    Yes.

11       Q.    Okay.  If you need a break at any

12   point, my only request is that if I've asked a

13   question, that you go ahead and give me the answer

14   before we go on the break; is that okay?

15       A.    Yes.

16       Q.    If you don't understand any of my

17   questions, will you let me know?

18       A.    Yes.

19       Q.    And will you let me know if you need me

20   to clarify or rephrase any of my questions?

21       A.    Yes.

22       Q.    And if you, at any point, want to

23   clarify, or change, or update any of your answers,

24   you can do that.

25            Will you let me know that you need to

```
                                        Page 8
 1   do that?
 2          A.     Yes.
 3          Q.     And that way we can get your truthful,
 4   accurate, complete testimony here today; okay?
 5          A.     Okay.
 6          Q.     And if you answer my question, and you
 7   don't ask for a clarification, I'm going to assume
 8   that you understood the question when you give your
 9   answer; okay?
10          A.     All right.
11          Q.     Have you ever had your deposition taken
12   before?
13          A.     No, I haven't.
14          Q.     Have you ever testified in court?
15          A.     No, I haven't.  Not in -- not in -- not
16   in civil court, no.
17          Q.     Have you testified in criminal court?
18          A.     Yes.
19          Q.     How many times?
20          A.     Twice.
21          Q.     Was that in Chicago?
22          A.     Yes.
23          Q.     What were the nature of those case --
24   was it two separate cases?
25          A.     Yes.
```

Page 9

1        Q.      What were the nature of those cases?

2        A.      It was a possession of a controlled

3   substance.

4        Q.      Were you a witness or the Defendant?

5        A.      I was the Defendant.

6        Q.      Both cases?

7        A.      Yes.

8        Q.      When were those cases?

9        A.      The cases was all originally from 2009.

10       Q.      Any other involvement in criminal

11  cases?

12       A.      No.

13       Q.      Can you tell me your date of birth,

14  please?

15       A.      2/10/70.

16       Q.      And I know you gave Karyn your address

17  earlier.  And I didn't write it down.

18               Can you please tell me your current

19  home address?

20       A.      ███████████████████████████████████

    ███  ██████████████████████

22               MS. GOUGH:  Let's go off the record for

23  just a moment.

24               Thank you.

25               (Whereupon, a short recess was taken.)

Page 10

1      Q.    Mr. Hunt, are you okay to go back on
2  the record?
3      A.    Yes.
4      Q.    Okay.  I am ready when you are.
5            THE COURT REPORTER:  Anytime you're
6  ready.
7            MS. GOUGH:  Oh, you know what?  I'm so
8  sorry, she's -- I'm so sorry, tech issues on our
9  end.
10           THE COURT REPORTER:  Oh, Spencer
11  Shannon isn't in.  He's just coming in again.
12           (Whereupon, a short recess was taken.)
13           MS. GOUGH:  Okay.  We can go back on
14  the record.
15      Q.    Okay.  Apologies, Mr. Hunt.
16           Thank you for your patience as I
17  figured out my tech issues on my end.
18           Okay.  So, you live at 2628 South
19  Millard Avenue in Chicago.
20           How long have you lived there?
21      A.    Approximately three and a half years.
22      Q.    Where did you live before South Millard
23  Avenue?
24      A.    I stayed at 2 -- 216 South California
25  Avenue.

Page 11

```
 1        Q.     Also in Chicago?
 2        A.     Yes.
 3               60612 area code.
 4        Q.     How long did you live there?
 5        A.     Two years.  Almost two years.
 6        Q.     Have you ever lived outside of Chicago?
 7        A.     No, I haven't.
 8        Q.     Are you currently employed?
 9        A.     Not at the moment, no.  I just recently
10   got laid off.
11        Q.     What was the job that you got laid off
12   from?
13        A.     I was -- I worked at Chicago Dryer.
14        Q.     And what --
15        A.     They -- excuse me.
16        Q.     Go ahead.
17               What is Chicago Dryer?
18        A.     A manufacture of industrial sized
19   dryers.
20        Q.     And is that clothes --
21        A.     Excuse me.  I didn't hear you.
22        Q.     Like, clothes dryers for laundry?
23        A.     Yes, for laundry, yes.
24        Q.     How long did you work there?
25        A.     I worked there a year.
```

Page 12

1    Q.    What did you do before Chicago Dryer?

2    A.    I worked at Quiet Logistics.

3    Q.    What did you do there?

4    A.    I was a sorter and a -- I worked in

5  shipping and receiving.

6    Q.    How long did you work at Quiet

7  Logistics?

8    A.    A year.

9    Q.    What did you do before Quiet Logistics?

10    A.    Before Quiet Logistics, I worked for --

11  I worked at S&C Electric.

12    Q.    What did you do for S&C Electric?

13    A.    I was a mechanical assembler.

14    Q.    How long did you work for S&C Electric?

15    A.    Six years.

16    Q.    Besides these three positions that we

17  talked about, have you had any other jobs or

18  employment in the last, say, eight years?

19    A.    Yes, I was doing lawn care.

20    Q.    How long have you done lawn care?

21    A.    I've done it off and on over the last

22  12 years.

23    Q.    Is that just a summer -- summer gig,

24  like, spring, summer, fall kind of deal?

25    A.    Yeah, it's seasonal, so yes.

                                                           Page 13

1          Q.      Are you currently doing that?

2          A.      Yes.

3          Q.      Is there a particular company that you

4     work with?

5          A.      No.

6          Q.      Have you -- besides this case, have you

7     been involved in any other civil lawsuits?

8          A.      Yes.

9          Q.      How many?

10         A.      Two.

11         Q.      Okay.  Tell me about that first one.

12         A.      The first one, I believe it was a --

13                 MR. SHEEHAN:  This is Spencer Sheehan.

14                 Mr. Hunt, can I jump in here?

15                 THE WITNESS:  Yes, you can.

16                 MR. SHEEHAN:  Kirsten, I think -- and

17    I'll just make it easier.  I think Mr. Hunt may be

18    referring to the two cases where you were named

19    Plaintiff.

20                 Did I have that correct?

21                 THE WITNESS:  Yes.

22                 MR. SHEEHAN:  Okay.  You do your best

23    to try to remember what those were.  If you can't, I

24    will make sure to get that information to Kirsten

25    after; okay?

```
                                            Page 14

 1                  THE WITNESS:  Okay.

 2                  MR. SHEEHAN:  All right.  Go ahead.

 3      Please continue.  I'm sorry.

 4          A.    Okay.  I believe the first one was -- I

 5      can't -- quite remember the company, but it was --

 6                  MR. SHEEHAN:  It was Hunt verse General

 7      Mills.

 8                  Does that sound familiar?

 9                  THE WITNESS:  Yeah.

10                  Yeah, it was the -- the honey nut bar,

11      I believe it was.

12                  MR. SHEEHAN:  Yes.

13                  Yes.  Yes.  Yes.  That's right.  Honey

14      Oats.

15                  THE WITNESS:  Yes.

16                  MR. SHEEHAN:  Okay.

17          A.    And I can't quite remember the second

18      one.

19                  MR. SHEEHAN:  I think the second one,

20      Mr. Hunt, was -- could that have been a lidocaine

21      case?

22                  THE WITNESS:  Yes, it was.

23                  MR. SHEEHAN:  Was that a lidocaine one?

24                  THE WITNESS:  Yes, it was.

25                  MR. SHEEHAN:  Yes.
```

Page 15

1          I think -- right.  Kirsten, I think it
2    was -- it might have been one -- yeah, it was.  I
3    think it was a Dollar General or something.
4                    THE WITNESS:  Yeah.
5                    MR. SHEEHAN:  Something like that.
6                    Kirsten, I'm sure you already know
7    which one it is, so I'm doing your search, but I'm
8    pretty sure those were the two.
9          Q.    Okay.  Mr. Hunt, besides the General
10   Mills case and the other lidocaine case, any other
11   civil lawsuits that you've been involved with?
12         A.    No.
13         Q.    The General Mills case, Honey Oats,
14   what was the product in that case?
15         A.    It was a -- it was a Honey Nut Oat bar,
16   I believe it was.
17         Q.    When was that case?
18         A.    I'm not -- I can't quite remember.
19         Q.    Was it in the last year or further back
20   than a year?
21         A.    I believe it was further back.  If I --
22   if I recall correctly.
23         Q.    What were your claims in the General
24   Mills Honey Oat bar case?
25                    MR. SHEEHAN:  Objection; legal

Page 16

1   conclusion.

2           We will provide you the complaint, so

3   continue.

4           MS. GOUGH:   Sure.

5       Q.      And you can answer, Mr. Hunt.

6           MR. SHEEHAN:   Yes.

7       Q.      Just to the best that you remember.

8           MR. SHEEHAN:   Right.

9       A.      To be honest, I can't -- I can't recall

10  it.

11      Q.      Was that in a case in Illinois?

12      A.      I believe so, yes.

13      Q.      Was it in Federal Court?

14      A.      I can't quite remember.   I'm sorry.

15      Q.      No problem.

16          And the other lidocaine case, was that

17  -- what kind of product was at issue there?

18      A.      I believe it was a -- a -- another

19  brand of the -- of the patches for -- if my memory

20  serves me correctly.

21      Q.      And who -- who was the Defendant in

22  that case, Mr. Hunt?

23      A.      Who was the Defendant?

24      Q.      Yes.

25      A.      The manufacture of the -- of the -- of

Page 17

1      the patch, Kroger.

2                    MR. SHEEHAN:  No.

3                    She's not talking about the other --

4      she's talking about the other ones, not this one.

5                    THE WITNESS:  Oh, oh, oh.

6                    Yeah, what was the other one?

7           A.    I can't remember.

8                    MR. SHEEHAN:  Oh, Kirsten, I pulled up

9      that information.

10                   MS. GOUGH:  Sure.

11                   MR. SHEEHAN:  It shows Greenbrier

12     International.

13                   MS. GOUGH:  Okay.  So, I can get that

14     from you maybe off the record.

15                   MR. SHEEHAN:  Sure.  No problem.

16                   MS. GOUGH:  Okay.

17                   MR. SHEEHAN:  But I think it was, like,

18     dollar stuff stores.

19                   MS. GOUGH:  Okay.  Thank you.

20          Q.    Mr. Hunt, where was the other lidocaine

21     patch case that you were involved with?

22          A.    The other lidocaine?

23          Q.    Yep, the other lidocaine patch case,

24     where was that case filed?

25          A.    I don't remember.

Page 18

1      Q.      Do you remember when that case was?

2      A.      No.

3      Q.      Was it in the last year or so?

4      A.      I believe it's been a little longer

5  than that.

6      Q.      Is the General Mills Honey Nut oat bar

7  case still going on?

8      A.      No.

9      Q.      Did you receive a settlement in that

10  case?

11             MR. SHEEHAN:  Objection.

12             Privileged.

13             Ms. Gough, that's something that can't

14  be disclosed pursuant to anything.

15             MS. GOUGH:  Are you instructing your

16  client not to answer?

17             MR. SHEEHAN:  I hope you can

18  understand.  I don't want --

19             MS. GOUGH:  Sure.

20             MR. SHEEHAN:  -- first.

21             MS. GOUGH:  I just want to be clear

22  that he's not --

23             THE COURT REPORTER:  One at a time,

24  please.

25             MR. SHEEHAN:  I'm sorry?

Page 19

1              THE COURT REPORTER:  One at a time,
2    please.

3              MR. SHEEHAN:  Okay.

4              You can answer, Mr. Hunt, you can
5    answer.  You can answer.

6         A.    What was the question again?

7              MS. GOUGH:  Karyn, can you please read
8    it back?

9              (Whereupon, the referred to question
10   and testimony was read back by the Reporter:

11             "QUESTION:  Did you receive a
12   settlement in that case?")

13        A.    Yes, I did.

14        Q.    And the other lidocaine patch case, is
15   that case still going on?

16        A.    No.

17        Q.    Did that case settle?

18        A.    Yes.

19        Q.    And same question for that case:  Did
20   you receive a settlement in the other lidocaine
21   patch case?

22        A.    Yes.

23        Q.    Okay.  We might come back with more
24   questions on the lidocaine patch case later.

25             For this case, you've sued my client,

Page 20

1    The Kroger, Co.

2              What is your understanding of this

3    case?

4         A.    Can you rephrase the question?

5         Q.    Sure.

6              You understand that you are a named

7    Plaintiff in this case?

8         A.    Uh-hum.

9              THE COURT REPORTER:  I didn't get a

10   response.

11        A.    Yes.

12        Q.    And you understand that you have been

13   named as a class representative in this case?

14        A.    Yes.

15        Q.    What is your understanding of your role

16   as a named Plaintiff in this case?

17        A.    Well, my -- I believe my role is to --

18   I'm trying to speak -- conversation for -- for

19   everyone that was misleaded [sic] by this product.

20        Q.    Okay.  And what is your understanding

21   of the responsibilities of a class representative in

22   this case?

23        A.    I'm not sure what you mean.

24        Q.    Do you understand that you have any

25   particular duties or obligation, as class

Page 21

1    representative?

2          A.      What sort of duties?

3                  I'm -- I'm not understanding what you

4    -- what you're asking me.

5          Q.      That's my question to you, Mr. Hunt:

6    Do you understand that there's anything that you

7    need to do, as class representative in this case?

8          A.      Yes, to tell the truth.

9          Q.      Yes, absolutely.

10                 What else?

11         A.      And to answer the questions that to the

12   best of my ability on.

13         Q.      Yes.

14                 And outside of our deposition here

15   today, is there anything that, as class

16   representative, you understand that you need to do?

17         A.      Yes.

18         Q.      And what is that?

19         A.      I believe I should just try to -- just

20   try to answer all the -- all the questions that's --

21   that you're asking me in full and to the best of my

22   ability.

23         Q.      Aside from that and aside from our

24   deposition here today, is there anything else that

25   you understand you are supposed to do, as class

                                                    Page 22

1    representative?

2         A.      No.

3         Q.      Do you know what the class definition

4    is in this case?

5                 MR. SHEEHAN:  Objection.

6                 Legal.

7                 Please continue so we can get your

8    answer or attempt to get an answer.

9                 THE COURT REPORTER:  I can't really

10   hear you, sir.  Mr. --

11                MR. SHEEHAN:  I'm sorry?

12                THE COURT REPORTER:  I can't hear you.

13                MR. SHEEHAN:  Oh, I said "objection."

14                That's a legal thing.

15                But, Mr. Hunt, do your best answer it.

16        A.      And what -- what was the question

17   again?

18        Q.      Sure.  I'll ask it again.

19                What is your understanding of the class

20   definition in this case?

21                MR. SHEEHAN:  Objection.

22                Legal.

23                Please answer, Mr. Hunt.

24        A.      I'm not understanding what you're

25   asking me.

Page 23

1          Q.      Sure.

2                  In a class action case, each class

3    action has a class definition.

4          A.      Um-hum.

5          Q.      Do you know what that class definition

6    is, in this case?

7          A.      No.

8          Q.      Have you ever seen any documents that

9    would identify the class definition in this case?

10                 MR. SHEEHAN:  Objection.

11                 Legal.

12                 Continue.

13         Q.      You can answer the question, Mr. Hunt.

14         A.      Yes.  And what was the question again?

15                 THE COURT REPORTER:  Do you want me to

16   read it back?

17                 THE WITNESS:  Yes.

18                 MS. GOUGH:  Yes, please.

19                 (Whereupon, the referred to question

20   and testimony was read back by the Reporter:

21                 "QUESTION:  Have you ever seen any

22   documents that would identify the class definition

23   in this case?")

24         A.      Any documents relating to the case.

25         Q.      Just any documents that identify what

Page 24

```
 1   the class definition is.

 2        A.     No, I don't believe so.

 3        Q.     Okay.  I'd would like to introduce our

 4   first exhibit.  It'll take me just a second to share

 5   my screen.

 6               (Whereupon, Defendant's Notice of

 7   Deposition of Plaintiff Hunt was marked as

 8   Defendant's Exhibit 1 for identification as of this

 9   date by the Reporter.)

10               MS. GOUGH:  Okay.  Oh, I see that it

11   says sharing is disabled.

12               Karyn, what's the best way?

13               THE COURT REPORTER:  Yes, I'll make you

14   cohost, no problem.

15               MS. GOUGH:  Thank you.

16               THE COURT REPORTER:  That should be

17   better now.

18               MS. GOUGH:  Yes, there we are.

19               Thank you.

20        Q.     Okay.  Can you see this document,

21   Mr. Hunt?

22        A.     Yes.

23        Q.     It says:

24               "Defendant's Notice of Deposition of

25   Plaintiff Hunt."
```

Page 25

1              Do you see that?

2       A.    Yes.

3       Q.    Have you seen this document before?

4       A.    Yes.

5       Q.    Okay.  I'd like to scroll, I'm just

6   going to scroll through.  Tell me if you'd like me

7   to slow down and you, of course, can read anything,

8   but I'm just scrolling to that second page where it

9   says:

10             "REQUEST FOR PRODUCTS OF DOCUMENTS."

11             Do you see that?

12      A.    Yes.

13      Q.    Number 1, it says:

14             "All DOCUMENTS read, reviewed,

15  considered and/or relied upon by YOU to prepare for

16  this deposition."

17             Did you bring any documents for Request

18  Number 1 today?

19      A.    You said, did I bring -- did I bring

20  any documents?

21      Q.    Correct.

22      A.    No.

23      Q.    Number 2, says:

24             "YOUR current resume and/or curriculum

25  vitae."

Page 26

```
 1              Did you bring any documents for Number

 2    2?

 3              MR. SHEEHAN:  Objection.

 4              Continue.

 5         A.   No.

 6              I didn't bring any documents.

 7         Q.   Okay.  And Number 3 says:

 8              "To the extent not already produced,

 9    all DOCUMENTS in YOUR files and/or otherwise in YOUR

10    possession, custody or control that are responsive

11    to Defendant's First Set of Requests For Production

12    of Documents."

13              And I understand we just received your

14    Discovery responses this morning.

15              Did you bring any document relating to

16    Number 3 here?

17         A.   No.

18         Q.   Okay.  What did you do to prepare for

19    your deposition today?

20         A.   I didn't do anything to prepare for it.

21              MR. SHEEHAN:  Objection.

22              Mr. Hunt, you can discuss, you know,

23    our discussion.  I'm not trying to -- I think that's

24    what Ms. Gough is referring to.

25              So, you can discuss that with
```

Page 27

1   Ms. Gough.

2              THE WITNESS:   Okay.

3       A.      Can you be more specific with the

4   question, please?

5       Q.      Sure.

6              Did you speak to anyone to prepare for

7   your deposition today?

8       A.      Yes.

9       Q.      Who did you speak to?

10      A.      My attorney.

11      Q.      And who is your attorney?

12      A.      Mr. Sheehan.

13      Q.      Did anyone --

14             MR. SHEEHAN:   You can call me

15  "Spencer."

16             THE WITNESS:   "Spencer."

17             MR. SHEEHAN:   Thank you.

18      Q.      Was anyone else present when you spoke

19  to Mr. Sheehan to prepare for your deposition today?

20      A.      No.

21      Q.      How many times did you speak with

22  Mr. Sheehan to prepare for your deposition today?

23      A.      Once.

24      Q.      When was that?

25      A.      I don't remember exactly.

Page 28

1          Q.      Was it today?

2          A.      You spoke -- I spoke briefly with him,

3    yes.

4                  MR. SHEEHAN:  I'm sorry?  I didn't

5    speak with him today.  We spoke on Friday.

6                  THE WITNESS:  It was --

7          Q.      Does that sound right, Mr. Hunt?

8          A.      Yeah, that was.  It was Friday.  I'm

9    sorry.

10                 MR. SHEEHAN:  I know I didn't speak to

11   anybody today before this deposition.  I wasn't

12   awake, so I'm sorry.

13         Q.      About how long did you speak with

14   Mr. Sheehan on Friday; without going into what you

15   spoke about, about how long did you speak to him?

16         A.      Maybe about 30 or 45 minutes.

17         Q.      Before Friday, had you ever spoken to

18   Mr. Sheehan about this case?

19         A.      Yes.

20         Q.      About when was that?

21         A.      I can't even remember.

22         Q.      Before Friday, about how many times did

23   you speak with Mr. Sheehan?

24         A.      Once, I believe.

25         Q.      Okay.  I'd like to go into your

Page 29

1    personal background a bit, and I'm going to ask some

2    questions about medical conditions and injuries, and

3    I'm asking those questions to get some context for

4    your case involving the lidocaine patch.

5              A.     Okay.

6              Q.     So, do you have any medical conditions?

7              A.     I'm a pre-diabetic.

8              Q.     Anything else?

9              A.     No.

10             Q.     Do you have any injuries?

11             A.     No.

12             Q.     Have you had any surgeries?

13             A.     I've had a hand surgery.

14             Q.     Do you take any prescription

15   medication?

16             A.     No.

17             Q.     Have you ever been prescribed a

18   lidocaine patch by a doctor?

19             A.     No.

20             Q.     Have you ever been prescribed lidocaine

21   cream by a doctor?

22             A.     No.

23             Q.     Do you know what lidocaine is?

24             A.     Lidocaine?  Yes.

25             Q.     What does lidocaine do?

Page 30

1      A.    Lidocaine is a -- I believe it's a pain

2  reliever.

3      Q.    Shifting topics again, what grocery

4  stores do you shop at?

5      A.    Mariano's, Jewel's.

6            I mean, I shop at several grocery

7  stores, yeah.

8      Q.    Besides Mariano's, do you shop at any

9  Kroger-brand stores?

10      A.    No, not that I recall, no.

11      Q.    Do you have a Mariano's or a Kroger

12  loyalty account or a frequent shopper account?

13      A.    No.

14      Q.    Do you ever use Kroger or Mariano's

15  digital coupons?

16      A.    No.

17      Q.    Do you have a Jewel frequent-shopper

18  account?

19      A.    No.

20      Q.    Okay.  I'd like to shift topics again

21  to your use of the product.

22            And you understand when I say

23  "product," I'm talking about the Kroger lidocaine

24  patch that is subject in this litigation?

25      A.    Um-hum, yes.

Page 31

1      Q.     When you bought the product, what did
2  the label look like?
3      A.     It was a -- a gray package with a --
4  some -- with a -- I think it had some blue and some
5  writing and stuff on it.  And lidocaine extra
6  strength.
7      Q.     Was there anything about this package
8  or the label of the product that made you want to
9  buy it?
10      A.     Yeah, it said "extra strength."
11      Q.     What about that made you want to buy
12  the product?
13             MR. SHEEHAN:  Objection.
14             Continue.  Please continue, Mr. Hunt.
15      A.     Oh, what made me want to buy it?
16  Because it said "extra strength," and I was -- I was
17  in pain.  And I thought that the patch would be a
18  good relief of pain.
19      Q.     A few moments ago, we talked, just
20  generally, about your medical background, and you
21  didn't list any injuries.
22             What is this pain that you are using
23  this product for?
24      A.     It was some back pain.  I had strained
25  a muscle in my back.

Page 32

1      Q.      When did you strain that muscle?

2      A.      It was last -- it was right before I

3  had brought the -- bought the product.

4      Q.      Okay.  And we'll get into all of your

5  purchases of the product.

6              Can you tell me about when that

7  strained muscle was?

8      A.      When?

9      Q.      Yes.

10     A.      Oh, it was still the last -- I don't

11  know exactly.  I can't remember.  I just remember it

12  was a while ago.

13     Q.      When you say "a while ago," are we

14  talking about, like, a month ago, a year ago?  Can

15  you give me an --

16     A.      Yeah, a year.

17     Q.      -- estimation?

18     A.      A year ago.

19     Q.      Did you receive any medical treatment

20  for that strained muscle?

21     A.      No.

22     Q.      Well, are there any other conditions or

23  injuries similar to that strained back muscle that

24  you've experienced?

25     A.      No.

Page 33

1      Q.     Are you still dealing with that same
2  strained back muscle?
3      A.     No.
4      Q.     Okay.  Going back to the package, was
5  there anything else, other than the phrase "extra
6  strength" that was on the package --
7                MR. SHEEHAN:  Objection.
8                Please continue.
9      Q.     Was there anything else on the package
10 besides that phrase "extra strength," that made you
11 want to buy the product?
12     A.     No.
13               MS. GOUGH:  Okay.  I'm going to
14 introduce our second exhibit.
15               (Whereupon, First Amended Complaint was
16 marked as Defendant's Exhibit 2 for identification
17 as of this date by the Reporter.)
18     Q.     Just a moment.
19               Okay.  This is Exhibit 2.  It's the
20 First Amended Complaint.
21               Have you seen this document before?
22     A.     Yes.
23     Q.     When did you first see this document?
24               MR. SHEEHAN:  Objection.  Kirsten, if
25 you'd like to remind me, I can provide you documents

Page 34

1    in response to this question.

2              But anyway, continue, Mr. Hunt.

3              You look puzzled, Kirsten.

4              MS. GOUGH:  I am.

5              Just, you're going to provide documents

6    about when he first saw the complaint?

7              MR. SHEEHAN:  I can provide you

8    because, I believe, prior to filing this document,

9    the Plaintiffs were required to review and do a

10   scroll through, quick wrap on it, so I'm pretty sure

11   that that's the case, so just if you want to follow

12   up and ask before that if I have it; okay, if you'd

13   like it.

14             MS. GOUGH:  Fair enough.

15             MR. SHEEHAN:  Okay.  I might be able to

16   provide it now, if I have it.

17             But anyways, please continue, Mr. Hunt.

18        Q.    This image that is on the first page of

19   this document, does this look familiar?

20             MR. SHEEHAN:  Can you make it a little

21   bigger, please?

22             MS. GOUGH:  Oh, I can try.  See.

23             MR. SHEEHAN:  Okay.  You know --

24             MS. GOUGH:  Oh, here we go.

25             MR. SHEEHAN:  Okay.  Thanks.

```
                                                    Page 35

 1                    MS. GOUGH:  How is that any better.

 2                    MR. SHEEHAN:  That's better for me,

 3      yes.

 4                    MS. GOUGH:  Okay.

 5          Q.        How is that, Mr. Hunt?  Can you see the

 6      image?

 7          A.        Yes.

 8          Q.        Does this look familiar?

 9          A.        Yes.  That's it.

10          Q.        When you say "that's it," what do you

11      mean?

12          A.        That's -- that's the product.

13          Q.        Did you personally purchase the

14      product?

15          A.        Yes.

16                    I did.

17          Q.        Did anyone else ever buy it for you?

18          A.        No.

19          Q.        Where did you first purchase the

20      product?

21          A.        I purchased it at Mariano's.

22          Q.        Which Mariano's?

23          A.        The one on Ashland.

24                    The -- I believe the address is 31

25      something South Ashland.
```

Page 36

1      Q.     That's fine.

2             When did you first purchase the

3   product?

4      A.     It has been over a year.

5      Q.     Okay.  So, it's May, 2024.

6             Is it fair to say that that was

7   sometime in 2023?

8      A.     Yes.

9      Q.     Before the year 2023, did you ever

10  purchase the product?

11     A.     No.

12     Q.     Did you ever purchase the product at a

13  location other than at the Mariano's, on Ashland

14  Avenue?

15     A.     No.

16     Q.     When did you last purchase the product?

17     A.     It has been over a year, but it was

18  2023.

19     Q.     Is it fair to say that you only

20  purchased the product in the year 2023?

21     A.     Yes.

22     Q.     How many times did you purchase the

23  product?

24     A.     If my memory serves me correctly, I

25  believe it was twice.

Page 37

1     Q.    Did anybody tell you or advise you to

2  purchase the product?

3     A.    No.

4     Q.    Did anyone tell you or advise you to

5  stop purchasing the product?

6     A.    No.

7     Q.    And fair to say that you're not still

8  using the product?

9     A.    No.

10         I'm not.

11     Q.    When you say:  No, you're not, you're

12  not currently using the product?

13     A.    No.

14         I'm not using it, no.

15     Q.    Okay.  So, if you bought the product

16  two times, about how many times would you say you

17  used the product?

18     A.    I have tried using it a few times.

19     Q.    Let me get back to your purchases:  Did

20  you ever use a coupon to buy the product?

21     A.    No.

22     Q.    Was it ever on sale when you bought it?

23     A.    No.

24     Q.    Did you ever get a discount on the

25  products?

Page 38

1          A.      No.

2          Q.      Did you ever see an advisement or the

3     product?

4          A.      No.

5          Q.      And you purchased the product because

6     you had the back pain from a strained muscle?

7          A.      Yes.

8          Q.      Was there anything that you liked about

9     the product?

10         A.      No.

11         Q.      What did you not like about the

12     product?

13         A.      Everything.

14                 I wasn't even able to use the product.

15     The -- the -- the tape didn't even stick.  The

16     adhesive wouldn't even stick to my skin.

17         Q.      How many of each patch came in a box

18     when you bought it?

19         A.      I believe it was six, if my memory

20     serves me correctly.

21         Q.      So, if you bought -- you bought the

22     product two times, each package had six, did you use

23     all 12 patches that you bought?

24         A.      I tried to.

25         Q.      And you said you "tried to."  Were you

Page 39

1    unsuccessful in using all 12 patches?

2         A.    Yeah.

3               They didn't work.

4         Q.    All 12 didn't work?

5         A.    Yep.

6         Q.    When you purchased the product, what

7    did the shelf look like when -- where you bought it?

8         A.    What -- what -- what did the shelf look

9    like?

10        Q.    Yeah.

11              What I'm getting at is:  What other

12   products were nearby?

13        A.    All type of -- I believe it was pain

14   medication.

15        Q.    Were there other --

16        A.    For pain.

17        Q.    I'm sorry, can you say that again?

18        A.    I said items for the pain.

19        Q.    Were there other lidocaine patches near

20   the Kroger patch?

21        A.    I'm quite sure there were but I can't

22   recall it right now.  It was so long ago.

23        Q.    What made you choose the Kroger patch

24   over other lidocaine patches?

25        A.    I just chose -- I just chose it.

Page 40

1      Q.      Did you read the front of the box when

2  you purchased the product?

3      A.      Yeah.

4              I looked over it, yes.

5      Q.      What about the back of the box, did you

6  look over that, as well?

7      A.      Yeah.

8      Q.      What did you see on the back of the

9  box?

10     A.      I don't remember.

11     Q.      How much did the product cost when you

12  bought it?

13     A.      I -- I don't remember.

14     Q.      Do you still have any of the patches?

15     A.      No.

16     Q.      Do you have the box that the patch came

17  in?

18     A.      No.

19     Q.      Do you have any receipts from when you

20  purchased the product?

21     A.      No.

22     Q.      Have you ever used other lidocaine

23  patches?

24     A.      Yes.

25             I believe I did.

Page 41

1       Q.     And what kind was that?

2       A.     I don't remember, exactly.

3       Q.     Have you ever used Salonpas®?

4       A.     I did -- I can't remember.

5       Q.     What about Icy Hot® Lidocaine Patches?

6       A.     I can't remember.

7       Q.     What about Aspercreme® Lidocaine

8 Patches?

9       A.     I don't remember.

10      Q.     Have you ever bought a lidocaine patch

11 from a store other than at a Mariano's?

12      A.     No.

13      Q.     Have you ever used a lidocaine cream or

14 other kind of lidocaine product?

15      A.     No.

16              Not that I recall, no.

17      Q.     Where on your body did you apply the

18 lidocaine patch products from Kroger?

19      A.     The right side of my back, lower back.

20      Q.     Of the 12 patches that you bought, did

21 you put them all on the same spot?

22      A.     Yes.

23              Yeah, they have to be on the same spot.

24 That's where the pain was.

25      Q.     Have you received any medical treatment

Page 42

```
 1   for that strained back -- strained muscle in your

 2   back?

 3        A.     No.

 4               I haven't.

 5        Q.     Did you see any instructions on the

 6   package or the product?

 7        A.     I don't recall seeing any.

 8        Q.     Is it fair to say that you didn't read

 9   any instructions, if they were there?

10        A.     I -- I'm quite sure I read it, but I

11   just can't tell you exactly what it was.

12        Q.     Do you remember anything about the

13   instructions or anything on the package that said

14   how long to leave the patch on your body?

15        A.     No.

16               I don't remember, no.

17        Q.     Based on the package, how long did you

18   expect that the patch would stay on your body?

19        A.     At least a few hours.

20        Q.     What do you mean by "a few hours?"

21        A.     A few hours, three, four hours.

22        Q.     Did you do anything before you applied

23   your product?  Did you, I don't know, clean your

24   skin, anything like that?

25        A.     No.
```

Page 43

1              I just lifted my shift up and tried to

2    apply it.

3         Q.    Did you ever shower right before you

4    applied the product?

5         A.    Yeah.

6              No.

7         Q.    This strained back muscle, did you --

8    did that happen to you while you were doing your

9    lawn care work?

10        A.    No.

11             Actually, I was at a -- I was at a

12   warehouse when I was doing that.

13        Q.    Do you remember what time of year it

14   was?

15        A.    What time of year?

16        Q.    Yes.

17        A.    It was warm out.

18        Q.    Warm, like --

19        A.    It had to be -- it had to be late

20   spring, early Summer.

21        Q.    Was it while you were working for

22   Chicago Dryer?

23        A.    Excuse me?

24        Q.    Did you have this strained back muscle

25   when you were working for Chicago Dryer?

Page 44

1           A.      Yeah.

2           Q.      Describe where you worked.  What kind

3      of a facility was it?

4           A.      It was, like, a -- a -- like, a

5      warehouse shopping -- machine shop environment.

6           Q.      Was it hot in there?

7           A.      Somewhat.

8                   It all depends on what department.

9           Q.      What about your department?

10          A.      I worked in several departments.

11          Q.      Were there some that were hotter than

12     others?

13          A.      Yes.

14                  It was.

15          Q.      How often did you work in the hot --

16     the hot areas of that warehouse?

17          A.      Maybe a -- a few times a week.

18          Q.      When you worked for Chicago Dryer, what

19     sort of work were you doing?

20                  I know you said that you were working

21     on -- well, that they manufactured industrial-sized

22     dryers.

23                  What was your job?

24          A.      I was an Assembler.

25          Q.      And what kind of work is that?  I'm not

Page 45

```
 1   familiar with it.
 2        A.    So, I mean, I was -- I was basically
 3   using tools and building, turning -- turning screws
 4   and bolts.
 5        Q.    Did it require a lot of lifting?
 6        A.    Excuse me?
 7        Q.    Did you do any lifting, lots of moving
 8   around?
 9        A.    Yeah.
10              Yeah, I did some lifting.
11        Q.    Was it a fairly active job?
12        A.    Was it fairly what?
13        Q.    Active.
14        A.    Yes.
15              You can say at times it was.
16        Q.    At times?
17              How much of your job at Chicago Dryer
18   would you call active, where you're moving, lifting,
19   just moving around?
20        A.    About 75 percent of the job.
21        Q.    Did you apply the product to your lower
22   back while you were at Chicago Dryer?
23        A.    No.
24              It was once I got home.  I had to buy
25   the product first once I got off work, and then once
```

Page 46

1    I got home I applied it.

2         Q.     After you applied the product, what did

3    you have do?

4         A.     Sit on the couch and watch television.

5         Q.     Sitting on the couch.

6                You said that the product didn't stick;

7    is that right?

8         A.     Yeah.

9         Q.     Can you describe how that went?  I am

10   trying to envision how if you're sitting still that

11   you won't apply to your back.

12        A.     Because of the adhesive, the adhesive

13   wasn't working.

14        Q.     Did you ever have somebody apply it for

15   you?

16        A.     You apply it to your skin and it kept

17   coming loose.

18        Q.     Did anyone ever apply it for you?

19        A.     No.

20               I applied it myself.

21        Q.     How long did the product stick to your

22   lower back when you applied it?

23        A.     A few minutes.

24        Q.     Is that -- is that less than an hour?

25        A.     Yes.

Page 47

```
 1                 It is.
 2        Q.      You would put it on after work, and you
 3   would sit on the couch.
 4                 Did you also get up and walk around,
 5   were you moving after you put it on?
 6        A.      No.
 7                 Ma'am, I was sitting there watching
 8   television.
 9        Q.      When you put the product on, did it
10   provide any pain relief?
11        A.      No.
12                 It didn't.  It wouldn't even stick.
13        Q.      For your strained back muscle, did you
14   use any other pain relief products?
15        A.      No.
16                 I did not.
17        Q.      No over-the-counter painkillers, like
18   Ibuprofen, anything like that?
19        A.      No.
20        Q.      Why not?
21        A.      Because I had the patch.  Because I
22   thought the patch was going to do the job, but it
23   didn't.
24        Q.      So, why didn't you try something else?
25        A.      I just dealt with the pain after that.
```

Page 48

1      Q.      Did you ever tell anyone that you were
2  unhappy with the product?
3      A.      Not -- no.
4      Q.      Did you ever complain to anybody about
5  it?
6      A.      No.
7      Q.      Did you ever return the product to the
8  Mariano store?
9      A.      No.
10     Q.      Did you ever ask for a refund?
11     A.      No.
12     Q.      Did you ever contact the Mariano store
13 where you bought it, telling them --
14     A.      No.
15     Q.      -- that you were unhappy with it?
16     A.      No.
17             I did not.
18     Q.      Did you ever contact Mariano's or
19 Kroger Customer Service about the product?
20     A.      No.
21             I did not.
22             MS. GOUGH:  We haven't really been
23 going for an hour, but you've been sitting here for
24 an hour.
25             Is now a good time to take a break?

```
                                                 Page 49
 1              THE COURT REPORTER:  That would be
 2  great.
 3              (Whereupon, a short break was taken.)
 4              MS. GOUGH:  Let's go back on the
 5  record.
 6         Q.    Okay.  Are you ready, Mr. Hunt?
 7         A.    Yes.
 8              I am.
 9         Q.    Okay.  Okay.  I'm going to circle back
10  to how you applied the product.
11              Did you ever shower right before you
12  put it on?
13         A.    No.
14              I did not.
15         Q.    Did you ever put lotion or anything
16  else on your body before you put the product on?
17         A.    No.
18              I did not.
19         Q.    And you read the instructions before
20  you applied the product?
21         A.    Yes.
22         Q.    Do you remember what those instructions
23  said?
24         A.    No.
25              Not exactly.
```

1    Q.    Can you describe how you did it from,

2  you know, opening the package to putting it on the

3  -- on your body?  Tell me how you did that.

4    A.    Well, once I opened up the packaging,

5  you get the -- the patch out.  I applied it to the

6  right side of my -- my -- my lower back and I

7  pressed it on.  I pressed it on and it stuck, and I

8  sat down on the couch.  I sat there for a few

9  minutes, and the next thing I know I -- I can feel

10  it coming loose.

11    Q.    Tell me how you took the package out of

12  --

13         MS. GOUGH:  I'm sorry.

14    Q.    Tell me how you took the product out of

15  the package.

16    A.    I opened the box up and -- and -- and

17  -- and opened up the single packet and took the

18  patch out, pulled the -- the -- the piece off the

19  adhesive and applied it to my back.

20    Q.    Was the patch sticky when you took it

21  out of the packaging?

22    A.    Was it sticky?

23    Q.    Yes.

24    A.    No.

25         It wasn't sticky.

Page 51

```
 1        Q.     The adhesive that was on the patch, was
 2   that sticky?
 3        A.     Not too much.  I mean, it had some
 4   stickiness to it.
 5        Q.     So, when you put it on your back, were
 6   you able to smooth it all the way out so that it was
 7   fully applied to your lower back?
 8        A.     Yes.
 9               It -- yes, I did.
10        Q.     Did you ever have to peel the patch off
11   of your back?
12        A.     No.
13               I did not.
14        Q.     Tell me -- tell me how the patch would
15   become detached from your back.
16        A.     I am not sure how it became detached,
17   all I know is that I applied it and it became loose.
18               And it just wasn't sticking like it --
19   like it was supposed to stick.
20        Q.     Was it, like, sliding around on your
21   back?
22        A.     No.
23               It wasn't sliding, it just became
24   detached.
25        Q.     So, would it -- I'm just trying to
```

Page 52

1    envision how -- how that was.

2                 Can you describe how it became

3    detached?

4         A.      No.

5                 I can't how it became detached.  All I

6    know is that it became loose.  It was peeling loose.

7    I tried pushing it back, tried applying it back, and

8    it coming loose.  The adhesive wouldn't stick.

9         Q.      Did you use one patch per day?

10        A.      I actually took it -- when -- when that

11   one kept coming loose, I opened another one and

12   tried to apply it.  It was doing the same thing.

13        Q.      How many times did you do that?

14        A.      I did it, like, three or four times.

15        Q.      So how many different days did you use

16   the patch?

17        A.      I tried using it, like, three days in a

18   row.

19        Q.      Was that for one box of the patches?

20        A.      I tried to use both patches -- I mean,

21   use both boxes of --

22                THE WITNESS:  Excuse me.

23        Q.      So you used both boxes over the course

24   of about three days; is that right?

25        A.      Yes.  Yes.

Page 53

```
 1              They kept coming loose.
 2       Q.     How long did the package say it should
 3  stick to your body?
 4       A.     I am not sure exactly how long it said
 5  it, but I know it's supposed to be more than a few
 6  minutes.
 7       Q.     And what was your expectation for how
 8  long it should stick?
 9       A.     At least a few hours, 'til the -- 'til
10  the pain subsides.
11       Q.     Are you planning to buy the product
12  again?
13       A.     No, I'm not.
14       Q.     Is there anything about the label on
15  the product, if it was changed, that would make you
16  want top buy the product again?
17       A.     No.
18              I have no confidence in the product
19  now.
20       Q.     Have you ever had problems with other
21  adhesive products sticking to your body?
22       A.     No.
23       Q.     Like Band-Aid®'s?
24  Band-Aid's always stick fine for you?
25       A.     Yeah.
```

Page 54

```
 1        Q.      Have you ever used menthol patch on
 2   your body?
 3        A.      No.
 4        Q.      Have you ever used any other type of
 5   patch on your body?
 6        A.      I am not -- I'm not a smoker so no, I
 7   don't -- I don't use -- I don't use menthol patches.
 8        Q.      Have you used any other kind of patch
 9   on your body?
10        A.      Yes, I have.
11        Q.      What kind of patch?
12        A.      Like a Band-Aid® patch.
13        Q.      Can you tell me what a Band-Aid® patch
14   is?  I'm just envisioning --
15        A.      It's like a larger -- a larger
16   Band-Aid®.  It's a larger Band-Aid®.  That's all it
17   was.
18        Q.      And where did you apply that?
19        A.      I you applied it to my arm.
20        Q.      Did that stick?
21        A.      Yes, it did.
22        Q.      How long did it stick?
23        A.      It was on there for a few days.
24        Q.      When you used the product, you said you
25   were on your couch at home; is that right?
```

Page 55

1          A.      Yes.

2          Q.      Do you have air conditioning at home?

3          A.      Yes, I do have air conditioning, yes.

4          Q.      And let's see, you've live at your

5    address for --

6          A.      2628 South Millard.

7          Q.      Yes, south Millard.

8                  You lived there for three-and-a-half

9    years, so you would've used that patch at your

10   current home?

11         A.      Yes.

12         Q.      And did you have air conditioning when

13   you were using the patch?

14         A.      I am not sure if the air was on at the

15   time.

16         Q.      Is there anything that would've

17   interfered with how sticky the patch was?  Is there

18   anything, that you can think of, that would have

19   made it not stick to your body?

20         A.      No.

21         Q.      You weren't, like -- you didn't just

22   get out of the shower; you weren't especially

23   sweaty; you didn't --

24         A.      No.

25         Q.      -- you didn't just put location on?

Page 56

```
 1        A.      No, none of that.
 2        Q.      What time of day did you put it on?
 3        A.      It was in the evening.
 4                I had went to work, got off, then went
 5   and -- and bought the patch, then came home and
 6   applied it.  So it was the evening time.
 7        Q.      So if the product didn't work for you,
 8   did you consider trying another option to get rid of
 9   the pain?
10        A.      No.
11        Q.      You didn't consider going to see a
12   doctor?
13        A.      No.
14        Q.      Why not?
15        A.      I just didn't.
16        Q.      Did you know that a doctor could
17   prescribe you a lidocaine patch?
18                THE COURT REPORTER:  You're on mute,
19   sir.
20                Mr. Hunt, you're on mute.
21                MR. SHEEHAN:  Hold on.  Maybe we lost
22   him.
23                Mr. Hunt, are you there?
24                THE WITNESS:  Yes, I'm there.
25                MR. SHEEHAN:  We missed you -- I think
```

Page 57

1    Ms. Gough had a question, and I don't know if you

2    were answering it.

3                    Can you re-ask it?

4         A.    Can you ask the question, please?

5                    MS. GOUGH:  Can you read it back,

6    Karyn?

7                    (Whereupon, the referred to question

8    and testimony was read back by the Reporter:

9                    "QUESTION:  Did you know that a doctor

10   could prescribe you a lidocaine patch?")

11        A.    No, I did not.

12        Q.    Tell me again what -- what you remember

13   seeing on the package for the product.

14                   Do you remember any of the words or

15   phrases that were on the package?

16        A.    Yeah.

17                   It said it had -- it had Kroger, Extra

18   Strength Lidocaine Patch on it.

19        Q.    Do you remember seeing any numbers or

20   percentages on the package?

21        A.    I remember seeing some of it saying

22   about percent, but I'm not sure exactly what it was.

23   It's been -- it's been so long, I can't -- I can't

24   remember.

25        Q.    And I can't remember if I asked you

Page 58

1   this before:  What made you choose the Kroger patch

2   over other brands?

3        A.    I just went in the store and just --

4   and just picked it up.  I didn't go in trying to

5   decide which -- what product was better than the

6   other product.  I just went in and pick -- picked it

7   up.

8        Q.    And why did you pick up the Kroger

9   patch?

10        A.    Because it said "Extra Strength" on the

11   label.

12        Q.    Did any of that -- I'm sorry.  Go

13   ahead?

14        A.    I said, and I was in pain.

15        Q.    The other lidocaine patch products that

16   were similar to this one, do you remember any of the

17   words or phrases on those packages?

18        A.    No, I do not.

19        Q.    Did any of them say "Extra Strength"?

20        A.    I'm not sure.

21        Q.    What does "extra strength" mean to you?

22        A.    "Extra strength" means that -- that

23   it's a strong product.  I mean, it should relieve

24   the pain more quicker.

25        Q.    Do you use other extra strength

Page 59

1   products, like other over-the-counter painkillers?

2          A.     No, not at the moment.  I haven't been

3   in pain lately.

4          Q.     Mr. Hunt, you're represented by counsel

5   today?

6          A.     Yes.

7          Q.     And that's Mr. Sheehan?

8          A.     Yes.

9          Q.     Do you have any other lawyers in this

10  case?

11         A.     No, I do not.

12         Q.     Have you ever heard of a law firm,

13  called Greene Consumer Law?

14         A.     No.

15         Q.     Have you ever met someone, named

16  Francis Greene, a lawyer?

17         A.     No.

18         Q.     Did you ever sign an Engagement Letter

19  with someone, named Francis Greene?

20         A.     No.

21         Q.     When did you first meet Mr. Sheehan?

22         A.     It's been -- it's been over a year.

23         Q.     Did you see any advertisements about

24  this lawsuit on Facebook?

25         A.     No.

Page 60

1      Q.     How did you learn about this lawsuit?

2      A.     I am going to believe, I was -- this

3  was a case that was -- that was filed.

4             MR. SHEEHAN:  Kirsten, if I may, just

5  to make it easier for you, you know, usually, it is

6  something that somebody response to an

7  advertisement, but I believe in this circumstance,

8  because I had he represented Mr. Hunt, I'm pretty

9  sure, I don't have a record of him doing an

10  advertisement, but it's likely that I asked him

11  because I represented him, you know, "did you use

12  this product before?"

13             MS. GOUGH:  Understood.

14             Thank you.

15             MR. SHEEHAN:  Sure.

16      Q.     Mr. Hunt, do you know anyone else who

17  is a client of Mr. Sheehan's?

18      A.     No, I do not.

19      Q.     Besides this case, do you have any

20  other current or ongoing cases with Mr. Sheehan?

21             MS. GOUGH:  You're on mute.

22             MR. SHEEHAN:  Mr. Hunt, are you back?

23             Are you off mute?  Mr. Hunt --

24             THE WITNESS:  Can you hear me?

25             MR. SHEEHAN:  Yes, sir.

Page 61

1          I don't know if you answered the prior

2    question of Ms. Gough because you went on mute at

3    some point there.

4               THE WITNESS:  Yes, I'm having technical

5    difficulties.

6               MR. SHEEHAN:  No problem.

7               MS. GOUGH:  We've all been there.

8               MR. SHEEHAN:  Ms. Gough, did you want

9    to repeat that?  I don't know if --

10              MS. GOUGH:  Sure.

11       Q.    Do you know anyone else that is a

12   client of Mr. Sheehan's?

13       A.    No, I do not.

14       Q.    Do you know someone, named Tiffany

15   Agee?

16       A.    No, I do not.

17       Q.    Do you know someone, named Lanette

18   Johnson?

19              THE COURT REPORTER:  Mr. Hunt?  Hello?

20              MR. SHEEHAN:  Hello?

21              He's is having technical difficulties.

22   The video probably got disconnected.  If we give him

23   a moment, I'm sure he is in the process of

24   connecting.

25              MS. GOUGH:  Off the record.

```
                                                    Page 62

 1                (Whereupon, a short recess was taken.)

 2                (Whereupon, the referred to question

 3    and testimony was read back by the Reporter:

 4                "THE QUESTION:  Do you know someone

 5    named Lanette Johnson?")

 6         A.    No, I do not.

 7         Q.    When did you first review your

 8    complaint in this case?

 9         A.    Did I first review the complaint?

10         Q.    The complaint.

11         A.    The complaint?

12         Q.    Yes.

13         A.    It's been a while ago.

14         Q.    Did you review that complaint before it

15    was filed?

16         A.    I don't remember.

17         Q.    When you looked at the complaint, did

18    you review it to make sure it was correct and

19    accurate?

20                MR. SHEEHAN:  Objection; legal

21    conclusion.

22                Continue.

23         Q.    You can answer.

24                MR. SHEEHAN:  Yes.

25         A.    Yeah.  Yes.
```

Page 63

1          Q.      And the complaint that you saw, to your
2    knowledge, was complete and accurate?
3          A.      Yes.
4          Q.      Okay.   The other lidocaine patch
5    lawsuit that we talked about back at the beginning
6    of the deposition, I think I know the answer to this
7    question, but I just want to clarify.
8                  What attorney represented you in that
9    case?
10          A.      Mr. Sheehan.
11          Q.      And what product was the subject of
12    that case?
13          A.      It was a patch.
14                  I can't quite remember exactly.
15          Q.      And you said it was another lidocaine
16    case.
17                  So was that product another lidocaine
18    patch?
19          A.      I believe so.
20          Q.      When did you use that product?
21          A.      I don't remember.   It's been awhile.
22          Q.      Where did you buy that product?
23          A.      I don't remember.
24          Q.      Was it at Mariano's?
25          A.      I'm not sure; I don't remember.

Page 64

1          Q.      What year did you purchase that
2     product?
3          A.      I don't remember exactly now.  I don't
4     remember.
5          Q.      Was it before you used the Kroger
6     Lidocaine Patch?
7          A.      Yes, it was.
8          Q.      Was it while you were working at
9     Chicago Dryer?
10         A.      I don't think -- I don't remember.  I
11    don't think so.
12         Q.      What was your experience with that
13    product?
14         A.      It's about the same:  I wasn't
15    satisfied.
16         Q.      Why weren't you satisfied?
17         A.      Because to me, it didn't even -- it
18    didn't work properly.  It didn't do what -- what the
19    label said it was going to do.
20         Q.      Did it stick well to your body?
21         A.      No.
22                 That -- that adhesive wasn't -- wasn't
23    sticking properly, as well.
24         Q.      Where on your body did you put the
25    other lidocaine patch?

Page 65

1          A.      Just, I applied it to my back.

2          Q.      The same area on your back?

3          A.      I'm not sure.  I just know it was on my

4    back.  It's been awhile.  I can't quite remember.

5          Q.      Was it for that same strained muscle

6    that you had in your back?

7          A.      No.  No, it wasn't.

8          Q.      What were your claims in that case, the

9    best that you can remember?

10         A.      I don't remember, to be -- to be

11   honest.

12         Q.      Do you remember where that case was

13   filed?

14         A.      No.

15         Q.      And I know that you said you received a

16   settlement.

17                 Did that case go to trial at any point?

18         A.      No.

19         Q.      Were there any other named plaintiffs

20   in that case or other class representatives?

21         A.      No, not that I remember.  No.

22         Q.      In this case, what is your

23   understanding of who the Defendants are?

24         A.      Can you rephrase that question, please?

25         Q.      Sure.

Page 66

```
1                In this case, what is your

2      understanding of who you have sued in this case?

3           A.    What was my understanding of who I have

4      -- who I have sued?

5           Q.    Yes.

6           A.    I am suing the -- the manufacture of

7      the product.

8           Q.    And who is that?

9           A.    Kroger.

10          Q.    Anyone else?

11          A.    To my knowledge, that's it.

12          Q.    Do you know where this case was filed?

13          A.    It was filed in Federal Court,

14     Illinois.

15          Q.    Do you know when this case was filed,

16     the original complaint?

17          A.    No, not exactly.

18          Q.    Did you know that there was a complaint

19     filed before the one with your name on it?

20          A.    Can you rephrase the question?

21          Q.    Sure.

22                Did you know that there was a complaint

23     filed by somebody else in this case?

24          A.    Did I know?

25          Q.    Correct.
```

Page 67

1              MR. SHEEHAN:  If I may jump in here.

2              Mr. Hunt, you can tell the Defendant

3    what I told you, to the extent you remember, about

4    any issues about why you were you know,

5    participating.

6              If you remember, you're free to just,

7    you know, mention that.

8         A.    I -- I don't quite remember.

9              MR. SHEEHAN:  Okay.  That's fine.

10        Q.    Did you know that there was a complaint

11   filed by Tiffany Agee in this case?

12        A.    No.

13        Q.    Circling back to your use of the

14   product, explain again what your injury or condition

15   was that led you to use this product?

16        A.    I strained a muscle in my back, in the

17   lower right side.

18        Q.    How long did you have that pain?

19        A.    A -- maybe a few hours before I bought

20   the patch.

21        Q.    And how long did the pain last?

22        A.    After that initial injury, maybe a few

23   weeks.

24        Q.    Okay.  How did you strain your back?

25        A.    I think I was bending over, reaching

Page 68

1    for some tools, I believe it was.

2           Q.    Was that at work?

3           A.    Uh-hum.

4                 THE COURT REPORTER:  I didn't get a

5    response.

6           A.    Yes.

7           Q.    Did you tell your employer that you

8    hurt your back at work?

9           A.    No.

10          Q.    Would your employer have done anything,

11   if you did tell them that you hurt your back at

12   work?

13          A.    I'm not sure.

14          Q.    Was this at Chicago Dryer?

15          A.    Yes.

16          Q.    Would your employer at Chicago Dryer

17   have referred you to a doctor, if you told them you

18   hurt your back at work?

19          A.    I'm not sure.

20          Q.    Did you see a doctor at any point for

21   this strained muscle in your back?

22          A.    No.

23          Q.    Did you miss any work as a result of

24   hurting your back at work and ending up with a

25   strained muscle?

Page 69

1      A.      Yeah.

2              I think I did.  I took a couple of -- I

3   think I did take a couple of days off.

4      Q.      A couple?  Is that two, is that three,

5   how many days?

6      A.      I believe it was two days.

7      Q.      Did you consider --

8      A.      If my memory serves me.

9      Q.      I'm sorry, go ahead.

10     A.      I said if my memory serves me correct,

11  I believe it was two days.

12     Q.      Did you consider going to see a doctor

13  for your back if it was bad enough to keep you out

14  of work?

15     A.      No.

16     Q.      Has any doctor ever told you that you

17  can't work because of your back pain?

18     A.      No.

19     Q.      Did you try anything else to relieve

20  the pain in your back?

21     A.      Later on I -- I think I applied some

22  ice to it.

23     Q.      Did that help?

24     A.      Yeah, somewhat.

25     Q.      Did you try anything else to relieve

1    the pain, besides ice?

2         A.      No.

3         Q.      No over-the-counter painkillers?

4         A.      No.

5         Q.      When you took those couple of days off

6    from work, what was the reason that you told your

7    employer for missing those days?

8         A.      I told him I was sick.

9         Q.      Did you tell them that you hurt your

10   back?

11        A.      No.

12        Q.      When you went back to work, were you

13   able to do your job?

14        A.      Yeah.

15               To a certain degree, yes.

16        Q.      What do you mean:  "To a certain

17   degree"?

18        A.      I still was a little stiff.

19        Q.      But you were able to perform your job

20   functions?

21        A.      Yeah, somewhat.

22        Q.      How did the stiff -- stiffness in your

23   back impair your ability to do your job?

24        A.      I wasn't able -- I wasn't as flexible.

25        Q.      But you were still able to perform your

Page 71

```
 1   job duties, even if you weren't as flexible?
 2        A.     Somewhat.
 3               It was limited.
 4        Q.     Did your employer notice that your
 5   ability to do your job was limited?
 6        A.     No.
 7               They didn't.
 8        Q.     Did you miss any other work because of
 9   your back pain?
10        A.     No.
11        Q.     Have you hurt your back at work, other
12   than this instance?
13        A.     No.
14        Q.     Did you have any imaging done of your
15   back?
16        A.     No.
17        Q.     No X-rays?
18        A.     No.
19        Q.     No MRI's?
20        A.     No.
21               No doctors at all.
22        Q.     Why didn't you go see a doctor for your
23   back pain?
24        A.     I just didn't go.
25        Q.     Did you have a doctor at that point?
```

Page 72

```
 1        A.      Yes.
 2        Q.      Could that doctor write you
 3   prescriptions?
 4        A.      I believe all doctors can write
 5   prescriptions.
 6        Q.      Did you consider asking your Doctor for
 7   a prescription for your back pain?
 8        A.      No, I did not.
 9        Q.      And is it fair to say that you didn't
10   take any other medication for your back pain?
11        A.      No.
12        Q.      No, that's not fair to say or no, you
13   didn't take any other medication?
14        A.      No.
15                I didn't take any -- no, I didn't take
16   any other medications.
17        Q.      Okay.
18                MS. GOUGH:  I think I will take five
19   minutes to look over my notes, but I -- I think that
20   is about all that I have.
21                MR. SHEEHAN:  All right.  We will come
22   back in five minutes, and I may have one or two
23   questions.
24                MS. GOUGH:  Okay.  I will be right
25   back.
```

Page 73

1           MR. SHEEHAN:  We will have five minutes

2     if you wish to, you know, disconnect or, you know,

3     just put it on mute for five minutes.  I think

4     that's all.  We're almost done.

5           Thank you so much, Mr. Hunt.

6           THE WITNESS:  You're welcome.

7           (Whereupon, a short break was taken.)

8           MS. GOUGH:  Back on the record.

9     Q.    Okay.  Are you ready, Mr. Hunt?

10    A.    Yes.

11          I am.

12    Q.    Okay.  Back on the record.

13          I just have maybe a minute or two of

14    additional questions, and then I will hand it over

15    to your attorney for any follow-ups.

16          Going back to the General Mills Honey

17    Nut Oat Bar case that you mentioned.

18          Do you remember when that was filed?

19    A.    No.

20          I do not.

21    Q.    What were your claims in that case?  To

22    the best that you remember.

23    A.    I believe it was something doing with

24    the favoring.  They said that it was natural, but it

25    wasn't.

Page 74

1        Q.    Was that the first case that you had
2   with this -- Mr. Sheehan?
3        A.    I believe it was.
4        Q.    How did you become involved in that
5   case?
6        A.    I don't remember.
7        Q.    Do you remember seeing an ad for that
8   case?
9        A.    I believe so.
10       Q.    And you responded to that ad?
11       A.    Yes.
12             MS. GOUGH:  Okay.  I don't think I have
13   any further questions.
14             MR. SHEEHAN:  Thank you, Ms. Gough.
15             And thank you, Mr. Hunt.
16             I have just have one or two questions.
17   EXAMINATION BY
18   MR. SHEEHAN:
19       Q.    Mr. Hunt, can you hear me?
20       A.    Yes.
21             I can.
22       Q.    You described the product as being
23   labelled as "extra strength"; is that accurate?
24       A.    Yes.
25       Q.    Would it surprise you, Mr. Hunt, if the

Page 75

```
 1   label of the product that you purchased, it said:
 2   "Maximum strength"?
 3               Does that refresh your recollection?
 4               MS. GOUGH:  Object to form.
 5       A.      Yes.
 6       Q.      Can you see this?  Probably not.
 7               There we go.  Can you see that?  It's
 8   kind of a -- Mr. Hunt?
 9       A.      I'm moving it over a little bit.
10       Q.      Can you see that?
11       A.      The other way, yeah.  Yeah.  Yes, I see
12   it now.
13       Q.      What does that say, Mr. Hunt?
14       A.      "Maximum strength."
15       Q.      Was this the product -- now, this --
16               MR. SHEEHAN:  Hold on.
17       Q.      This is the individual --
18       A.      Yes.
19               Yes, it was.
20       Q.      What does that say on the top of it?
21       A.      It says:
22               "Kroger Maximum Strength Lidocaine
23   Patch."
24       Q.      Is that the product you purchased,
25   Mr. Hunt?
```

Page 76

1        A.      Yes.  Yes.

2                It is, because I remember by the -- the

3  blue -- the blue man right there.

4        Q.      The blue man?

5        A.      Yeah.

6        Q.      And what does that say on that

7  strength?

8        A.      It says:

9                "Kroger Maximum Strength Lidocaine

10  Patch."

11               MR. SHEEHAN:  That is all I have.

12               Thank you, Mr. Hunt.

13               THE WITNESS:  You're welcome.

14  EXAMINATION BY

15  MS. GOUGH:

16       Q.      Mr. Hunt, just a few follow-ups.

17               What does "maximum strength" mean to

18  you, when you read that?

19       A.      "Maximum strength" means the

20  maximum-allowed amount of pain medication, I

21  believe.  "Maximum strength."

22       Q.      When you say "maximum-allowed amount,"

23  does that -- what do you -- what do you mean by

24  "maximum-allowed amount of pain medication"?

25       A.      I mean, as far as a -- a -- how quickly

Page 77

1  it works and the strength of the actual medication.

2      Q.      Do you understand that Doctors can

3  prescribe lidocaine patches?

4      A.      I'm quite sure Doctors can subscribe

5  any type of medicine, yes.

6      Q.      If a -- if a doctor prescribed a

7  lidocaine patch, would you understand that to be

8  stronger than something that you can buy at the

9  store?

10     A.      That, I'm not sure of.

11     Q.      Do you -- is there a difference between

12  the phrases maximum strength and extra strength?

13     A.      Yes.

14     Q.      How are those phrases different to you?

15     A.      I believe maximum is the max -- maximum

16  point.  I mean, that's the most you can get.

17     Q.      The most you can get from an

18  over-the-counter drug or maximum you can get at all?

19     A.      Maximum is -- means maximum.  Whether

20  -- whether -- I'm not sure -- however you get it,

21  maximum, it only has that one meaning.

22     Q.      Do you know what the maximum amount of

23  lidocaine, an over-the-counter patch can have, what

24  that maximum amount -- amount is?

25     A.      No.

Page 78

1              I do not.
2      Q.      Why did you think it said "extra
3    strength"?
4      A.      I'm not sure.
5              I -- all I remember was the -- the
6    strength until I actually seen the -- the product
7    label again, and then I knew that was the label -- I
8    mean, the product that I had purchased.
9      Q.      If you saw a product with a label that
10   said extra strength next to a product that said
11   "maximum strength," would you chose one over the
12   other?
13     A.      Yeah.
14     Q.      Which one would you chose?
15     A.      I would chose the maximum.
16     Q.      Do you remember seeing any other
17   lidocaine patches that said "extra strength"?
18     A.      Actually, I don't.
19     Q.      The other lidocaine cap --
20             MS. GOUGH:  I'm sorry.
21     Q.      The other lidocaine patch case that you
22   were involved with, do you remember any of the
23   phrases on that packaging?
24     A.      No.
25             I do not.

Page 79

1          Q.     Do you remember if it said "extra
2    strength" or "maximum strength"?
3          A.     No.
4                 I do not.
5          Q.     And you don't remember where you bought
6    those patches?
7          A.     No.
8                 I can't recall it.  Its been awhile.
9          Q.     And that case, you were involved with
10   was before the current case against Kroger; is that
11   correct?
12         A.     Yes.
13                MS. GOUGH:  Okay.  I think that's all I
14   have.
15                MR. SHEEHAN:  I don't have anything
16   further.
17                MS. GOUGH:  Okay.  Thank you, Mr. Hunt.
18                I appreciate your time.
19                THE WITNESS:  Thank you, as well.
20                THE COURT REPORTER:  Mr. Sheehan, would
21   you like a copy of the transcript?
22                MR. SHEEHAN:  Yes.
23                A written or a -- only a pdf and, you
24   know, with the mini four-page and an index, regular
25   delivery.  Only digital copy.

Page 80

```
 1              Mr. Hunt, if necessary, will review and
 2   sign, if necessary.
 3              THE COURT REPORTER:  Do you want a
 4   rough of the transcript?
 5              MR. SHEEHAN:  No.
 6              Thank you.  Yes, no thank you.
 7              THE COURT REPORTER:  How about you, Ms.
 8   Gough?
 9              MS. GOUGH:  I will take a pdf.  No
10   exhibits, please.  No rough.
11              MR. SHEEHAN:  Yes.
12              With the exhibits.  I'm sorry.  That
13   should go without saying, I think, Ms. Chiusano.
14              THE COURT REPORTER:  Okay.
15              MR. SHEEHAN:  And no paper version,
16   just a hard -- just a digital.
17              (Whereupon, at 1:44 P.M., the
18   Examination of this witness was concluded.)
19
20
21
22              °     °         °           °
23
24
25
```

Page 81

1          E X H I B I T S

2

3   DEFENDANT'S EXHIBITS

4

5   EXHIBIT  EXHIBIT                        PAGE

6   NUMBER   DESCRIPTION

7   1        Defendant's Notice of

8            Deposition of Plaintiff

9            Hunt                          24

10  2        First Amended Complaint    33

11

12

13

14

15

16            (Exhibits retained by Counsel.)

17

18

19

20

21

22

23

24

25

Page 82

1              I N D E X

2  EXAMINATION BY                    PAGE

3  MS. GOUGH                         4

4

5

6  INFORMATION AND/OR DOCUMENTS REQUESTED

7  INFORMATION AND/OR DOCUMENTS   PAGE

8  (None)

9

10

11      QUESTIONS MARKED FOR RULINGS

12  PAGE LINE   QUESTION

13  (None)

14

15

16

17

18

19

20

21

22

23

24

25

Page 83

1              C E R T I F I C A T E

2

3    STATE OF NEW YORK       )

                       :  SS.:

4    COUNTY OF NEW YORK      )

5

6        I, KARYN CHIUSANO, a Notary Public for and

7    within the State of New York, do hereby certify:

8        That the witness whose examination is

9    hereinbefore set forth was duly sworn and that such

10   examination is a true record of the testimony given

11   by that witness.

12       I further certify that I am not related to any

13   of the parties to this action by blood or by

14   marriage and that I am in no way interested in the

15   outcome of this matter.

16       IN WITNESS WHEREOF, I have hereunto set my hand

17   this 18th day of May, 2024.

18

19

20   _____

               KARYN CHIUSANO

21

22

23

24

25

Page 84

```
 1                    Veritext Legal Solutions
                         1100 Superior Ave
 2                          Suite 1820
                       Cleveland, Ohio 44114
 3                     Phone: 216-523-1313
 4
     May 29, 2024
 5
     To: Spencer Sheehan, Esq.
 6
     Case Name: Hunt, Shannon, Et Al. v. The Kroger Co.
 7
     Veritext Reference Number: 6693230
 8
     Witness:  Shannon Hunt Deposition Date:  5/13/2024
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 85

1                DEPOSITION REVIEW
               CERTIFICATION OF WITNESS

2

        ASSIGNMENT REFERENCE NO: 6693230
3       CASE NAME: Hunt, Shannon, Et Al. v. The Kroger Co.
        DATE OF DEPOSITION: 5/13/2024
4       WITNESS' NAME: Shannon Hunt
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have made no changes to the testimony
    as transcribed by the court reporter.

8

    _____       _____
9   Date                   Shannon Hunt
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:

12

        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.

15

        I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17

                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25

Page 86

1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 6693230
3       CASE NAME: Hunt, Shannon, Et Al. v. The Kroger Co.
        DATE OF DEPOSITION: 5/13/2024
4       WITNESS' NAME: Shannon Hunt
5           In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7           I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9           I request that these changes be entered
    as part of the record of my testimony.
10

            I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Shannon Hunt
14

            Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23          _____
            Notary Public
24
            _____
25          Commission Expiration Date

Page 87

1                    ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2               ASSIGNMENT NO: 6693230
3   PAGE/LINE(S) /        CHANGE        /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

    _____      _____
20  Date                  Shannon Hunt
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23                        _____
                          Notary Public
24
                          _____
25                        Commission Expiration Date

[& - amended]                                                                    Page 1

**&**

**&** 2:3 3:14

**0**

**04744** 1:6

**1**

**1** 3:14 24:8
25:13,18 81:7
**101** 2:10
**1100** 84:1
**11021** 2:6
**11:38** 1:12
**12** 12:22 38:23
39:1,4 41:20
**13** 1:11
**18034** 83:19
**1820** 84:2
**18th** 83:17
**1:22** 1:6
**1:44** 80:17

**2**

**2** 10:24 25:23
26:2 33:16,19
81:10
**2/10/70** 9:15
**20** 85:16 86:22
87:22
**2000** 2:10
**2009** 9:9
**2023** 36:7,9,18
36:20
**2024** 1:11 36:5
83:17 84:4
**216** 10:24

**216-523-1313**
84:3
**24** 81:9
**2628** 4:10 9:20
10:18 55:6
**29** 84:4

**3**

**3** 26:7,16
**30** 3:13 28:16
**31** 35:24
**33** 81:10

**4**

**4** 82:3
**409** 2:5
**44114** 84:2
**45** 28:16

**5**

**5/13/2024** 84:8
85:3 86:3

**6**

**60** 2:5
**60612** 11:3
**60623** 4:11
9:21
**6693230** 84:7
85:2 86:2 87:2

**7**

**75** 45:20

**9**

**92101** 2:10

**a**

**a.m.** 1:12
**ability** 6:22 7:1
21:12,22 70:23
71:5
**able** 34:15
38:14 51:6
70:13,19,24,25
**above** 84:17
**absolutely** 21:9
**accordance**
85:5 86:5
**account** 30:12
30:12,18
**accurate** 8:4
62:19 63:2
74:23
**acknowledge**
85:11 86:16
**act** 85:14 86:20
**action** 23:2,3
83:13
**active** 45:11,13
45:18
**actual** 77:1
**actually** 43:11
52:10 78:6,18
**ad** 74:7,10
**addition** 4:20
**additional**
73:14
**address** 4:9
9:16,19 35:24
55:5 84:15

**adhesive** 38:16
46:12,12 50:19
51:1 52:8
53:21 64:22
**administer** 3:9
**advertisement**
60:7,10
**advertisements**
59:23
**advise** 37:1,4
**advisement**
38:2
**affixed** 85:15
86:21
**agee** 61:15
67:11
**ago** 31:19
32:12,13,14,14
32:18 39:22
62:13
**agreed** 3:4,17
**ahead** 7:13
11:16 14:2
58:13 69:9
**aid** 53:23 54:12
54:13,16,16
**aid's** 53:24
**air** 55:2,3,12,14
**al** 84:6 85:3
86:3
**allowed** 76:20
76:22,24
**amended** 33:15
33:20 81:10

**[amount - bit]**                                    Page 2

**amount** 76:20
  76:22,24 77:22
  77:24,24
**answer** 7:13
  8:6,9 16:5
  18:16 19:4,5,5
  21:11,20 22:8
  22:8,15,23
  23:13 62:23
  63:6
**answered** 61:1
**answering** 57:2
**answers** 6:7,9
  7:23
**anybody** 28:11
  37:1 48:4
**anytime** 10:5
**anyway** 34:2
**anyways** 34:17
**apologies** 10:15
**appear** 85:11
  86:15
**appended**
  86:11,18
**applied** 42:22
  43:4 46:1,2,20
  46:22 49:10,20
  50:5,19 51:7
  51:17 54:19
  56:6 65:1
  69:21
**apply** 41:17
  43:2 45:21
  46:11,14,16,18
  52:12 54:18

**applying** 52:7
**appreciate** 4:17
  4:24 79:18
**approximately**
  10:21
**area** 11:3 65:2
**areas** 44:16
**arm** 54:19
**ashland** 35:23
  35:25 36:13
**aside** 21:23,23
**asked** 7:12
  57:25 60:10
**asking** 5:9,23
  21:4,21 22:25
  29:3 72:6
**aspercreme**
  41:7
**assembler**
  12:13 44:24
**assignment**
  85:2 86:2 87:2
**associates** 2:3
**assume** 8:7
**attached** 86:7
**attempt** 22:8
**attorney** 27:10
  27:11 63:8
  73:15
**attorneys** 2:3,9
**authorize**
  86:11
**authorized** 3:9
**ave** 84:1

**avenue** 4:10
  9:20 10:19,23
  10:25 36:14
**awake** 28:12
**awhile** 63:21
  65:4 79:8

**b**

**b** 81:1
**back** 10:1,13
  15:19,21 19:8
  19:10,23 23:16
  23:20 31:24,25
  32:23 33:2,4
  37:19 38:6
  40:5,8 41:19
  41:19 42:1,2
  43:7,24 45:22
  46:11,22 47:13
  49:4,9 50:6,19
  51:5,7,11,15,21
  52:7,7 57:5,8
  60:22 62:3
  63:5 65:1,2,4,6
  67:13,16,24
  68:8,11,18,21
  68:24 69:13,17
  69:20 70:10,12
  70:23 71:9,11
  71:15,23 72:7
  72:10,22,25
  73:8,12,16
  84:15
**background**
  29:1 31:20

**bad** 69:13
**band** 53:23,24
  54:12,13,16,16
**bar** 14:10
  15:15,24 18:6
  73:17
**based** 42:17
**basically** 45:2
**beginning** 63:5
**behalf** 1:3 2:4
**believe** 13:12
  14:4,11 15:16
  15:21 16:12,18
  18:4 20:17
  21:19 24:2
  28:24 30:1
  34:8 35:24
  36:25 38:19
  39:13 40:25
  60:2,7 63:19
  68:1 69:6,11
  72:4 73:23
  74:3,9 76:21
  77:15
**bending** 67:25
**best** 13:22 16:7
  21:12,21 22:15
  24:12 65:9
  73:22
**better** 24:17
  35:1,2 58:5
**bigger** 34:21
**birth** 9:13
**bit** 29:1 75:9

**blood**   83:13
**blue**   31:4 76:3
  76:3,4
**body**   41:17
  42:14,18 49:16
  50:3 53:3,21
  54:2,5,9 55:19
  64:20,24
**bolts**   45:4
**bought**   31:1
  32:3 37:15,22
  38:18,21,21,23
  39:7 40:12
  41:10,20 48:13
  56:5 67:19
  79:5
**box**   38:17 40:1
  40:5,9,16
  50:16 52:19
**boxes**   52:21,23
**brand**   16:19
  30:9
**brands**   58:2
**break**   7:7,8,11
  7:14 48:25
  49:3 73:7
**briefly**   28:2
**bring**   25:17,19
  25:19 26:1,6
  26:15
**broadway**   2:10
**brought**   32:3
**building**   45:3
**buy**   31:9,11,15
  33:11 35:17

37:20 45:24
53:11,16 63:22
77:8

**c**

**c**   2:1 83:1,1
**ca**   84:25
**california**   2:10
  10:24
**call**   27:14
  45:18
**called**   4:1 59:13
**cap**   78:19
**care**   12:19,20
  43:9
**case**   1:6 5:5
  8:23 13:6
  14:21 15:10,10
  15:13,14,17,24
  16:11,16,22
  17:21,23,24
  18:1,7,10
  19:12,14,15,17
  19:19,21,24,25
  20:3,7,13,16,22
  21:7 22:4,20
  23:2,6,9,23,24
  28:18 29:4
  34:11 59:10
  60:3,19 62:8
  63:9,12,16
  65:8,12,17,20
  65:22 66:1,2
  66:12,15,23
  67:11 73:17,21
  74:1,5,8 78:21

79:9,10 84:6
85:3 86:3
**cases**   8:24 9:1,6
  9:8,9,11 13:18
  60:20
**certain**   70:15
  70:16
**certificate**
  86:11
**certification**
  3:6 85:1 86:1
**certify**   83:7,12
**change**   7:23
  84:13,14 86:8
  87:3
**changed**   53:15
**changes**   7:4
  84:12 85:7
  86:7,9
**chicago**   4:10
  8:21 9:20
  10:19 11:1,6
  11:13,17 12:1
  43:22,25 44:18
  45:17,22 64:9
  68:14,16
**chiusano**   1:19
  80:13 83:6,20
**choose**   39:23
  58:1
**chose**   39:25,25
  78:11,14,15
**circle**   49:9
**circling**   67:13

**circumstance**
  60:7
**civil**   1:17 8:16
  13:7 15:11
  85:5 86:5
**claims**   15:23
  65:8 73:21
**clarification**
  8:7
**clarify**   7:20,23
  63:7
**class**   20:13,21
  20:25 21:7,15
  21:25 22:3,19
  23:2,2,3,5,9,22
  24:1 65:20
**clean**   42:23
**clear**   6:5 18:21
**cleveland**   84:2
**client**   18:16
  19:25 60:17
  61:12
**clothes**   11:20
  11:22
**code**   11:3
**cohost**   24:14
**come**   19:23
  72:21
**coming**   10:11
  46:17 50:10
  52:8,11 53:1
**commission**
  85:19 86:25
  87:25

**[company - department]** Page 4

**company** 13:3
14:5
**complain** 48:4
**complaint** 16:2
33:15,20 34:6
62:8,9,10,11,14
62:17 63:1
66:16,18,22
67:10 81:10
**complete** 8:4
63:2
**completed**
84:15
**concluded**
80:18
**conclusion** 16:1
62:21
**condition** 67:14
**conditioning**
55:2,3,12
**conditions** 29:2
29:6 32:22
**confidence**
53:18
**connecting**
61:24
**consider** 56:8
56:11 69:7,12
72:6
**considered**
25:15
**consumer**
59:13
**contact** 48:12
48:18

**context** 29:3
**continue** 14:3
16:3 22:7
23:12 26:4
31:14,14 33:8
34:2,17 62:22
**control** 26:10
**controlled** 9:2
**conversation**
20:18
**copy** 3:11,14
79:21,25
**correct** 13:20
25:21 62:18
66:25 69:10
79:11
**corrections**
84:12 86:17
**correctly** 15:22
16:20 36:24
38:20
**cost** 40:11
**couch** 46:4,5
47:3 50:8
54:25
**counsel** 3:5,14
59:4 81:16
**counter** 47:17
59:1 70:3
77:18,23
**county** 83:4
85:10 86:15
**couple** 69:2,3,4
70:5

**coupon** 37:20
**coupons** 30:15
**course** 25:7
52:23
**court** 1:1 3:11
5:2,12,14,21
6:3 8:14,16,17
10:5,10 16:13
18:23 19:1
20:9 22:9,12
23:15 24:13,16
49:1 56:18
61:19 66:13
68:4 79:20
80:3,7,14 85:7
**cream** 29:21
41:13
**criminal** 8:17
9:10
**current** 9:18
25:24 55:10
60:20 79:10
**currently** 11:8
13:1 37:12
**curriculum**
25:24
**custody** 26:10
**customer** 48:19
**cutter** 2:5
**cv** 1:6

| **d** | | | |
|---|---|---|---|

**d** 3:1 82:1
**date** 1:11 9:13
24:9 33:17
84:8 85:3,9,19

86:3,13,25
87:20,25
**day** 52:9 56:2
83:17 85:16
86:22 87:22
**days** 3:13 52:15
52:17,24 54:23
69:3,5,6,11
70:5,7 84:18
**deal** 12:24
**dealing** 33:1
**dealt** 47:25
**dear** 84:10
**decide** 58:5
**deed** 85:14
86:20
**deemed** 84:19
**defendant** 1:9
1:16 2:9 5:5
9:4,5 16:21,23
67:2
**defendant's**
24:6,8,24
26:11 33:16
81:3,7
**defendants**
65:23
**definition** 22:3
22:20 23:3,5,9
23:22 24:1
**degree** 70:15
70:17
**delivery** 79:25
**department**
44:8,9 84:22

**[departments - examined]** Page 5

**departments**
44:10
**depends** 44:8
**deposition** 1:15
3:7,8,11 4:18
8:11 21:14,24
24:7,24 25:16
26:19 27:7,19
27:22 28:11
63:6 81:8 84:8
84:11 85:1,3
86:1,3
**describe** 44:2
46:9 50:1 52:2
**described**
74:22
**description**
81:6
**detached** 51:15
51:16,24 52:3
52:5
**diabetic** 29:7
**diane** 2:11
**diego** 2:10
**difference**
77:11
**different** 52:15
77:14
**difficult** 5:16
**difficulties** 61:5
61:21
**digital** 30:15
79:25 80:16
**disabled** 24:11

**disclosed** 18:14
**disconnect** 73:2
**disconnected**
61:22
**discount** 37:24
**discovery**
26:14
**discuss** 26:22
26:25
**discussion**
26:23
**district** 1:1,1
**division** 1:2
**doctor** 29:18,21
56:12,16 57:9
68:17,20 69:12
69:16 71:22,25
72:2,6 77:6
**doctors** 71:21
72:4 77:2,4
**document**
24:20 25:3
26:15 33:21,23
34:8,19
**documents**
23:8,22,24,25
25:10,14,17,20
26:1,6,9,12
33:25 34:5
82:6,7
**doing** 12:19
13:1 15:7 43:8
43:12 44:19
52:12 60:9
73:23

**dollar** 15:3
17:18
**drug** 77:18
**dryer** 11:13,17
12:1 43:22,25
44:18 45:17,22
64:9 68:14,16
**dryers** 11:19,22
44:22
**duly** 4:2 83:9
**duties** 20:25
21:2 71:1
**dwebster** 2:12

**e**

**e** 2:1,1 3:1,1
81:1 82:1 83:1
83:1
**earlier** 9:17
**early** 43:20
**easier** 13:17
60:5
**eastern** 1:2
**effect** 3:10,12
7:1
**eight** 12:18
**electric** 12:11
12:12,14
**email** 84:17
**employed** 11:8
**employer** 68:7
68:10,16 70:7
71:4
**employment**
12:18

**enclosed** 84:11
**engagement**
59:18
**entered** 86:9
**entire** 85:5 86:5
**environment**
44:5
**envision** 46:10
52:1
**envisioning**
54:14
**errata** 84:13,18
86:7,10,18
87:1
**especially**
55:22
**esq** 2:6,11,11
84:5
**estimation**
32:17
**et** 84:6 85:3
86:3
**evening** 56:3,6
**exactly** 27:25
32:11 41:2
42:11 49:25
53:4 57:22
63:14 64:3
66:17
**examination**
4:5 74:17
76:14 80:18
82:2 83:8,10
**examined** 4:3

**[except - gough]**

| | | | |
|---|---|---|---|
| **except** 3:18 | **f** | 35:19 36:2 | **g** |
| **excuse** 11:15,21 | **f** 3:1 83:1 | 45:25 59:21 | **general** 14:6 |
| 43:23 45:6 | **facebook** 59:24 | 62:7,9 74:1 | 15:3,9,13,23 |
| 52:22 | **facility** 44:3 | 81:10 | 18:6 73:16 |
| **executed** 86:10 | **fair** 34:14 36:6 | **five** 72:18,22 | **generally** 31:20 |
| **execution** | 36:19 37:7 | 73:1,3 | **getting** 39:11 |
| 85:14 86:19 | 42:8 72:9,12 | **flexible** 70:24 | **gig** 12:23 |
| **exhibit** 24:4,8 | **fairly** 45:11,12 | 71:1 | **give** 7:13 8:8 |
| 33:14,16,19 | **fall** 12:24 | **follow** 34:11 | 32:15 61:22 |
| 81:5,5 | **familiar** 14:8 | 73:15 76:16 | **given** 83:10 |
| **exhibits** 80:10 | 34:19 35:8 | **follows** 4:4 | **go** 4:25 5:10,19 |
| 80:12 81:3,16 | 45:1 | **force** 3:12 | 5:24 7:13,14 |
| **expect** 42:18 | **far** 76:25 | **foregoing** | 9:22 10:1,13 |
| **expectation** | **favoring** 73:24 | 85:13 86:18 | 11:16 14:2 |
| 53:7 | **federal** 1:17 | **form** 3:18 75:4 | 28:25 34:24 |
| **experience** | 16:13 66:13 | **forth** 83:9 | 49:4 58:4,12 |
| 64:12 | **feel** 50:9 | **forum** 4:23 | 65:17 69:9 |
| **experienced** | **figured** 10:17 | **forward** 84:15 | 71:22,24 75:7 |
| 32:24 | **filed** 17:24 60:3 | **four** 42:21 | 80:13 |
| **expiration** | 62:15 65:13 | 52:14 79:24 | **going** 8:7 18:7 |
| 85:19 86:25 | 66:12,13,15,19 | **francis** 59:16 | 19:15 25:6 |
| 87:25 | 66:23 67:11 | 59:19 | 28:14 29:1 |
| **explain** 67:14 | 73:18 | **free** 67:6 85:14 | 33:4,13 34:5 |
| **extent** 26:8 | **files** 26:9 | 86:20 | 47:22 48:23 |
| 67:3 | **filing** 3:6 34:8 | **frequent** 30:12 | 49:9 56:11 |
| **extra** 31:5,10 | **find** 84:11 | 30:17 | 60:2 64:19 |
| 31:16 33:5,10 | **fine** 36:1 53:24 | **friday** 28:5,8 | 69:12 73:16 |
| 57:17 58:10,19 | 67:9 | 28:14,17,22 | **good** 5:3 31:18 |
| 58:21,22,25 | **finish** 6:6 | **front** 40:1 | 48:25 |
| 74:23 77:12 | **firm** 59:12 | **full** 21:21 | **gordon** 2:8 |
| 78:2,10,17 | **first** 4:2,13 6:2 | **fully** 51:7 | **gough** 2:11 4:6 |
| 79:1 | 13:11,12 14:4 | **functions** 70:20 | 4:15,21,25 5:4 |
| | 18:20 24:4 | **further** 3:17 | 6:1 9:22 10:7 |
| | 26:11 33:15,20 | 15:19,21 74:13 | 10:13 16:4 |
| | 33:23 34:6,18 | 79:16 83:12 | 17:10,13,16,19 |

18:13,15,19,21
19:7 23:18
24:10,15,18
26:24 27:1
33:13 34:4,14
34:22,24 35:1
35:4 48:22
49:4 50:13
57:1,5 60:13
60:21 61:2,7,8
61:10,25 72:18
72:24 73:8
74:12,14 75:4
76:15 78:20
79:13,17 80:8
80:9 82:3
**gray**   31:3
**great**   2:6 5:22
  49:2
**greenbrier**
  17:11
**greene**   59:13
  59:16,19
**grocery**   30:3,6
**ground**   5:11,25
**grsm.com**   2:12
  2:12

**h**

**h**   4:1,1 81:1
**half**   10:21 55:8
**hand**   29:13
  73:14 83:16
**happen**   43:8
**hard**   80:16

**head**   6:11,11
**hear**   4:14,16
  5:17 11:21
  22:10,12 60:24
  74:19
**heard**   59:12
**held**   1:17
**hello**   61:19,20
**help**   69:23
**hereinbefore**
  83:9
**hereunto**   83:16
**hold**   5:14 56:21
  75:16
**home**   9:19
  45:24 46:1
  54:25 55:2,10
  56:5
**honest**   16:9
  65:11
**honey**   14:10,13
  15:13,15,24
  18:6 73:16
**hope**   18:17
**hot**   41:5 44:6
  44:15,16
**hotter**   44:11
**hour**   7:8 46:24
  48:23,24
**hours**   42:19,20
  42:21,21 53:9
  67:19
**hum**   20:8 23:4
  30:25 68:3

**hunt**   1:3,15 2:4
  4:8 5:3,8 10:1
  10:15 13:14,17
  14:6,20 15:9
  16:5,22 17:20
  19:4 21:5
  22:15,23 23:13
  24:7,21,25
  26:22 28:7
  31:14 34:2,17
  35:5 49:6
  56:20,23 59:4
  60:8,16,22,23
  61:19 67:2
  73:5,9 74:15
  74:19,25 75:8
  75:13,25 76:12
  76:16 79:17
  80:1 81:9 84:6
  84:8 85:3,4,9
  86:3,4,13
  87:20
**hurt**   68:8,11,18
  70:9 71:11
**hurting**   68:24

**i**

**ibuprofen**
  47:18
**ice**   69:22 70:1
**icy**   41:5
**identification**
  24:8 33:16
**identify**   23:9
  23:22,25

**illinois**   1:1 4:11
  9:21 16:11
  66:14
**image**   34:18
  35:6
**imaging**   71:14
**impair**   70:23
**important**   6:5
**included**   84:13
**incorporated**
  86:12
**index**   79:24
**indicating**
  84:13
**individual**
  75:17
**individually**
  1:3 2:4
**industrial**
  11:18 44:21
**information**
  13:24 17:9
  82:6,7
**initial**   67:22
**injuries**   29:2,10
  31:21 32:23
**injury**   67:14,22
**instance**   71:12
**instructing**
  18:15
**instructions**
  42:5,9,13
  49:19,22
**interested**
  83:14

**interfere** 6:22
**interfered**
   55:17
**international**
   17:12
**introduce** 24:3
   33:14
**involved** 13:7
   15:11 17:21
   74:4 78:22
   79:9
**involvement**
   9:10
**involving** 29:4
**issue** 16:17
**issues** 10:8,17
   67:4
**it'll** 24:4
**items** 39:18

**j**

**jewel** 30:17
**jewel's** 30:5
**job** 11:11 44:23
   45:11,17,20
   47:22 70:13,19
   70:23 71:1,5
**jobs** 12:17
**johnson** 1:3 2:4
   61:18 62:5
**judge** 3:10
**jump** 4:13
   13:14 67:1

**k**

**karyn** 1:18
   5:12 6:1,2 9:16
   19:7 24:12
   57:6 83:6,20
**keep** 69:13
**kept** 46:16
   52:11 53:1
**kgough** 2:12
**kind** 12:24
   16:17 41:1,14
   44:2,25 54:8
   54:11 75:8
**kirsten** 2:11 5:4
   13:16,24 15:1
   15:6 17:8
   33:24 34:3
   60:4
**knew** 78:7
**know** 7:5,9,17
   7:19,25 9:16
   10:7 15:6 22:3
   23:5 26:22
   28:10 29:23
   32:11 34:23
   42:23 44:20
   50:2,9 51:17
   52:6 53:5
   56:16 57:1,9
   60:5,11,16
   61:1,9,11,14,17
   62:4 63:6 65:3
   65:15 66:12,15
   66:18,22,24
   67:4,7,10 73:2

73:2 77:22
   79:24
**knowledge**
   63:2 66:11
**kroger** 1:8 2:9
   5:5 17:1 20:1
   30:9,11,14,23
   39:20,23 41:18
   48:19 57:17
   58:1,8 64:5
   66:9 75:22
   76:9 79:10
   84:6 85:3 86:3

**l**

**l** 3:1,1
**label** 31:2,8
   53:14 58:11
   64:19 75:1
   78:7,7,9
**labelled** 74:23
**laid** 11:10,11
**lanette** 1:3 2:4
   61:17 62:5
**larger** 54:15,15
   54:16
**late** 43:19
**lately** 59:3
**laundry** 11:22
   11:23
**law** 59:12,13
**lawn** 12:19,20
   43:9
**lawsuit** 59:24
   60:1 63:5

**lawsuits** 13:7
   15:11
**lawyer** 59:16
**lawyers** 59:9
**learn** 60:1
**leave** 42:14
**led** 67:15
**legal** 15:25
   22:6,14,22
   23:11 62:20
   84:1 87:1
**letter** 59:18
   84:19
**lidocaine** 14:20
   14:23 15:10
   16:16 17:20,22
   17:23 19:14,20
   19:24 29:4,18
   29:20,23,24,25
   30:1,23 31:5
   39:19,24 40:22
   41:5,7,10,13,14
   41:18 56:17
   57:10,18 58:15
   63:4,15,17
   64:6,25 75:22
   76:9 77:3,7,23
   78:17,19,21
**lifted** 43:1
**lifting** 45:5,7
   45:10,18
**liked** 38:8
**likely** 60:10
**limited** 71:3,5

**[line - missed]**                                                    Page 9

**line** 82:12
84:13 86:7
87:3
**list** 31:21
**listed** 86:7,17
**listing** 86:7
**litigation** 30:24
**little** 18:4 34:20
70:18 75:9
**live** 10:18,22
11:4 55:4
**lived** 10:20
11:6 55:8
**llp** 2:8
**location** 1:18
36:13 55:25
**logistics** 12:2,7
12:9,10
**long** 10:20 11:4
11:24 12:6,14
12:20 28:13,15
39:22 42:14,17
46:21 53:2,4,8
54:22 57:23
67:18,21
**longer** 18:4
**look** 31:2 34:3
34:19 35:8
39:7,8 40:6
72:19
**looked** 40:4
62:17
**loose** 46:17
50:10 51:17
52:6,6,8,11

53:1
**lost** 56:21
**lot** 5:16 45:5
**lotion** 49:15
**lots** 45:7
**lower** 41:19
45:21 46:22
50:6 51:7
67:17
**loyalty** 30:12

**m**

**m** 2:11
**ma'am** 47:7
**machine** 44:5
**madam** 84:10
**made** 31:8,11
31:15 33:10
39:23 55:19
58:1 85:7
**make** 13:17,24
24:13 34:20
53:15 60:5
62:18
**making** 5:16
**man** 76:3,4
**mansukhani**
2:8
**manufacture**
11:18 16:25
66:6
**manufactured**
44:21
**mariano** 48:8
48:12

**mariano's**
35:21,22 36:13
41:11
**mariano's** 30:5
30:8,11,14
48:18 63:24
**marked** 24:7
33:16 82:11
**marriage** 83:14
**matter** 83:15
**max** 77:15
**maximum** 75:2
75:14,22 76:9
76:17,19,20,21
76:22,24 77:12
77:15,15,18,19
77:19,21,22,24
78:11,15 79:2
**mean** 20:23
30:6 35:11
42:20 45:2
51:3 52:20
58:21,23 70:16
76:17,23,25
77:16 78:8
**meaning** 77:21
**means** 6:16
58:22 76:19
77:19
**mechanical**
12:13
**medical** 6:25
29:2,6 31:20
32:19 41:25

**medication**
6:21 29:15
39:14 72:10,13
76:20,24 77:1
**medications**
72:16
**medicine** 77:5
**meet** 59:21
**memory** 16:19
36:24 38:19
69:8,10
**menthol** 54:1,7
**mention** 67:7
**mentioned**
73:17
**met** 59:15
**midwest** 84:17
87:1
**mill** 2:5
**millard** 4:10
9:20 10:19,22
55:6,7
**mills** 14:7
15:10,13,24
18:6 73:16
**mini** 79:24
**minute** 73:13
**minutes** 28:16
46:23 50:9
53:6 72:19,22
73:1,3
**misleaded**
20:19
**missed** 56:25

**[missing - package]** Page 10

| | | | |
|---|---|---|---|
| **missing** 70:7 | **natural** 73:24 | **o** | 27:2 28:25 |
| **moment** 9:23 | **nature** 8:23 9:1 | | 29:5 30:20 |
| 11:9 33:18 | **near** 39:19 | **o** 3:1 4:1 | 32:4 33:4,13 |
| 59:2 61:23 | **nearby** 39:12 | **oat** 15:15,24 | 33:19 34:12,15 |
| **moments** 31:19 | **necessary** 80:1 | 18:6 73:17 | 34:23,25 35:4 |
| **month** 32:14 | 80:2 | **oath** 3:9 6:13 | 36:5 37:15 |
| **morning** 5:3,13 | **neck** 2:6 | **oats** 14:14 | 49:6,9,9 63:4 |
| 6:3,14,22,23 | **need** 7:8,11,19 | 15:13 | 67:9,24 72:17 |
| 7:2 26:14 | 7:25 21:7,16 | **object** 75:4 | 72:24 73:9,12 |
| **moving** 45:7,18 | **new** 1:19 2:6 | **objection** 15:25 | 74:12 79:13,17 |
| 45:19 47:5 | 4:3 83:3,4,7 | 18:11 22:5,13 | 80:14 |
| 75:9 | **nodding** 6:10 | 22:21 23:10 | **once** 7:7 27:23 |
| **mri's** 71:19 | **noise** 5:16 | 26:3,21 31:13 | 28:24 45:24,25 |
| **muscle** 31:25 | **northern** 1:1 | 33:7,24 62:20 | 45:25 50:4 |
| 32:1,7,20,23 | **notarized** | **objections** 3:18 | **ones** 17:4 |
| 33:2 38:6 42:1 | 84:14 | **obligation** | **ongoing** 60:20 |
| 43:7,24 47:13 | **notary** 1:19 4:2 | 20:25 | **opened** 50:4,16 |
| 65:5 67:16 | 83:6 84:25 | **occurring** 4:20 | 50:17 52:11 |
| 68:21,25 | 85:10,18 86:15 | **official** 85:15 | **opening** 50:2 |
| **mute** 5:19 | 86:23 87:23 | 86:21 | **option** 56:8 |
| 56:18,20 60:21 | **note** 84:12 | **oh** 10:7,10 17:5 | **original** 3:7,14 |
| 60:23 61:2 | **notes** 72:19 | 17:5,5,8 22:13 | 66:16 |
| 73:3 | **notice** 24:6,24 | 24:10 31:15 | **originally** 9:9 |
| | 71:4 81:7 | 32:10 34:22,24 | **outcome** 83:15 |
| **n** | **number** 25:13 | **ohio** 84:2 | **outside** 11:6 |
| | 25:18,23 26:1 | **okay** 4:17,22 | 21:14 |
| **n** 2:1 3:1 4:1,1 | 26:7,16 81:6 | 4:25 5:3,23 6:2 | |
| 4:1,1 82:1 | 84:7,13 | 6:8,11 7:11,14 | **p** |
| **name** 4:7 5:4,6 | **numbers** 57:19 | 8:4,5,9 10:1,4 | |
| 66:19 84:6 | 86:7 | 10:13,15,18 | **p** 2:1,1 3:1 |
| 85:3,4,15 86:3 | **nut** 14:10 15:15 | 13:11,22,25 | **p.m.** 80:17 |
| 86:4,21 | 18:6 73:17 | 14:1,4,16 15:9 | **package** 31:3,7 |
| **named** 13:18 | | 17:13,16,19 | 33:4,6,9 38:22 |
| 20:6,13,16 | | 19:3,23 20:20 | 42:6,13,17 |
| 59:15,19 61:14 | | 24:3,10,20 | 50:2,11,15 |
| 61:17 62:5 | | 25:5 26:7,18 | 53:2 57:13,15 |
| 65:19 | | | 57:20 |

**[packages - product]**                    Page 11

packages  58:17
packaging  50:4
  50:21 78:23
packet  50:17
page  25:8
  34:18 79:24
  81:5 82:2,7,12
  84:13,15 86:7
  87:3
pain  30:1 31:17
  31:18,22,24
  38:6 39:13,16
  39:18 41:24
  47:10,14,25
  53:10 56:9
  58:14,24 59:3
  67:18,21 69:17
  69:20 70:1
  71:9,23 72:7
  72:10 76:20,24
painkillers
  47:17 59:1
  70:3
paper  80:15
part  86:9
participating
  67:5
particular  13:3
  20:25
parties  1:18 3:5
  83:13
patch  17:1,21
  17:23 19:14,21
  19:24 29:4,18
  30:24 31:17

38:17 39:20,23
40:16 41:10,18
42:14,18 47:21
47:22 50:5,18
50:20 51:1,10
51:14 52:9,16
54:1,5,8,11,12
54:13 55:9,13
55:17 56:5,17
57:10,18 58:1
58:9,15 63:4
63:13,18 64:6
64:25 67:20
75:23 76:10
77:7,23 78:21
patches  16:19
38:23 39:1,19
39:24 40:14,23
41:5,8,20
52:19,20 54:7
77:3 78:17
79:6
patience  10:16
pdf  79:23 80:9
peel  51:10
peeling  52:6
percent  45:20
57:22
percentages
57:20
perform  70:19
70:25
personal  29:1
personally
35:13 85:11

86:15
phone  84:3
phrase  33:5,10
phrases  57:15
58:17 77:12,14
78:23
pick  58:6,8
picked  58:4,6
piece  50:18
place  4:18
plaintiff  1:15
2:3 4:13 13:19
20:7,16 24:7
24:25 81:8
plaintiffs  1:4
34:9 65:19
plan  7:7
planning  53:11
please  4:7 5:6
9:14,18 14:3
18:24 19:2,7
22:7,23 23:18
27:4 31:14
33:8 34:17,21
57:4 65:24
80:10 84:11,11
point  7:4,12,22
61:3 65:17
68:20 71:25
77:16
positions  12:16
possession  9:2
26:10
pre  29:7

prepare  25:15
26:18,20 27:6
27:19,22
prescribe  56:17
57:10 77:3
prescribed
29:17,20 77:6
prescription
29:14 72:7
prescriptions
72:3,5
present  27:18
pressed  50:7,7
pretty  15:8
34:10 60:8
prior  34:8 61:1
privileged
18:12
probably  61:22
75:6
problem  16:15
17:15 24:14
61:6
problems  53:20
procedure  1:17
85:5 86:5
process  61:23
produced  26:8
product  15:14
16:17 20:19
30:21,23 31:1
31:8,12,23
32:3,5 33:11
35:12,14,20
36:3,10,12,16

36:20,23 37:2
37:5,8,12,15,17
37:20 38:3,5,9
38:12,14,22
39:6 40:2,11
40:20 41:14
42:6,23 43:4
45:21,25 46:2
46:6,21 47:9
48:2,7,19
49:10,16,20
50:14 53:11,15
53:16,18 54:24
56:7 57:13
58:5,6,23
60:12 63:11,17
63:20,22 64:2
64:13 66:7
67:14,15 74:22
75:1,15,24
78:6,8,9,10
**production**
26:11 84:15,17
84:22
**products** 25:10
37:25 39:12
41:18 47:14
53:21 58:15
59:1
**properly** 64:18
64:23
**provide** 6:23
16:2 33:25
34:5,7,16
47:10

**public** 1:19 4:2
83:6 85:10,18
86:15,23 87:23
**pulled** 17:8
50:18
**purchase** 35:13
35:19 36:2,10
36:12,16,22
37:2 64:1
**purchased**
35:21 36:20
38:5 39:6 40:2
40:20 75:1,24
78:8
**purchases** 32:5
37:19
**purchasing**
37:5
**pursuant** 1:16
18:14
**pushing** 52:7
**put** 41:21 47:2
47:5,9 49:12
49:15,16 51:5
55:25 56:2
64:24 73:3
**putting** 50:2
**puzzled** 34:3

**q**

**question** 6:6
7:13 8:6,8 19:6
19:9,11,19
20:4 21:5
22:16 23:13,14
23:19,21 27:4

34:1 57:1,4,7,9
61:2 62:2,4
63:7 65:24
66:20 82:12
**questions** 5:9
5:24 7:17,20
19:24 21:11,20
29:2,3 72:23
73:14 74:13,16
82:11
**quick** 34:10
**quicker** 58:24
**quickly** 76:25
**quiet** 12:2,6,9
12:10
**quite** 14:5,17
15:18 16:14
39:21 42:10
63:14 65:4
67:8 77:4

**r**

**r** 2:1 3:1 83:1
**rays** 71:17
**reaching** 67:25
**read** 19:7,10
23:16,20 25:7
25:14 40:1
42:8,10 49:19
57:5,8 62:3
76:18 85:5,6
85:12 86:5,6
86:17
**reading** 84:19
**ready** 5:2 10:4
10:6 49:6 73:9

**really** 22:9
48:22
**reason** 70:6
84:14 86:8
87:3
**recall** 15:22
16:9 30:10
39:22 41:16
42:7 79:8
**receipt** 84:18
**receipts** 40:19
**receive** 18:9
19:11,20 32:19
**received** 26:13
41:25 65:15
**receiving** 12:5
**recently** 11:9
**recess** 9:25
10:12 62:1
**recollection**
75:3
**record** 4:7 5:1
5:7 6:6,10 9:22
10:2,14 17:14
49:5 60:9
61:25 73:8,12
83:10 86:9
**recorded** 4:19
**rees** 2:8
**reference** 84:7
85:2 86:2
**referenced**
85:11 86:15
**referred** 19:9
23:19 57:7

62:2 68:17
**referring** 13:18
26:24
**refresh** 75:3
**refund** 48:10
**regular** 79:24
**related** 83:12
**relating** 23:24
26:15
**relied** 25:15
**relief** 31:18
47:10,14
**relieve** 58:23
69:19,25
**reliever** 30:2
**remember**
13:23 14:5,17
15:18 16:7,14
17:7,25 18:1
27:25 28:21
32:11,11 40:10
40:13 41:2,4,6
41:9 42:12,16
43:13 49:22
57:12,14,19,21
57:24,25 58:16
62:16 63:14,21
63:23,25 64:3
64:4,10 65:4,9
65:10,12,21
67:3,6,8 73:18
73:22 74:6,7
76:2 78:5,16
78:22 79:1,5

**remind** 33:25
**remotely** 1:18
**repeat** 61:9
**rephrase** 7:20
20:4 65:24
66:20
**reporter** 5:2,12
5:14,21 6:3
10:5,10 18:23
19:1,10 20:9
22:9,12 23:15
23:20 24:9,13
24:16 33:17
49:1 56:18
57:8 61:19
62:3 68:4
79:20 80:3,7
80:14 85:7
**represent** 5:4
**representative**
20:13,21 21:1
21:7,16 22:1
**representatives**
65:20
**represented**
59:4 60:8,11
63:8
**request** 7:12
25:10,17 86:9
86:11
**requested** 82:6
**requests** 26:11
**require** 45:5
**required** 34:9
84:25

**reserved** 3:18
**respective** 3:5
**responded**
74:10
**response** 20:10
34:1 60:6 68:5
**responses**
26:14
**responsibilities**
20:21
**responsive**
26:10
**result** 68:23
**resume** 25:24
**retained** 81:16
**return** 48:7
**returned** 84:18
**review** 34:9
62:7,9,14,18
80:1 84:12
85:1 86:1
**reviewed** 25:14
**rid** 56:8
**right** 6:12 8:10
14:2,13 15:1
16:8 28:7 32:2
39:22 41:19
43:3 46:7
49:11 50:6
52:24 54:25
67:17 72:21,24
76:3
**road** 2:5
**role** 20:15,17

**rough** 80:4,10
**row** 52:18
**rules** 1:17 5:11
5:25 85:5 86:5
**rulings** 82:11

**s**

**s** 2:1 3:1,1 4:1
53:23 81:1
84:15 86:8,8
87:3
**s&c** 12:11,12
12:14
**sale** 37:22
**salonpas** 41:3
**san** 2:10
**sat** 50:8,8
**satisfied** 64:15
64:16
**saw** 34:6 63:1
78:9
**saying** 57:21
80:13
**says** 24:11,23
25:9,13,23
26:7 75:21
76:8
**screen** 24:5
**screws** 45:3
**scroll** 25:5,6
34:10
**scrolling** 25:8
**scully** 2:8
**seal** 85:15
86:21

**[sealing - sorry]** Page 14

| | | | |
|---|---|---|---|
| **sealing** 3:6 | **shannon** 1:3,15 | 80:15 84:5 | **similarly** 1:3 |
| **search** 15:7 | 2:4 4:8 5:8,15 | **sheehan's** | 2:5 |
| **seasonal** 12:25 | 10:11 84:6,8 | 60:17 61:12 | **sincerely** 84:21 |
| **second** 5:14 | 85:3,4,9 86:3,4 | **sheet** 84:13 | **single** 50:17 |
| 14:17,19 24:4 | 86:13 87:20 | 86:7,10,18 | **sir** 22:10 56:19 |
| 25:8 33:14 | **share** 24:4 | 87:1 | 60:25 84:10 |
| **see** 24:10,20 | **sharing** 24:11 | **shelf** 39:7,8 | **sit** 46:4 47:3 |
| 25:1,11 33:23 | **she'll** 6:3 | **shift** 30:20 43:1 | **sitting** 46:5,10 |
| 34:22 35:5 | **sheehan** 2:3,6 | **shifting** 30:3 | 47:7 48:23 |
| 38:2 40:8 42:5 | 4:12,12,16,22 | **shipping** 12:5 | **situated** 1:3 2:5 |
| 55:4 56:11 | 5:18 13:13,13 | **shop** 30:4,6,8 | **six** 12:15 38:19 |
| 59:23 68:20 | 13:16,22 14:2 | 44:5 | 38:22 |
| 69:12 71:22 | 14:6,12,16,19 | **shopper** 30:12 | **sized** 11:18 |
| 75:6,7,10,11 | 14:23,25 15:5 | 30:17 | 44:21 |
| **seeing** 42:7 | 15:25 16:6,8 | **shopping** 44:5 | **skin** 38:16 |
| 57:13,19,21 | 17:2,8,11,15,17 | **short** 9:25 | 42:24 46:16 |
| 74:7 78:16 | 18:11,17,20,25 | 10:12 49:3 | **sliding** 51:20 |
| **seen** 23:8,21 | 19:3 22:5,11 | 62:1 73:7 | 51:23 |
| 25:3 33:21 | 22:13,21 23:10 | **shower** 43:3 | **slow** 25:7 |
| 78:6 | 26:3,21 27:12 | 49:11 55:22 | **smoker** 54:6 |
| **separate** 8:24 | 27:14,17,19,22 | **shown** 84:16 | **smooth** 51:6 |
| **serves** 16:20 | 28:4,10,14,18 | **shows** 17:11 | **solutions** 84:1 |
| 36:24 38:20 | 28:23 31:13 | **sic** 20:19 | 87:1 |
| 69:8,10 | 33:7,24 34:7 | **sick** 70:8 | **somebody** |
| **service** 3:13 | 34:15,20,23,25 | **side** 41:19 50:6 | 46:14 60:6 |
| 48:19 | 35:2 56:21,25 | 67:17 | 66:23 |
| **set** 26:11 83:9 | 59:7,21 60:4 | **sign** 59:18 80:2 | **somewhat** 44:7 |
| 83:16 | 60:15,20,22,25 | **signature** 83:19 | 69:24 70:21 |
| **settle** 19:17 | 61:6,8,20 | 84:14 | 71:2 |
| **settlement** 18:9 | 62:20,24 63:10 | **signed** 3:8,10 | **sooner** 7:8 |
| 19:12,20 65:16 | 67:1,9 72:21 | 3:12 85:13 | **sorry** 5:20 10:8 |
| **several** 30:6 | 73:1 74:2,14 | 86:18 | 10:8 14:3 |
| 44:10 | 74:18 75:16 | **signing** 84:19 | 16:14 18:25 |
| **shakes** 6:11 | 76:11 79:15,20 | **similar** 32:23 | 22:11 28:4,9 |
| | 79:22 80:5,11 | 58:16 | 28:12 39:17 |

**[sorry - tape]**

50:13 58:12
69:9 78:20
80:12
**sort** 21:2 44:19
**sorter** 12:4
**sound** 14:8
28:7
**south** 4:10 9:20
10:18,22,24
35:25 55:6,7
**speak** 20:18
27:6,9,21 28:5
28:10,13,15,23
**specific** 27:3
**spencer** 2:3,6,7
4:12 10:10
13:13 27:15,16
84:5
**spencersheeh...**
2:7
**spoke** 27:18
28:2,2,5,15
**spoken** 28:17
**spot** 41:21,23
**spring** 12:24
43:20
**ss** 83:3
**start** 6:7
**state** 1:19 4:3,7
5:6 83:3,7
85:10 86:15
**statement**
85:13,14 86:19
86:19

**states** 1:1
**stay** 42:18
**stayed** 10:24
**stick** 38:15,16
46:6,21 47:12
51:19 52:8
53:3,8,24
54:20,22 55:19
64:20
**stickiness** 51:4
**sticking** 51:18
53:21 64:23
**sticky** 50:20,22
50:25 51:2
55:17
**stiff** 70:18,22
**stiffness** 70:22
**stipulated** 3:4
3:17
**stop** 37:5
**store** 41:11
48:8,12 58:3
77:9
**stores** 17:18
30:4,7,9
**strain** 32:1
67:24
**strained** 31:24
32:7,20,23
33:2 38:6 42:1
42:1 43:7,24
47:13 65:5
67:16 68:21,25
**strength** 31:6
31:10,16 33:6

33:10 57:18
58:10,19,21,22
58:25 74:23
75:2,14,22
76:7,9,17,19,21
77:1,12,12
78:3,6,10,11,17
79:2,2
**strong** 58:23
**stronger** 77:8
**stuck** 50:7
**stuff** 17:18 31:5
**subject** 30:24
63:11
**subpoena** 1:16
**subscribe** 77:4
**subscribed**
85:10 86:14
87:21
**subsides** 53:10
**substance** 9:3
**sued** 19:25 66:2
66:4
**suing** 66:6
**suite** 2:5,10
84:2
**summer** 12:23
12:23,24 43:20
**superior** 84:1
**supposed** 21:25
51:19 53:5
**sure** 13:24 15:6
15:8 16:4
17:10,15 18:19
20:5,23 22:18

23:1 27:5
34:10 39:21
42:10 51:16
53:4 55:14
57:22 58:20
60:9,15 61:10
61:23 62:18
63:25 65:3,25
66:21 68:13,19
77:4,10,20
78:4
**surgeries** 29:12
**surgery** 29:13
**surprise** 74:25
**sweaty** 55:23
**sworn** 3:8 4:2
83:9 85:10,13
86:14,18 87:21

**t**

**t** 3:1,1 4:1 81:1
83:1,1
**take** 6:10 7:7
24:4 29:14
48:25 69:3
72:10,13,15,15
72:18 80:9
**taken** 1:16 8:11
9:25 10:12
49:3 62:1 73:7
**talked** 12:17
31:19 63:5
**talking** 17:3,4
30:23 32:14
**tape** 38:15

**tech** 10:8,17
**technical** 61:4
 61:21
**television** 46:4
 47:8
**tell** 6:16 9:13
 9:18 13:11
 21:8 25:6 32:6
 37:1,4 42:11
 48:1 50:3,11
 50:14 51:14,14
 54:13 57:12
 67:2 68:7,11
 70:9
**telling** 48:13
**testified** 4:3
 8:14,17
**testify** 7:1
**testimony** 6:23
 8:4 19:10
 23:20 57:8
 62:3 83:10
 85:6,7 86:6,9
 86:12
**thank** 4:22 6:1
 9:24 10:16
 17:19 24:15,19
 27:17 60:14
 73:5 74:14,15
 76:12 79:17,19
 80:6,6
**thanks** 34:25
**thing** 6:2 22:14
 50:9 52:12

**think** 4:25
 13:16,17 14:19
 15:1,1,3 17:17
 26:23 31:4
 55:18 56:25
 63:6 64:10,11
 67:25 69:2,3
 69:21 72:18,19
 73:3 74:12
 78:2 79:13
 80:13
**thirty** 84:18
**thought** 31:17
 47:22
**three** 10:21
 12:16 42:21
 52:14,17,24
 55:8 69:4
**tiffany** 61:14
 67:11
**time** 1:12 3:19
 18:23 19:1
 43:13,15 48:25
 55:15 56:2,6
 79:18
**times** 8:19
 27:21 28:22
 36:22 37:16,16
 37:18 38:22
 44:17 45:15,16
 52:13,14
**today** 5:9 6:19
 7:4 8:4 21:15
 21:24 25:18
 26:19 27:7,19

 27:22 28:1,5
 28:11 59:5
**told** 67:3 68:17
 69:16 70:6,8
**took** 50:11,14
 50:17,20 52:10
 69:2 70:5
**tools** 45:3 68:1
**top** 53:16 75:20
**topics** 30:3,20
**transcribed**
 85:7
**transcript**
 79:21 80:4
 84:11,12 85:5
 85:12 86:5,11
 86:17
**treatment**
 32:19 41:25
**trial** 3:19 65:17
**tried** 37:18
 38:24,25 43:1
 52:7,7,12,17,20
**true** 83:10
**truth** 6:17 21:8
**truthful** 8:3
**try** 13:23 21:19
 21:20 34:22
 47:24 69:19,25
**trying** 20:18
 26:23 46:10
 51:25 56:8
 58:4
**turning** 45:3,3

**twice** 8:20
 36:25
**two** 8:24 11:5,5
 13:10,18 15:8
 37:16 38:22
 69:4,6,11
 72:22 73:13
 74:16
**type** 39:13 54:4
 77:5

## u

**u** 3:1 4:1
**uh** 20:8 68:3
**um** 23:4 30:25
**under** 6:13
**understand**
 4:17 6:13,16
 7:16 18:18
 20:6,12,24
 21:6,16,25
 26:13 30:22
 77:2,7
**understanding**
 20:2,15,20
 21:3 22:19,24
 65:23 66:2,3
**understood** 8:8
 60:13
**unhappy** 48:2
 48:15
**united** 1:1
**unsigned** 3:11
**unsuccessful**
 39:1

**update** 7:23

**ups** 73:15
76:16

**use** 30:14,21
37:20 38:14,22
47:14 52:9,15
52:20,21 54:7
54:7 58:25
60:11 63:20
67:13,15

**used** 3:12 37:17
40:22 41:3,13
52:23 54:1,4,8
54:24 55:9
64:5

**using** 31:22
37:8,12,14,18
39:1 45:3
52:17 55:13

**usually** 60:5

**v**

**v** 84:6 85:3
86:3

**verbal** 6:9

**veritext** 84:1,7
87:1

**veritext.com.**
84:17

**verse** 14:6

**version** 80:15

**video** 4:18,19
4:19 61:22

**vitae** 25:25

**w**

**w** 2:10

**waived** 3:7
84:19

**walk** 47:4

**want** 5:24 7:22
18:18,21 23:15
31:8,11,15
33:11 34:11
53:16 61:8
63:7 80:3

**warehouse**
43:12 44:5,16

**warm** 43:17,18

**watch** 46:4

**watching** 47:7

**way** 8:3 24:12
51:6 75:11
83:14

**we've** 61:7

**webster** 2:11

**week** 44:17

**weeks** 67:23

**welcome** 73:6
76:13

**went** 46:9 56:4
56:4 58:3,6
61:2 70:12

**whereof** 83:16

**wish** 73:2

**witness** 3:8,13
3:15 4:1 9:4
13:15,21 14:1
14:9,15,22,24
15:4 17:5

23:17 27:2,16
28:6 52:22
56:24 60:24
61:4 73:6
76:13 79:19
80:18 83:8,11
83:16 84:8,11
85:1,4,11 86:1
86:4,15

**witness'** 84:14

**words** 57:14
58:17

**work** 11:24
12:6,14 13:4
39:3,4 43:9
44:15,19,25
45:25 47:2
56:4,7 64:18
68:2,8,12,18,23
68:24 69:14,17
70:6,12 71:8
71:11

**worked** 11:13
11:25 12:2,4
12:10,11 44:2
44:10,18

**working** 43:21
43:25 44:20
46:13 64:8

**works** 77:1

**would've** 55:9
55:16

**wrap** 34:10

**write** 9:17 72:2
72:4

**writing** 31:5

**written** 79:23

**x**

**x** 1:2,9 71:17
81:1 82:1

**y**

**yeah** 5:21
12:25 14:9,10
15:2,4 17:6
28:8 30:7
31:10 32:16
39:2,10 40:3,7
41:23 43:5
44:1 45:9,10
46:8 53:25
57:16 62:25
69:1,24 70:14
70:21 75:11,11
76:5 78:13

**year** 11:25 12:8
15:19,20 18:3
32:14,16,18
36:4,9,17,20
43:13,15 59:22
64:1

**years** 10:21
11:5,5 12:15
12:18,22 55:9

**yep** 17:23 39:5

**york** 1:19 2:6
4:3 83:3,4,7

**[zoom - zoom]**                                          Page 18

| z |
|---|
| **zoom**   4:18,20 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.